

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 5, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **VANTAGE BENEFITS** | § | **CASE NO. 18-31351-SGJ-7** |
| **ADMINISTRATORS, INC.,** | § | |
| Debtor. | § | (Chapter 7) |

---

| | | |
|---|---|---|
| **JEFFREY MIMS, as Chapter 7** | § | |
| **Trustee for Vantage Benefits** | § | |
| **Administrators, Inc.,** | § | **Adversary No. 20-03055** |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| **MATRIX TRUST COMPANY, MATRIX** | § | |
| **SETTLEMENT & CLEARANCE** | § | |
| **SERVICES, LLC, JEFFREY RICHIE,** | § | |
| **and WENDY RICHIE,** | § | |
| Defendants, | § | |

## MEMORANDUM OPINION AND ORDER ON MATRIX DEFENDANTS' MOTION TO DISMISS: (A) DENYING IT AS TO COUNTS 1-3 & 6-7; (B) GRANTING IT AS TO

**COUNT 4 (WITH CONSENT OF PLAINTIFF);[1] AND (C) GRANTING PLAINTIFF 14 DAYS' LEAVE TO AMEND AS TO COUNTS 8-10[2]**

### A. Introduction

The above-referenced adversary proceeding ("Adversary Proceeding") relates to the Chapter 7 bankruptcy case of Vantage Benefits Administrators, Inc. ("Vantage"). According to the live complaint ("Second Amended Compliant" or "SAC") in this Adversary Proceeding, Vantage was founded in or about 1997, and its primary business activity was providing a full spectrum of services as a "third-party administrator" ("TPA") for numerous employee retirement benefit plans of several third-party companies.[3]

TPAs, like Vantage, contract with clients/companies to provide services such as record-keeping, processing of plan participants' requests for distributions, and providing information to participants about their accounts. Vantage charged fees for its TPA services. Vantage had 50 employees. Significant to this Adversary Proceeding, Vantage did not actually handle the retirement funds—rather it contracted out the custodial services for the retirement accounts to two entities referred to as the "Matrix Defendants" in this Adversary Proceeding (who are later defined). The relationship among Vantage and the Matrix Defendants was memorialized in: (a) a "Services Agreement"[4] dated September 27, 2012, to which Vantage and both Matrix Defendants were parties; and (b) various "Custodial Account Agreements" to which Vantage, Vantage's clients, and one of the Matrix Defendants was a party.

---

[1] As later explained herein, Plaintiff is given 14 days' leave to amend his Count 1, to incorporate Plaintiff's Count 4 theories into his Count 1 breach of contract claim.

[2] As later explained herein, in the event Plaintiff does not amend Counts 8-10, this court will send this Memorandum and Opinion to the District Court, with a cover Report and Recommendation that it dismiss Counts 8-10, with prejudice to Plaintiff's re-filing them.

[3] Vantage also had a more recently established "fiduciary services" line of business with 10-15 clients and developed related software.

[4] This Services Agreement should not be confused with separate services agreements that Vantage had with clients to whom it provided TPA services.

An involuntary Chapter 7 bankruptcy petition was filed against Vantage by certain of its creditors on April 19, 2018. The involuntary petition was commenced approximately six months after Vantage's headquarters were raided by the Federal Bureau of Investigation ("FBI") on October 25, 2017, and its co-owners, Jeff and Wendy Richie (the "Richies"), husband and wife, were arrested for (and later pleaded guilty, in June 2020, to) a massive embezzlement scheme. The embezzlement scheme involved unauthorized distribution requests sent by the Richies to the Matrix Defendants, requesting transfers of funds from 13 different pension plans and 7 retirement plan accounts that Vantage administered, which occurred over several years, and resulted in the theft of millions of dollars. Some of these retirement plans were those of large and impressive clients such as Texas A&M University Optional Retirement Plan, Dallas County Community College, and Collin County Community College. Certain employees of Vantage were whistleblowers—having reported irregularities and concerns to federal officials. More specifically, the Adversary Proceeding involves allegations that the Richies created and transmitted false and illegal "distribution requests" to the Matrix Defendants, requesting disbursements of funds allegedly on behalf of plan participants, but the funds were requested to go (and went) to *a Vantage operating account* and, in some cases, to the Richies' *personal bank accounts*.

The Chapter 7 bankruptcy trustee is the Plaintiff in this Adversary Proceeding. The theory of his case is that the Matrix Defendants "enabled" the Richies' embezzlement of funds by failure to provide statements or online access to plans (which presumably would have contradicted the fabricated account statements and information on the Vantage website that was being created by the Richies); creating and providing software which allowed "under the table" payment requests by the Richies; and failing to send mandatory IRS Form 1099s for the illegal

3

payments. The Trustee further alleges that the Matrix Defendants' utilization of a highly automated business model (*e.g.,* use of certain software called "BridgeNet")—allegedly involving little if any human review and aimed at reducing costs—likely prevented the Matrix Defendants from seeing "red flags" that might have revealed the embezzlement. For example, "all or substantially all of the transfers (there were hundreds) by Matrix were made to the same account—the Vantage operating account—despite the fact that the transfers were purportedly 'disbursements' or 'distributions' to individual plan participants." SAC, ¶ 45.

In summary, the Trustee argues that the Matrix Defendants' overall way of doing business "made it easy" for the Richies to embezzle in the manner they did—the Matrix Defendants had exclusive control over plan assets, and they did not implement appropriate measures and controls. The Matrix Defendants earned transaction-based fees for making the various illegal payments. The Matrix Defendants allegedly also did not report the various payments to the plan beneficiaries or to the IRS as legally required. All of the collective actions of the Matrix Defendants and the Richies are alleged to have destroyed the business of Vantage—which, prior to these activities of the Richies—had been a legitimate TPA.

The Trustee filed his original complaint on April 6, 2020 and the Second Amended Complaint on November 16, 2020, which asserts 10 causes of action (nine of which are against the Matrix Defendants):

- **Count 1** – **Breach of Contract** against the Matrix Defendants (with respect to the Services Agreement);

- **Count 2** – **Negligence** against the Matrix Defendants (breach of duty to Vantage to act as a reasonable, prudent custodian);

- **Count 3 – Willful Misconduct and Gross Negligence** against the Matrix Defendants (conduct in performing under the Services Agreement was allegedly reckless and involved extreme risk);

- **Count 4 – UCC[5] Duty of Good Faith and Commercial Reasonableness** against the Matrix Defendants (Services Agreement is alleged to have been governed by the UCC and there was an unwaivable obligation of good faith and commercial reasonableness in the performance thereof);

- **Count 5 – State Law Breach of Fiduciary Duties by the Richies** (asserted against Richies only);

- **Count 6 – State Law Participation in Breach of Fiduciary Duties and Aiding and Abetting** the Richies' Breach of Fiduciary Duties, against the Matrix Defendants;

- **Count 7 – State Law Breach of Fiduciary Duties as Agent** against the Matrix Defendants (as alleged agents of Vantage);

- **Count 8 – ERISA[6] Breach of Fiduciary Duties** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only);

- **Count 9 – ERISA Prohibited Transactions** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only); and

- **Count 10 – ERISA Co-Fiduciary Liability** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only)

---

[5] "UCC" refers to the Uniform Commercial Code.
[6] "ERISA" refers to the Employee Retirement Income Security Act of 1974 (Pub. L. 93-406, 88 Stat. 829, enacted Sept. 2, 1974, codified in part at 29 U.S.C. § 1001 et seq.).

**B. Motion to Dismiss**

Pending before the court is a Motion to Dismiss and Memorandum in Support Thereof ("Motion to Dismiss") filed by the Matrix Defendants. The Matrix Defendants seek to dismiss all claims brought against them in the SAC under theories of ***lack of standing***, the doctrine of ***in pari delicto***, and for ***failure to state*** a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (which is made applicable in this adversary proceeding pursuant to Bankruptcy Rule 7012).

Further, as to Counts 2, 3, 6, and 7 (*i.e.,* the various state law tort claims), the Matrix Defendants argue such claims are ***barred by contract and economic-loss doctrines*** under New York law, in that they are based on the same conduct and duties as the breach of contract claim. Additionally, the Matrix Defendants seek to dismiss Count 4 for breach of the UCC duties of good faith and commercial reasonableness, contending that it is ***not an independent cause of action***.[7]

Notably, the Matrix Defendants contend that New York law should apply in this Adversary Proceeding, due to a choice of law provision in the Services Agreement. On the contrary, the Trustee argues that Texas law applies, since New York has no substantial relationship to the Services Agreement, the parties, or their acts, and Vantage was engaged in business in Texas. Neither side has fully addressed the application of both New York and Texas law as to each claim asserted and, instead, has analyzed each claim under the law that each respective side thinks applies.[8]

---

[7] For clarity, Count 5 is not being asserted against the Matrix Defendants—only against the Richies—and is not addressed by the Motion to Dismiss.

[8] While the Services Agreement includes a New York choice of law provision (*see* Matrix Defendants' App. 325, DE # 49 in the AP), the court notes that the exemplar Custodial Account Agreement has a Colorado choice of law provision (*see* Matrix Defendants' App. 347, DE # 49 in the AP).

In deciding the Motion to Dismiss, the court refers to: (1) the SAC [DE # 43 in the AP][9], (2) the Motion to Dismiss and Brief in Support [DE ## 45 & 48 in the AP], (3) the Trustee's Response Opposed to the Motion to Dismiss and Brief in Support [DE ## 54 & 55 in the AP], and (4) Matrix's Reply to the Trustee's Response [DE # 56 in the AP]. Based upon the facts alleged in the SAC and the arguments presented to the court, the court rules as follows on the Motion to Dismiss:  (a) it is denied as to Counts 1-3 and 6-7; (b) Count 4 is dismissed by consent of the Trustee and the Matrix Defendants, but the Trustee is granted leave to amend Count 1 to incorporate the UCC-related arguments into Count 1 as part of the breach of contract claim;[10] (c) the court will recommend that the District Court dismiss Counts 8-10—the ERISA claims—unless, within 14 days of this Order, the Trustee further amends the SAC, to establish *statutory standing*, as articulated in this Order, under ERISA and the Bankruptcy Code.  To be clear, the court is granting the Trustee leave to amend Counts 1, 8, 9, and 10.  But if Counts 8, 9, and 10 are not timely amended, this court will make a Report and Recommendation to the District Court that Counts 8-10 be finally dismissed.

### C. Jurisdiction

This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.

However, on May 21, 2020, the Matrix Defendants filed an unopposed motion to withdraw the reference seeking a jury trial in this Adversary Proceeding in the District Court. The Trustee

---

[9] References to "DE # ___ in the AP" refer to the docket entry number at which a pleading appears in the Bankruptcy Clerk's docket maintained in the Adversary Proceeding.

[10] This is consistent with what was announced at the hearing on the Motion to Dismiss, held on March 10, 2021. The court hastens to add that it is highly skeptical as to the UCC's application to the Services Agreement and Custodial Account Agreements, since they do not involve a sale of goods, lease of goods, or secured transactions.

and the Matrix Defendants have stipulated that: (i) all of the claims asserted by the Trustee in the Adversary Proceeding are non-core claims, (ii) the Trustee's claims and the Matrix Defendants' defenses thereto are all to be tried by the District Court, and (iii) the Matrix Defendants and the Trustee are entitled to a jury trial. The Trustee and the Matrix Defendants agree that the bankruptcy court will hear pretrial matters in this Adversary Proceeding. Accordingly, the bankruptcy court previously submitted its Report and Recommendation [DE #35 in the AP] to the District Court, which adopted the bankruptcy court's Report and Recommendation withdrawing the reference but deferring all pretrial matters to the bankruptcy court.

### D. Parties

Plaintiff, Jeffrey Mims, is the Chapter 7 trustee for the bankruptcy estate of Vantage, duly appointed after entry of an order of relief by the United States Bankruptcy Court of the Northern District of Texas, Dallas Division on June 5, 2018.

The Debtor, Vantage, was a corporation formed under the laws of California with its principal place of business at 1201 Elm Street, Suite 1600, Dallas, TX 75270. Vantage was a TPA for its own employee benefit plan and 21 other employee benefit plans located primarily in Texas but also throughout the country. The majority of the plans were ERISA-qualified, while some were exempt from ERISA.

Defendant Matrix Trust Company ("Matrix Trust") is a Colorado chartered bank which served as the custodian for the plans that Vantage administered. It contracted with Vantage to provide its services through the Services Agreement, dated September 27, 2012, earlier mentioned. It also contracted with Vantage *and* the various retirement plans through a separate form of agreement called a Custodial Account Agreement (various dates). As custodian, Matrix Trust maintained possession of all the plan assets, including cash and securities. Matrix Trust used a

single bank account to write checks and direct wire transfers for every single disbursement for all of the plans.

Defendant Matrix Settlement & Clearance Services, LLC ("Matrix Clearance," and together with Matrix Trust, the "Matrix Defendants") is an affiliate of Matrix Trust and both companies operate under the same parent companies. The SAC does not indicate in which jurisdiction Matrix Clearance was formed, but the Services Agreement (attached to the Motion to Dismiss) indicates that it is a New York limited liability company. Matrix Clearance also contracted with Vantage, as a party to the Services Agreement, to perform custodial services for Vantage. It appears from the allegations that Matrix Clearance acted as the intermediary between Matrix Trust and Vantage.

Defendants Jeffrey and Wendy Richie were last known to be residents of Dallas County, Texas and last worked at 1201 Elm Street, Suite 1600, Dallas, TX 75270. Jeffrey Richie founded Vantage in 1997 and was the President and CEO of Vantage. Wendy Richie, his wife, was the Vice President of Administration of Vantage. Each was indicted and pleaded guilty to theft from an employee benefit plan, as well as aggravated identity theft (Wendy Richie) and aiding and abetting (Jeffrey Richie). The United States District Court of the Northern District of Texas sentenced Wendy Richie to 132 months in prison and Jeffrey Richie to 87 months in prison on December 4, 2020.

### E. Legal Standard Applicable to the Motion to Dismiss

In evaluating a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint is to be charitably construed, with all well-pleaded factual allegations being accepted as true and with any reasonable inferences from those facts being drawn in favor of the non-moving

party (here, the Trustee).[11] "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[12] Moreover, "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[13] In 2009, the Supreme Court clarified the *Twombly* pleading standard and elaborated that, to survive a motion to dismiss, a civil complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."[14]

In ruling on a Rule 12(b)(6) motion, the material to which the court may refer is limited, and the court should not look beyond the pleadings.[15] The pleadings include the complaint and any documents attached to it.[16] However, the Fifth Circuit has recognized "[t]he court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims."[17] Here, the Matrix Defendants attached a 675-page appendix to the Motion to Dismiss. At the hearing on the Motion to Dismiss, the court denied consideration of any of the documents attached to the Motion to Dismiss, except for the Services Agreement. The Trustee conceded the Services Agreement was referred to in the SAC and is central to his claims asserted.[18]

---

[11] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

[12] *Id.* at 555 ; *Colony Ins. Co.*, 647 F.3d 248, 252 (5th Cir. 2011).

[13] *Twombly*, 550 U.S. at 555-56.

[14] *Ashcroft v. Iqbal*, 556 U.S. 662, 678-680 (2009) (the Court also affirmed the *Twombly* two-pronged approach to deciding motions to dismiss: first, determine what is a factual allegation versus a legal conclusion, as only factual allegations will be accepted as true; and second, determine whether the factual allegations state a plausible claim for relief).

[15] *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

[16] *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

[17] *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citing *Collins*, 224 F.3d at 498-99).

[18] This court has decided, post-hearing, to also consider the exemplar form of Custodial Account Agreement, as part of considering the Motion to Dismiss, as the court concludes it is also central to the claims asserted by the Trustee (*see* Matrix Defendants' App. 325 & 347, DE # 49 in the AP). *Collins*, 224 F.3d at 498-99.

### E. Analysis of the Motion to Dismiss

#### a. Standing

In the Motion to Dismiss, the Matrix Defendants have argued that the Trustee lacks standing to bring any of the claims he has alleged against them. To understand this issue, the court focuses first on (i) Counts 1-3 & 6-7 (*i.e.,* the breach of contract and state law tort claims that are allegedly ***owned by and brought on behalf of the Vantage estate***) and then on (ii) Counts 8-10 (the ERISA claims that are allegedly ***owned by and brought on behalf of the Vantage 401(k) plan***— that is, the retirement plan of the Vantage employees, as opposed to the other retirement plans Vantage administered for various third-party clients).

Distilled to its essence, the standing argument of the Matrix Defendants made regarding the breach of contract and state law tort claims seems primarily based on an argument that— regardless of labels used and damages alleged—the Trustee is seeking to recover funds that ***are not owed to the Vantage bankruptcy estate*** but, rather, are ***owed to the retirement plans themselves and the beneficiaries of those plans***. This appears to be an ***Article III standing*** argument.

In contrast, the standing argument of the Matrix Defendants with respect to the ERISA claims (Counts 8-10) seems primarily based on an argument that the Trustee lacks ***statutory standing under ERISA and the Bankruptcy Code*** to bring these counts, because the Trustee is not currently the plan administrator as to the Vantage 401(k) plan. The argument alleges the plan is defunct and there was nothing for the Trustee to administer as of the time the Vantage bankruptcy case was commenced. Each of these standing arguments are discussed in order below.

### 1. Article III Standing as to the Breach of Contract and Tort Claims (Counts 1-3 & 6-7).

The court starts with the general premise that a Chapter 7 Trustee has capacity to pursue litigation claims *owned by the bankruptcy estate*. 11 U.S.C. § 323(b). A chapter 7 trustee is also charged with (among other things) collecting and reducing to money the property of the bankruptcy estate. 11 U.S.C. § 704(a). Property of the estate is broadly defined to include "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Property of the estate includes causes of action. A cause of action belongs to a bankruptcy estate where it "explicitly or implicitly allege[s] harm to the debtor" and "the debtor could have raised the claim as of the commencement of the [bankruptcy] case."[19]

With regard to Counts 1-3 and 6-7, they are breach of contract and various state law tort claims. There were obviously contracts (*i.e.,* the Services Agreement and the Custodial Account Agreements) among Vantage and the Matrix Defendants, as well as a multi-year business relationship and transactions among them. Regardless of labels or theories, the Matrix Defendants argue that the Trustee is simply attempting to recover damages for an amount equal to the funds that the Matrix Defendants allegedly disbursed improperly from the various third-party retirement plan accounts for which Vantage served as a TPA. The harms, they argue, were suffered by the *plan beneficiaries*, not Vantage. They cite certain Supreme Court and Fourth Circuit authority standing for the proposition that bankruptcy trustees lack standing to assert claims on *behalf of creditors* and are not authorized to collect money *not owed to the estate*.[20] According to the Matrix Defendants, the right to bring any claim pertaining to funds that were misappropriated from third-

---

[19] *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust),* 25 F.3d 1281, 1284 (5th Cir. 1994).

[20] *See, e.g., Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 428 (1972); *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 511 (4th Cir. 2005).

party retirement plans belongs to ***the retirement-plan creditors*** whose funds were misappropriated, and ***not the Trustee*** on behalf of Vantage. The Matrix Defendants cite to prior holdings of the bankruptcy court pertaining to who owns claims pertaining to retirement plan losses. *See* Order dated 7/17/20, DE # 138 in underlying Bankruptcy Case # 18-31351.

In the Supreme Court's *Lujan* case, it stated that, in order for constitutional standing under Article III to exist, there must be three elements present as to each claim or cause of action: (1) injury in fact, (2) a causal connection, and (3) redressability.[21] First, injury in fact requires there to be an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'"[22] "Second, there must be a causal connection between the injury and the conduct complained of, the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of an independent action of some third party not before the court.'"[23] Finally, for a harm to have redressability, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"[24]

An opinion entitled *Osherow v. York* dealt with a standing argument in a situation that was analogous to this case.[25] In *Osherow*, two principals of a debtor had used investor funds, that were meant to be held in escrow by a third-party bank, for illicit purposes (including running a pyramid scheme) after the bank made allegedly improper distributions under the applicable contract. There, similar to the Matrix Defendants in this case, the bank made the argument that the bankruptcy trustee, Mr. Osherow, lacked standing to bring his suit because he was essentially alleging damages that were suffered by the investors, not damages that were suffered by the debtor itself. The bank

---

[21] *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).
[22] *Id.* at 560.
[23] *Id.*
[24] *Id.* at 561.
[25] No. 5:17-CV-483-DAE, 2019 WL 6048017 at *1-2 (W.D. Tex. August 5, 2019).

urged that, as there were improper distributions made to the debtor, no harm could have occurred to the debtor.[26] In response, the trustee argued that he indeed had standing to sue for breach of a contract, in that he was taking the place of a contractual counterparty (*i.e.,* the debtor), and the bank's breach of contract had caused money to be misappropriated that otherwise would have been out of the reach of the debtor's nefarious principals.[27]

The court in *Osherow* articulated two conclusions relevant to Article III standing. First, the debtor and the bank were parties to a contract, and "parties to a contract have standing to sue for breach of contract."[28] Second, ambiguity over the extent of damages does not strip a party of standing to bring a cause of action.[29]

Here, the Trustee has alleged a breach of contract claim in his SAC, Count 1, for Matrix's breach of the Services Agreement. Similar to *Osherow*, this court easily concludes that the Trustee has standing to sue for breach of a contract (*i.e.,* the Service Agreement) to which both the Debtor and the Matrix Defendants were parties.  This is a cause of action that might have been asserted by Vantage—as a party to the Services Agreement—and, thus, was inherited by the Trustee. Moreover, all of the state law torts (Counts 2-3 and 6-7) likewise pertain to the direct dealings and transactions among Vantage and the Matrix Defendants pursuant to the Services Agreement and Custodial Account Agreements. Vantage itself—not merely the retirement plan beneficiaries— had rights, obligations, and legally cognizable interests vis-à-vis these agreements. As with any contractual relationship, several duties automatically flowed back and forth among the parties. The Matrix Defendants had certain duties with regard to Vantage, pursuant to the Services Agreement,

---

[26] *Id.* at *4-5.
[27] *Id.* at *5.
[28] *Id.*
[29] *Id.*

and Matrix Trust had certain duties with regard to Vantage and the retirement plan participants pursuant to the Custodial Account Agreements.

Additionally, "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct."[30]  The Trustee's claims against the Matrix Defendants, as pleaded, are based primarily on the Debtor's separate contract and relationship with the Matrix Defendants. The claims are plausibly pleaded as wholly independent from duties that the Matrix Defendants owed to third parties.  The SAC explicitly or implicitly alleges harm to Vantage, and it appears that Vantage could have raised the claims as of the commencement of the bankruptcy case.

Next, in establishing injury in fact, this court agrees with the reasoning regarding damages set out in *Osherow*—ambiguity regarding the amount of damages does not deprive a party of standing. Again, the Matrix Defendants point to the Trustee alleging the same amount of damages as the amounts disbursed improperly from the various third-party retirement plans as being damages belonging to retirement-plan creditors. However, the Trustee has pleaded in the SAC that ***Vantage suffered harms outside of those suffered by the retirement-plan creditors***. The Trustee has alleged that the ultimate destruction of the Vantage enterprise, through a loss of revenue from its three lines of business and millions in judgments brought against it due to the alleged wrongdoing of the Richies and the Matrix Defendants, resulted in independent damage to Vantage.[31] The damages asserted purport to reflect a readily available number that the Trustee can assign to the alleged harms caused by the Matrix Defendants, until discovery can be conducted to assign a more certain and particularized amount of damages to the alleged wrongdoing. Any

---

[30] *Highland Capital Mgmt. LP, et. al., v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 584 (5th Cir. 2008).
[31] SAC, DE #43 in the AP, at ¶ 92.

ambiguity of damages is not enough to strip the Trustee of standing. The possibility that the Vantage enterprise suffered injury due to the alleged actions/inactions of the Matrix Defendants is not pure speculation and fantasy.[32]

The other two elements of Article III standing under *Lujan* were not addressed in the Motion to Dismiss, but the court concludes that a sufficient causal connection and redressability have been plausibly pleaded in the SAC. Thus, in summary, the Trustee—in the shoes of Vantage—has plausibly articulated Article III standing with regard to the breach of contract and state law tort claims (Counts 1-3 and 6-7).[33]

### 2. Statutory Standing as to the ERISA Claims Brought on Behalf of the Vantage 401(k) Plan (Counts 8-10)

With regard to Counts 8-10, the Trustee does not allege that these Counts are owned by or brought on behalf of ***the Vantage bankruptcy estate***. Rather, he alleges that they are owned by and brought ***on behalf of the Vantage 401(k) plan*** that was established for the benefit of Vantage's employees (in contrast to the various other retirement plans that Vantage administered for third-party clients' employees). The Trustee alleges he has standing to bring these claims because Vantage was formerly the plan administrator for the Vantage 401(k) plan and, thus, was a "fiduciary" which could bring suit on the plan's behalf. The Trustee has essentially inherited standing from Vantage, as its bankruptcy estate representative.

---

[32] *See Lujan*, 504 U.S. at 567.

[33] Having concluded the Trustee has constitutional standing to pursue Counts 1-3 and 6-7 since he has plausibly pleaded injury to the Vantage estate and the other *Lujan* factors, the court further concludes that statutory standing is not an issue here and easily exists, due to sections 323(b), 541(a)(1), and 704(a) of the Bankruptcy Code, as earlier referenced.

Generally speaking, in order to have statutory standing and a right to recover damages, a plaintiff must fall within a class of people defined by Congress as having a private right of action. Here, it is appropriate to consult both ERISA and the Bankruptcy Code.[34]

Under ERISA, several parties have standing to pursue a private right of action for breaches of ERISA's provisions with regard to an employee benefit plan: (a) plan participants, (b) plan beneficiaries, (c) the Secretary of Labor, and (d) fiduciaries of the plan. The persons empowered to bring civil actions are found at 29 U.S.C. § 1132(a), which provides:

(a) Persons empowered to bring a civil action: A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) *by the Secretary, or by a participant, beneficiary or fiduciary* for appropriate relief under section 1109 of this title[35] (emphasis added);

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

---

[34] This discussion of statutory standing *only* with regard to Counts 8-10 should not be interpreted to suggest that constitutional standing need not be analyzed. Constitutional standing always must be considered with regard to any cause of action (although Congress may sometimes modify or define what is an injury in fact). *See Lujan*, 504 U.S. at 578. However, there appears to be no genuine dispute that this is a situation in which a concrete injury has been suffered by many persons who were beneficiaries/plan participants in the Vantage 401(k) plan and that the three *Lujan* factors are plausibly present. The issue is whom, *by statute*, may bring a cause of action for the Vantage 401(k) plan (an ERISA-qualified plan).

[35] 29 U.S.C. § 1109. Liability for breach of fiduciary duty

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

…

Since the Trustee is not a plan participant, a plan beneficiary, nor the Secretary of Labor, the question is whether he is a ***fiduciary*** for purposes of this ERISA statute. A "person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A). The term ''fiduciary'' is liberally construed in keeping with the remedial purpose of ERISA.[36]

Here, the Debtor, Vantage, undoubtedly was an ERISA fiduciary for multiple plans for which it served as TPA—including being a fiduciary of its own 401(k) plan (the only one that is at issue here). But what about a bankruptcy trustee? The Bankruptcy Code includes a provision defining the obligation of a bankruptcy trustee to step into the shoes of a debtor who is an ERISA plan administrator. Section 704(a)(11) of the Bankruptcy Code provides in relevant part:

(a) The trustee shall—

…

(11) if, at the time of the commencement of the case, the debtor (or any entity designated by the debtor) served as the administrator (as defined in section 3 of the Employee Retirement Income Security Act of 1974) of an employee benefit plan, continue to perform the obligations required of the administrator; and

…

11 U.S.C. § 704(a)(11). In other words, section 704(a)(11) requires a chapter 7 trustee to perform the obligations required of the ERISA plan administrator if the debtor served as an

---

[36]*Am. Fed. of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the United States,* 841 F.2d 658, 662 (5th Cir.1988).

18

administrator at the time the bankruptcy case was commenced. Thus, it seems plausible that a trustee should be able to bring suit, if the debtor served as a plan administrator as of the time of the commencement of the case, as part of his "obligations" under section 704(a)(11)—particularly if no other party—not a plan participant or beneficiary or the Secretary of Labor—is bringing a suit when harm is alleged.

The Matrix Defendants argue that the language of section 704(a)(11) requires Vantage to have been acting as an administrator at the commencement of the bankruptcy case, or else the Trustee is unable to step into the shoes of the Debtor as an ERISA administrator. They argue that the Debtor was *not* acting as an administrator of the Vantage 401(k) plan at the time of the commencement of the bankruptcy case, as the plan was "defunct" and Vantage had been essentially shut down. Further, the Matrix Defendants argue that neither a former, nor successor, fiduciary is included by 29 U.S.C. 1132(a) as a "fiduciary."

The Trustee in his SAC does not, in fact, plead that Vantage was acting as the administrator of its own 401(k) retirement plan *at the time of the commencement of the bankruptcy case* but calls the Matrix Defendants' distinction between former and current fiduciaries a red herring in his Response to the Motion to Dismiss. The Sixth Circuit has addressed the standing distinction between current and former fiduciaries, through dicta, determining that if a trustee "had not been a plan fiduciary when this lawsuit was originally filed, he would have had no authority to bring the action under ERISA in the first place."[37] The Eighth Circuit addressed the distinction in *Blackmar v. Lichtenstein* when it determined, once the former trustee was replaced by his successor trustee, he ceased to be a fiduciary under ERISA and "no longer had the capacity to sue for violations which may have occurred" under ERISA.[38] To be clear, here, the Trustee has only

---

[37] *Corbin v. Blankenburg*, 29 F.3d 650, 652-53 (6th Cir. 1994).
[38] 603 F.2d 1306, 1310 (8th Cir. 1979).

pleaded the administrator status of the Debtor in the *past tense*. The Trustee has pleaded that the Debtor "was" a fiduciary or "had been" acting as a fiduciary prior to the Petition Date, but never explicitly states that the Debtor was acting as a fiduciary at the Petition Date.[39]

It is not clear to this court—based on the SAC as pleaded—whether Vantage was still technically in place as an administrator and fiduciary as of the commencement of the bankruptcy case. Thus, it is unclear if Vantage was a "fiduciary" with standing under 29 U.S.C. § 1132, so that the Trustee could then step into Vantage's place as a plan fiduciary, pursuant to section 704(a)(11). Moreover, it is not clear to this court—based on the SAC as pleaded and the authorities presented by the parties—whether the Trustee in this situation (where there is presumably a *defunct plan* and there was never a *successor* plan administrator appointed, post-Vantage)—would have section 29 U.S.C. § 1132 standing to pursue a cause of action on behalf of the defunct plan. Frankly, the literal wording of section 704(a)(11) does not seem to support standing even in the context of a defunct plan—if Vantage was not in any way acting as an administrator at the time of the commencement of the case.

Accordingly, the court finds that the Trustee has not pleaded sufficient statutory standing under ERISA or section 704(a)(11) of the Bankruptcy Code to bring the ERISA Claims (Counts 8-10). The court will grant leave of 14 days for the Trustee to further amend the SAC as to the ERISA Claims, Counts 8-10, to attempt to establish statutory standing under ERISA and the Bankruptcy Code by pleading, among other things, *that Vantage was still a plan administrator/fiduciary at the commencement of the bankruptcy case* and, thus, the Trustee stepped into its shoes. The court hastens to add that: (a) there are other parties with standing to bring these ERISA Counts (plan participants, beneficiaries, and the Secretary of Labor); and (b) it

---

[39] SAC, DE # 43 in the AP, at ¶ 120.

would appear that any recovery under Counts 8-10 would go to the Vantage 401(k) and its beneficiaries, not the bankruptcy estate as a whole.

### b. Choice of Law

Before this court can address the remaining arguments in the Motion to Dismiss, including whether the claims are barred by the doctrine of *in pari delicto* and whether the Trustee has otherwise failed to state a claim upon which relief can be granted, the court must address the choice of law conundrum here. The Trustee's SAC assumes that Texas law applies, and the Matrix Defendants contend that New York law applies. This is significant because there could be different results in this lawsuit depending on which law applies—for example, New York law has developed quite differently with regard to the *in pari delicto* doctrine.

Starting with the Matrix Defendants, they point to a choice of law provision in the Services Agreement that was entered into among the Debtor and the Matrix Defendants pre-petition. The choice of law provision states as follows:

> Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law principles thereof.

Further, they point to the Restatement (Second) Conflicts of Laws § 187 ("Restatement"),[40] which states as follows:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not

---

[40] Both the Fifth Circuit and Texas courts have stated that the choice-of-law analysis in the Restatement provides the appropriate analytical framework. *See Fishback Nursery v. PNC Bank*, 920 F.3d 932, 935-936 (5th Cir. 2019); *In re MC Asset Recovery, LLC v. Commerzbank A.G, et al. (In re Mirant Corp.)*, 675 F.3d 530, 536 (5th Cir. 2012); *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014), *reh'g denied* (Feb 27. 2015).

have resolved by an explicit provision in their agreement directed to that issue, unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of s 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

The Matrix Defendants further argue, in their Reply, that Section 187(2) is inapplicable and, even if it were to apply in this situation, the Trustee has failed "to carry his burden"[41] that subsection (a) or (b) are met. The Matrix Defendants contend that subsection (a) is not met because Matrix Clearance was a New York limited-liability company and that alone creates a substantial relationship to New York. Second, the Matrix Defendants argue that, under Fifth Circuit law, the choice of law provision is still enforceable if the parties "had a reasonable basis for their choice."[42] Finally, the Matrix Defendants argue that subsection (b) has not been met because the Trustee has not pleaded that applying New York law "would be contrary to a fundamental policy" of Texas.

The Trustee, in his Response, takes a more methodical approach on this choice of law conundrum. First, he notes that a federal court sitting in a diversity case applies the choice of law rules of the forum state (this court notes that, while this is an Adversary Proceeding rooted in bankruptcy subject matter jurisdiction, not diversity jurisdiction, courts have applied the choice of law rules of the forum state in the bankruptcy adversary proceeding context as well).[43] Second, the Trustee notes that Texas has adopted the Restatement approach to contractual choice of law provisions, and that the default position is that they are enforceable (*i.e.,* the "party autonomy rule"

---

[41] Reply, DE # 56 in AP, at p.3.

[42] *Drennen*, 452 S.W.3d at 325.

[43] *See Mirant Corp.,* 675 F.3d at 536.

typically applies), unless the chosen law has no substantial relationship to the parties or the transaction or application of the law chosen would be contrary to a fundamental policy of a state that has a materially greater interest than the chosen state in the determination of a particular issue. The Trustee argues that there is simply no substantial relationship to New York to warrant application of the choice of law provision in the Services Agreement, and Texas has the most significant relationship to the dispute. The Trustee argues in similar fashion that the UCC-related claims are not subject to the choice of law provision because there is no "reasonable relation" to the transactions at issue.[44] Further, the Trustee argues that the choice of law provision in the Services Agreement is not capable of encapsulating the *tort* claims asserted in this Adversary Proceeding, because it cannot be read to go beyond the formation and breach of the contract at issue.[45]

This court first agrees with the Trustee that this court should apply the law of the forum state, Texas, in undertaking this choice of law analysis. And Texas law does, indeed, recognize the "party autonomy rule," pursuant to which parties can agree to be governed by the law of another state and, thus, the "default position" is that choice of law provisions are enforceable.[46] However, it is not uncommon for a party to overcome a choice of law provision.[47] The Fifth Circuit has specifically stated in the *Cardoni* case (among others) that, "[c]ontractual choice-of-law provisions are not so unassailable. Unlike arbitration and forum selection clauses, which dictate where a dispute will be heard, choice-of-law provisions dictate the law that will decide the dispute, and thus create more tension with a state's power to regulate conduct within its borders."[48] The Fifth

---

[44] *See* Tex. Bus. & Com. Code Ann. § 1.301.

[45] *See Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003).

[46] *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015) ("We are accustomed to giving effect to the knowing and voluntary agreement of parties, especially sophisticated ones.").

[47] *Id.* at 581.

[48] *Id.* at 580 (citations omitted) (in reviewing a preliminary injunction, court held that a choice of law provision in a noncompete agreement was likely unenforceable).

Circuit elaborated that a court must look at Section 187(2) of the Restatement and determine whether the state chosen in the choice of law provision has no substantial relationship to the parties or transaction and whether there is no reasonable basis for the choice, or whether the law chosen would be contrary to a fundamental policy of a state which would appear to have a material greater interest than the chosen state on an issue.[49] The "more significant relationship" determination is made by examining various contacts, including: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.[50] These contacts should be weighed by their quality rather than how many are met.[51] Moreover, the Fifth Circuit has held in the *Benchmark Electronics* case that, while Texas law generally defaults to choice of law clauses regarding construction of a contract, when a **narrow** choice of law provision is involved, **tort** claims will not be governed by the narrow choice of law provision and "Texas law requires an issue-by-issue choice of law analysis" in such a situation.[52] In the *Benchmark* case, there was a contract at issue with a narrow choice of law provision that simply provided: "Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York...."[53] This is virtually identical to the choice of law provision in the Services Agreement among Vantage and the Matrix Defendants. The Fifth Circuit held that it respected the parties' determination that their agreement would be construed under New York law, but the "contractual choice of law clause does not, however, address the parties' entire relationship; Benchmark's claims of fraud and negligent misrepresentation are not

---

[49] *Id.* at 581.
[50] *Id.* at 583.
[51] *Id.*
[52] 343 F.3d at 727.
[53] *Id.* at 726.

governed by the parties' narrow choice of law provision."[54] The Fifth Circuit held that Texas had "the dominant contacts with the parties and the transaction, while New York is an adventitious location, which, apart from the choice of law clause in the parties' contract, is simply the domain of the professionals" who documented the agreement at issue.[55]

This court concludes that the determination of whether New York versus Texas law should apply in this Adversary Proceeding must entail an intensely factual inquiry. The Trustee pleaded in the SAC that Vantage was located in Texas, the Richies were located in Texas, the funds misappropriated were transferred to accounts located in Texas, and the Matrix Defendants are located in Colorado.[56] Moreover, this court also notes that the sample Custodial Account Agreement that the Matrix Defendants submitted in their Appendix, unlike the Services Agreement, states that it is governed by *Colorado* law, not New York law.[57] Additionally, the choice of law provision in the Services Agreement is virtually identical to the one in *Benchmark* where the Fifth Circuit held that such a provision should not be applied to fraud and misrepresentation tort claims.

To be clear, it is *plausible* that Texas law applies to some or all of the claims the Trustee has asserted against the Matrix Defendants. This court cannot possibly ascertain at this stage of the litigation whether the choice of law provision in the Services Agreement should be enforced without going beyond the four corners of the SAC and Services Agreement. While Matrix Clearance is a New York limited liability, as per the Services Agreement, this is certainly not dispositive as to choice of law.[58] Accordingly, the court concludes that the Trustee has pleaded

---

[54] *Id.*

[55] *Id.* at 728.

[56] SAC, DE #43 in the AP, at ¶ 10-15. MSCS, one of the Matrix parties to the Services Agreement, was listed in Services Agreement as a New York limited liability company. The parties, as previously mentioned, stipulated that the Services Agreement would be considered with the SAC for the motion to dismiss phase.

[57] *See* Matrix Defendants' App., DE # 49 in the AP, at pgs. 325 & 347.

[58] *See Drennen*, 452 S.W.3d at 325.

enough facts in the SAC for this court to determine that Texas law ***could plausibly apply*** to all of the claims against the Matrix Defendants in the SAC—especially the tort claims.[59] Thus, since Texas law could plausibly apply (as contended by the Trustee), the court will analyze the Matrix Defendants' *in pari delicto* argument and their other Rule 12(b)(6) arguments through the lens of Texas law, to assess whether the Trustee has pleaded plausible claims.

### c. In Pari Delicto Doctrine

Pursuant to the reasoning above, the court will follow Texas law (and cases within the Fifth Circuit construing it) in assessing: (a) whether the Trustee has asserted plausible claims against the Matrix Defendants; and (b) whether the *in pari delicto* doctrine that has been raised defensively by the Matrix Defendants (as to all claims against them) bars or absolutely defeats the Trustee's claims as a matter of law.

The parties have not cited (and the court is not aware of) any Fifth Circuit opinion squarely addressing the *in pari delicto* doctrine in the context of a bankruptcy trustee.[60] However, the Fifth Circuit has stated, in the context of a receivership case, the following description of the doctrine of *in pari delicto:*

> The doctrine embodies "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct, and is undergirded by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Rogers v. McDorman,* 521 F.3d 381, 385 (5th Cir.2008) (internal quotation marks and footnote omitted). A court will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own acts have placed them. *In pari delicto* is an equitable, affirmative defense, which is controlled by state common law. *See Pinter v. Dahl*, 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d

---

[59] The SAC included locations of the parties being primarily in Texas, Debtor business (including that of the Richies) occurring within Texas, and the subject-matter funds of Texas entities being transferred improperly within Texas.

[60] There is a passing reference to a chapter 7 trustee being *in pari delicto* in the penultimate sentence of *Sandoz v. FDIC (In re Pernie Bailey Drilling Co., Inc.)*, 993 F.2d 67, 70 (5th Cir. 1993), but the reference seems to pertain solely to the trustee's accusation that a defendant-bank had taken "fatally inconsistent positions" in the litigation—with the Fifth Circuit suggesting that the trustee had also been inconsistent (*in pari delicto* literally means "in equal fault" in Latin).

658 (1988); *see also In re Food Mgmt. Grp.*, 380 B.R. 677, 693 (Bankr.S.D.N.Y.2008). [61]

Thus, *in pari delicto* is an equitable defense. It has sometimes been referred to as the "unlawful acts" rule in Texas.[62]

In the *Jones v. Wells Fargo* case quoted above, the Fifth Circuit affirmed the district court, which had declined to apply the doctrine to a receiver. In that case, Mr. Wahab, a principal of W Financial (the entity that had gone into a receivership), had—pre-receivership—gone to a Wells Fargo branch and obtained on behalf of W Financial a large cashier's check payable to the Lateefs. Mr. Wahab then went to another Wells Fargo branch and presented the check—which had never been seen, much less endorsed, by the Lateefs. Mr. Wahab instructed Wells Fargo to deposit the check into the bank account of another company that Mr. Wahab controlled. The receiver later sued Wells Fargo for conversion of the check, in following Mr. Wahab's instructions. Wells Fargo argued the defense of *in pari delicto* against the receiver, since Mr. Wahab, as a principal of W Financial, had played a central role in the conversion. The Fifth Circuit, in affirming the district court's rejection of this defense, stated:

> Wells Fargo's *in pari delicto* argument fails to acknowledge the important distinction between W Financial as a corporation and Wahab as an individual. While it is undisputed that Wahab played a central role in the conversion of the cashier's check, W Financial is composed of more than Wahab or the other individuals who operated the company. "The legal concept that a corporation is a distinct entity separate from its stockholders, officers and directors is fundamental to the law of corporation." *Wynne v. Adcock Pipe & Supply*, 761 S.W.2d 67, 68 (Tex.App.—San Antonio 1988) (citation omitted). A corporation is "separate and distinct from the members who comprise it, with attributes, rights, and liabilities of its *966 own," even though it must act through its officers or agents. *Hirsch v. Tex. Lawyers' Ins. Exch.*, 808 S.W.2d 561, 563 (Tex.App.—El Paso 1991); *see also*

---

[61] *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012).

[62] *Hill v. Day* (*In re Today's Destiny, Inc.*), 388 B.R. 737, 748 (Bankr. S.D. Tex. 2008). *See also Rico v. Flores*, 481 F.3d 234, 241-42 (5ᵗʰ Cir. 2007) (tracing the doctrine in Texas back to the case of *Gulf, Colorado & Santa Fe Railway Co. v. Johnson*, 71 Tex. 619, 9 S.W. 602, 603 (1988) ("It may be assumed, as undisputed doctrine, that no action will lie to recover a claim for damages if, to establish it, the plaintiff requires aid from an illegal transaction, or is under the necessity of showing or in any manner depending upon an illegal act to which he is a party ....")).

*Singh v. Duane Morris, L.L.P.*, 338 S.W.3d 176, 181–82 (Tex.App.—Houston [14 Dist.] 2011) ("A corporation is a separate legal entity from its shareholders, officers, and directors.") (citation omitted). To conclude that W Financial stands *in pari delicto* simply because Wahab is a wrongdoer ignores the fundamental distinction between a corporation and its officers. W Financial itself does not stand *in pari delicto* to Wells Fargo, even if Wahab does.[63]

The Fifth Circuit went on to add that:

> The distinction between a corporation and its officers or agents is reinforced by the appointment of a receiver. A receiver is "the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." [Citations omitted.] Although a receiver generally "has no greater powers than the corporation had as of the date of the receivership," it is well established that "when the receiver acts to protect innocent creditors ... he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." [Citations omitted.] The receiver thus acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.[64]

While the *Jones v. Wells Fargo* case dealt with a receivership and would seem, at first blush, to be quite analogous to the situation of a bankruptcy trustee, it is not at all clear that the Fifth Circuit would go the same way in connection with a bankruptcy case. In fact, the court noted that such a situation might be different because section 541(a) of the Bankruptcy Code, which limits the debtor estate to interests of the debtor "as of the commencement of the case."[65] Additionally, several Circuit courts have applied the *in pari delicto* defense to bankruptcy trustees.[66]

---

[63] *Jones,* 666 F.3d at 966-67.

[64] *Id*. at 966.

[65] *Id*. at 967.

[66] *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir.2006) ("If a claim of ETS would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (citing *Grassmueck v. Am. Shorthorn Ass'n*., 402 F.3d 833, 837 (8th Cir.2005); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356–57 (3rd Cir.2001); *Terlecky v. Hurd (In re Dublin Sec. Inc.)*, 133 F.3d 377, 381 (6th Cir.1997); *Sender v. Buchanan (In re Hedged–Inv. Assocs.)*, 84 F.3d 1281, 1285 (10th Cir.1996); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158–66 (2nd Cir.2003).

Assuming that the *in pari delicto* defense might, indeed, bar a bankruptcy trustee's claims in this jurisdiction, it seems clear that it will not ***always*** bar them. **Rather, u**nder Texas law, even when parties are *in pari delicto*, relief from the doctrine will sometimes be granted if public policy or the equities demand it. In fact, the Texas Supreme Court stated in a case called *Lewis v. Davis* that:

> The rule is adopted not for the benefit of either party and not to punish either of them, but for the benefit of the public ... There is often involved, in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy.[67]

In other words, a policy analysis must occur on a case-by-case basis.

The Southern District of Texas previously ruled on an *in pari delicto* defense in the context of a motion to dismiss, in which a chapter 7 trustee had sued lenders to a corporate debtor (among others) and found, "[p]rior to an evidentiary hearing in which the Court can consider how the particular facts and equities of this case influence *in pari delicto*, the Court can not dismiss the Trustee's claim under Rule 12(b)(6)."[68] Similarly this court also has heard an *in pari delicto* argument in the context of a summary judgment motion and determined it was too factually intensive of an inquiry to conduct even at summary judgment. In the case of in ***In re TOCFHBI, Inc.*** this court stated:

> The court determines that, even if the *in pari doctrine* is available to use against a bankruptcy trustee, it is not a basis to grant summary judgment in favor of Settle Pou in the case at bar, because such defense is intensely factual and there are genuine issues of disputed fact relevant to this defense.[69]

In summary, while the defense of *in pari delicto* may sometimes bar a bankruptcy trustee's claims (again, assuming the Fifth Circuit would rule this way), this court believes that the

---

[67] *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947).
[68] *Today's Destiny,*, 388 B.R. at 749.
[69] 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009).

applicability of the defense necessitates an intensely factual inquiry and, thus, is not a proper subject for a Rule 12(b)(6) motion. Here, the four corners of the SAC affirmatively state that the Richies were engaged in illegal conduct. However, this does not justify Rule 12(b)(6) dismissal. *In pari delicto* would not be an automatic bar. The court must consider the facts and equities of the overall case and how they interact with the policy that *in pari delicto* was designed to serve. "The need to consider the 'peculiar facts and equities' is particularly acute when a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself."[70] Thus, the *in pari delicto* defense raised in the Motion to Dismiss as to all claims is denied.

### d. The Plausibility of the Tort Claims Generally and the "Economic Loss" Doctrine

The Matrix Defendants have raised yet a couple more theories defensively—these pertaining to all of the state law tort claims asserted against them. Specifically, the Matrix Defendants argue that Counts 2-3 & 6-7 fail as a matter of law based on the following: (a) all of the torts fail because they are based on ***the same conduct and duties*** that allegedly support the Trustee's ***breach of contract claim***; and (b) the ***"economic-loss doctrine"*** prevents the Trustee from receiving any damages for at least the negligence cause of action (the Matrix Defendants assert that the economic-loss doctrine, under New York law, "prevents a plaintiff from recovering purely economic losses in a negligence action").[71] The Matrix Defendants contend that the Trustee is seeking purely monetary relief on the same allegations as his breach-of-contract claim and in the same amount. These theories warrant separate discussion before addressing all the individual Counts.

---

[70] *Today's Destiny,* 388 B.R. at 749.
[71] *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012).

First, as discussed in detail above, for purposes of ruling on the Motion to Dismiss, this court has concluded that the Trustee has made a plausible claim that Texas law applies (particularly to the torts). Therefore, in the further exercise of charitably construing the SAC, it is appropriate to analyze these theories, as to the permissibility of the torts, under Texas law.

First, Texas jurisprudence has long stated that the contractual relationship of the parties may create duties under both contract and tort law.[72] The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached.

In *Scharrenbeck*, often considered the Texas Supreme Court's seminal case for this notion, a plaintiff had entered into a contract to have a kerosene hot water heater repaired by the defendant. The plaintiff alleged that the water heater was negligently repaired since the water heater set fire to and destroyed the plaintiff's house two hours after the repairs were made. The Texas Supreme Court reasoned that "[a] contract may create the state of things which furnishes the occasion of a tort." Further, "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract." The Texas Supreme Court found that the defendant could be held liable in tort, even though the relationship and harms arose from duties under a contract to which both were parties.

However, breach of contract and torts cannot always co-exist. Enter the "economic loss" doctrine. When the harms of the tort claims arise only out of economic loss based on a ***contractual expectancy***, the economic loss doctrine may preclude viability of the tort:

> Texas courts follow "[t]he economic loss rule [which] generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual

---

[72] *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508 (1947).

expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.,* 445 S.W.3d 716, 718 (Tex. 2014) (per curiam). Under this doctrine, "if the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex. 1991).[73]

While the economic loss doctrine appears to have originated in product defects and property damages cases, a more recent Texas Supreme Court applied it in a commercial dispute where there was a contract involved and a plaintiff was "clearly seeking to recover the benefit of his bargain," in the form of lost profits.[74] In *Southwestern Bell Telephone Co. v. DeLanney,* a business owner had contracted with Southwestern Bell for it to publish an advertisement in the Yellow Pages, but the advertisement was, mistakenly, automatically deleted under internal procedures when a telephone line of the customer was canceled. The customer brought a suit for negligent omission for failing to publish the Yellow Pages advertisement, seeking economic loss including loss profits.   The Texas Supreme Court determined that Southwestern Bell's duty to publish arose solely from its contract with the plaintiff and negligent failure to print the plaintiff's Yellow Page advertisement did not create tort liability for the plaintiff's lost business profits.[75]

Legal scholars and others have commented that, "Texas law is murky, to say the least, on the question of whether a plaintiff can recover under a 'tort' theory (rather than merely a 'contract' theory) for economic consequences of negligence during a defendant's performance (or non-performance) of contractual obligations."[76] In fact, the "'economic loss' rule is somewhat of a misnomer. Plaintiffs routinely recover economic damages, such as lost wages, hospital bills, etc., in negligence and strict products liability actions when they also suffer personal injury or property

---

[73] *Shakeri v. ADT Sec. Servs., Inc.,* 816 F.3d 283, 292 (5th Cir. 2016).

[74] *Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex. 1991).

[75] *See also Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex. 1986).

[76] William Powers Jr. & Margaret Niver, *Negligence, Breach of Contract, and the Economic Loss Rule,* 23 Tex. Tech. L. Rev. 477 (1992).

damage. The 'economic loss' rule precludes recovery only when the plaintiff suffers nothing *other than economic loss*." (Emphasis added.)[77]

Perhaps most important for purposes of this Motion to Dismiss, it appears that the "economic loss" rule has never been *a general rule of tort law*. Rather, it appears to be a rule in *negligence* and *strict product liability*. It appears that it does not preclude recovery for pure economic loss in cases involving *intentional* torts including fraud, negligent misrepresentation, intentional interference with contract, or other intentional torts.[78] Pure economic loss is commonly recoverable in certain torts, such as fraud and intentional interference with contract.[79] Moreover, pure economic loss is often recoverable in the situations of legal and accounting malpractice (where there was an underlying engagement agreement). This may be attributable to the fact that these professionals serve in a special, fiduciary relationship to their clients.[80]

Applying this murky area of law to the Motion to Dismiss, the court concludes as follows. First, torts can co-exist with breach of contract claims. Thus, the torts asserted by the Trustee are not automatically barred as a matter of law. Second, the economic loss doctrine does not appear to apply with regard to intentional torts. Therefore, the only potential bar the economic loss doctrine would present here would be with regard to the negligence claim (Count 2). The court does not believe that the economic loss rule bars the negligence claim for the following reason. The Trustee has pleaded that the Matrix Defendant served in a fiduciary capacity *vis-à-vis* their

---

[77] *Id.* at 477.

[78] *Id.* at 492.

[79] *Id. See also, e.g., American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990); *Shatterproof Glass Corp. v. James*, 466 S.W.2d 873, 877 (Tex. Civ. App.-Ft. Worth 1971, writ refd n.r.e.). *See also Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). *But see Hebisen v. Nassau Dev. Co.*, 754 S.W.2d 345, 348 (Tex. App.-Houston [14th Dist.] 1988, writ denied); *Rio Grande Land & Cattle Co. v. Light*, 749 S.W.2d 206, 210 (Tex. App.-San Antonio), rev'd in part, 758 S.W.2d 747 (Tex. 1988).

[80] "[L]ittle doubt exists that in some relationships, specifically fiduciary relationships . . . a duty of good faith and fair dealing exists and that breach of this duty gives rise to a tort action and potential punitive damages." Powers, *supra* note 75, at 491.

contractual arrangements with Vantage and under ERISA. This would be a special relationship obviously. While this court cannot determine at this juncture whether the Matrix Defendants absolutely rose to the level of fiduciaries, the Trustee has pleaded a plausible set of facts that might lead to such a conclusion. Here, the Trustee has plausibly asserted that the Matrix Defendants acted negligently, grossly negligent, or willfully in breaching duties beyond the duties explicitly set out under the Services Agreement. Such allegations include, but are not limited to, the Matrix Defendants' duty of care in failing to implement reasonable policies and procedures to safeguard assets in the Matrix's Defendants' control.[81] The Trustee asserts that the Matrix Defendants knew or should have known based on numerous red flags, such as depletion of accounts by more than 90% in a just a few months, that the disbursements being requested were improper.[82] Further, the Trustee has alleged damages that go beyond "benefit of the bargain" or "any anticipated benefit" of the Services Agreement.[83] Damages that would be included in the "benefit of the bargain" and arise solely as a breach of contract would be lost profits, fees paid to the Matrix Defendants, or costs associated with finding a replacement for the Matrix Defendants, to name a few examples. But a siege of judgments resulting in the destruction of the Debtor's business due to the alleged misconduct of the Matrix Defendants cannot be considered a loss of an anticipated benefit of the Services Agreement.

 As pleaded by the Trustee in the SAC, the allegations of tort claims can exist despite the existence of the Services Agreement and contractual duties between the two parties under Texas law.

---

[81] SAC, DE #43 in the AP, at ¶ 51-77.
[82] *Id.* at ¶ 76.
[83] *See DeLanney*, 809 S.W.2d at 495; *See also Chapman*, 445 S.W.3d at 718-19.

### e. 12(b)(6)-Failure to State a Claim

Turning finally to the individual claims, the Matrix Defendants have challenged all claims asserted against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. The court will address each count of the SAC in turn. All of the court's reasoning and rulings on standing, choice of law, *in pari delicto*, and the economic-loss doctrine above are incorporated when ruling on the Matrix Defendants' Rule 12(b)(6) challenge.

### 1. Count 1 – Breach of Contract

In Texas, the elements of a claim for breach of contract are: (1) a valid contract between the plaintiff and the defendant, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damage to the plaintiff as a result of the breach.[84]

The Matrix Defendants contend that Count 1, for breach of contract, should be dismissed for a failure to state a plausible claim under three arguments. First, they argue that Vantage did not perform its obligations under and breached the Services Agreement, citing improper instructions it attributes to Vantage. Second, the Matrix Defendants claim the SAC does not allege any actual breach of the Services Agreement because the Matrix Defendants were under no duty to investigate instructions of Vantage. Finally, the Matrix Defendants argue that the Services Agreement requires an act or omission to be not in good faith, grossly negligent, or willful misconduct to be actionable and the Trustee fails to allege sufficient facts.

The Trustee responds by refuting each of these three arguments. First, the Trustee states that the Matrix Defendants received full compensation and fees they were owed under the Services Agreement, and any misconduct in violation of the Services Agreement was committed by the Richies outside of the scope of their employment. Also, the Trustee views this argument as another

---

[84] *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 858 (5th Cir. 2014).

*in pari delicto* argument that is factually intensive and not appropriate on a Rule 12(b)(6) motion.[85] Second, the Matrix Defendants were not allowed to blindly follow the instructions they were given as they cannot waive duties under ERISA and could not follow instructions that required them to commit illegal acts.[86] Finally, the Trustee argues he has met his burden under the Services Agreement to have an actionable claim by alleging the Matrix Defendants knew of the illegal acts of the Richies and, as such, were not simply exercising an alleged right not to investigate.

The court is required to charitably construe the Second Amended Complaint, with all well-pleaded factual allegations being accepted as true and with any reasonable inferences from those facts being drawn in favor of the Trustee. The court concludes that a determination as to such things as whether the Richies were acting independently and outside the scope of their employment in the commission of illegal acts, and what the Matrix Defendants knew or had reason to know, would require an intensive factual inquiry that is inappropriate at the motion to dismiss phase. The court agrees with the Trustee's authority that holds that a dispute over whether a plaintiff to a breach of contract claim committed a material breach is not properly done at the motion to dismiss phase.[87]

As such, the court must accept the allegations that the Richies committed acts independent of Vantage and against the interest of Vantage as true. As alleged, Vantage fully performed under the Services Agreement. The Services Agreement has been included in consideration of the Motion to Dismiss by stipulation at the hearing conducted on the Motion to Dismiss. The court finds when interpreting facts and making inferences in favor of the non-moving party, the Trustee, the

---

[85] *See In re InSITE Servs. Corp.*, 287 B.R.79, 93 (Bankr. S.D.N.Y. 2002)(determining whether there were material breaches on behalf of a plaintiff in a breach of contract dispute, when highly disputed, is not proper for a motion to dismiss).

[86] *See* 29 U.S.C. § 1110 (stating any agreement governed by ERISA which purports to relieve a fiduciary of responsibility or liability is void as against public policy).

[87] *See In re InSITE Servs. Corp.*, 287 B.R. at 93.

provisions of the Service Agreement do not wholly bar the breach of contract claim alleged by the Trustee.

Accordingly, the Trustee has plausibly alleged the existence of a contract, adequate performance by Vantage, breach by the Matrix Defendants, and actual damages. Thus, the Trustee has alleged a plausible claim for breach for contract and the claim survives the Rule 12(b)(6) challenge.

### 2. Count 2 & 3 – Negligence & Gross Negligence/Willful Misconduct

The majority of the Matrix Defendants' argument in the Motion to Dismiss against Counts 2 & 3 arises from arguments addressed above in the discussion of the economic-loss doctrine.

As the court addressed above, the Texas Supreme Court has found that "[a]ccompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract."[88] As such, the court follows this precedent in concluding that conduct that causes a breach of contract can also create an action under tort. Further, as stated by the Texas Supreme Court, by entering a contract, tort duties can arise in executing the contract.[89] Here, the Trustee alleges that the Matrix Defendants did not perform their duty of care, skill, or faithfulness as part of his assertion of his negligence and gross negligence/willful misconduct claims. The Trustee did so in pleading allegations such as the Matrix Defendants knew ERISA prevented transfers of plan assets to parties in interest, and the Matrix Defendants knew Vantage and the Richies were not allowed to handle plan assets.[90] Thus, Counts 2 & 3 of the Trustee's SAC are pleaded sufficiently to survive the Motion to Dismiss.

---

[88] *Scharrenbeck*, 204 S.W.2d at 510.
[89] *See id.*
[90] SAC, DE #43 in the AP, at ¶ 72.

### 3. Count 4 – UCC Claim

The Trustee has asserted a claim under the UCC of an unwaivable obligation of good faith and commercial reasonableness. The Motion to Dismiss to the UCC claim, Count 4, is dismissed by consent, since the Trustee acknowledged at oral argument that there is no independent claim or cause of action for breach of a UCC duty of good faith, per se. Specifically, the Trustee stated during oral argument that Count 4 is basically an elaboration on his breach of contract claim (Count 1)—further stating that the Services Agreement between Vantage and the Matrix Defendants was subject to the UCC[91] and that, "therefore, the duty of good faith applies" and it "cannot be waived." Counsel for the Trustee reiterated that this Count "dovetails with the contract claim" and that "the remedy is still a breach of contract remedy, just unwaivable."

Given that the Trustee has acknowledged that he has not articulated an independent cause of action for which relief can be granted with regard to this Count, this Count will be dismissed. However, the court will grant leave of 14 days to the Trustee to amend Count 1--the breach of contract claim--to articulate and give the Matrix Defendants notice of this UCC-based theory that is part of the Trustee's breach of contract claim.

### 4. Counts 6 & 7 – Aiding and Abetting & Breach of Fiduciary Duties

Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[92] As for the aiding and abetting claim, the Texas Supreme Court "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting."[93]

---

[91] The court notes anecdotally that the Services Agreement and Custodial Account Agreements do not involve a sale of goods, a lease of goods, or a secured transaction. Thus, this court is highly skeptical that the UCC, in fact, applies here.
[92] *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex.2010).
[93] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex.2017) (the Court assumed for the purposes of its opinion an aiding and abetting claim existed because the issue was not briefed).

The Matrix Defendants have contested Counts 6 & 7 under the theories that not only did the Matrix Defendants not owe fiduciary duties to the Debtor, but the SAC also has pleaded no facts to show that the Matrix Defendants knowingly assisted the Richies in the breach of their fiduciary duties. The Trustee in response, and in the SAC, has pleaded that the Matrix Defendants were fiduciaries because they were agents of the Debtor.[94] Further, the Matrix Defendants were in a position of trust and confidence in relation to the plans Vantage serviced and exercised discretionary and unauthorized control over the plans' assets administered by the Debtor.[95]

Given that the Texas Supreme Court has yet to decide whether aiding and abetting is a recognized cause of action, this court is unable to conclude as a matter of law that the Trustee is unable to bring a cause of action or has not met his burden pleading under Texas law.[96]

As to the claim for breach of a fiduciary duty as an agent, under Texas law, an agency relationship imposes certain fiduciary duties on the parties.[97] But, even in an agency relationship such as employer-employee, courts take all aspects of the relationship into consideration when determining the nature of fiduciary duties flowing between the parties.[98] Further, "factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal."[99] The Services Agreement limits, on its face, the Matrix Defendants' duty to investigate and their liability for certain actions. However, the relationship between the Matrix Defendants and Vantage certainly included a level of trust that the Matrix Defendants would safeguard employee benefit assets that were being serviced. In making

---

[94] SAC, DE #43 in the AP, at ¶ 115.
[95] *Id.*
[96] *Parker*, 514 S.W.3d at 224.
[97] *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex.2002).
[98] *Id.* at 200.
[99] *National Plan Adm'rs, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex.2007).

favorable inferences for the Trustee in analyzing the SAC and Services Agreement, it appears plausible that the Matrix Defendants could be deemed to be Vantage's agent and owe fiduciary duties that covered transfers made by the Matrix Defendants that they knew or should have known were illegal and not in the best interest of the Debtor or the plan participants, as alleged by the Trustee.[100] Thus, Counts 6 & 7 survive the Motion to Dismiss as stating a plausible claim for relief under Texas law.

### 5. Counts 8-10 – ERISA Claims

The ERISA claims, Counts 8-10, are brought by the Trustee on behalf of the Vantage Plan and not any of the other administered plans. The court earlier discussed at length that it does not believe that the Trustee has effectively pleaded standing as to Counts 8-10. Assuming the Trustee can amend and plausibly plead standing, the court next needs to turn to whether the Trustee has plausibly pleaded that the Matrix Defendants are fiduciaries under ERISA, since these ERISA claims depend upon the Matrix Defendants being fiduciaries under the statute. The ERISA statute provides a definition for a fiduciary at 29 U.S.C. § 1002(21)(A):

> "Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

The Supreme Court has ruled "[i]n every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as

---

[100] SAC, DE #43 in the AP, at ¶ 115-16.

a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."[101] The Fifth Circuit has found "[t]he term "fiduciary" is liberally construed in keeping with the remedial purpose of ERISA" and extends to anyone who exercises any authority or control.[102] Further, the Fifth Circuit has said, in dicta, that "*[a]ll* plan administrators, officers, trustees, and ***custodians are fiduciaries*** for the purposes of ERISA."[103]

The Matrix Defendants contend that they never provided discretionary custodial services that allowed them to exercise sufficient authority or control of the Vantage Plan to qualify as a fiduciary under ERISA. The Matrix Defendants cite numerous provisions from the Custodial Account Agreement for the proposition that there was a lack of discretion in the custodial services provided by them. Additionally, in their Reply in Support of Motion to Dismiss, they stated that "the Fifth Circuit has never held that 'all custodians are fiduciaries.'"[104] Also, on the same page of the Reply, they cited a Fifth Circuit case, *Kirschbaum v. Reliant Energy*, 526 F.3d 243, 251 (5th Cir. 2008), for the proposition that ERISA fiduciary status is context specific and not an "all or nothing" concept.

First, the claim that the Fifth Circuit has never held that all custodians are fiduciaries under ERISA is a bit disingenuous in light of the ***Total Plan Servs., Inc.*** case cited above.[105] While dicta, the Fifth Circuit has broadly interpreted the meaning of "fiduciary" under ERISA to include all plan administrators, officers, trustees, and custodians.[106] Additionally, at the pin-cite provided by the Matrix Defendants in *Kirschbaum*, the Fifth Circuit was addressing whether the parties were acting in their roles that created the fiduciary status, or wearing a different hat, at the time of the

---

[101] *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000).
[102] *Bannister v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002).
[103] *Total Plan Servs., Inc. v. Texas Retailers Ass'n Inc.*, 825 F.2d 142, 143 (5th Cir. 1991) (emphasis added).
[104] Reply, DE #56 in the AP, at pg. 9.
[105] 825 F.2d at 143.
[106] *Total Plan Servs., Inc.*, 825 F.2d at 143.

alleged actions.[107] This does not bear on whether a custodian, acting as a custodian, is a fiduciary under ERISA. The Trustee has pleaded that the Matrix Defendants were acting as custodians under the parties' agreements and the Matrix Defendants have not contended that there were custodians, of some variation, under the agreements.[108] This court concludes that the SAC has plausibly pleaded that the Matrix Defendants were acting as custodians when allegedly disbursing funds improperly and, thus, they may have been acting as fiduciaries under ERISA at the time of the disbursements.

The Matrix Defendants have not contested any other elements of the ERISA claims (except for standing, as discussed earlier).  As stated earlier, the Trustee has not pleaded sufficient statutory standing under ERISA or section 704(a)(11) of the Bankruptcy Code to bring the ERISA Claims. The court will grant leave of 14 days for the Trustee to further amend the SAC as to the ERISA Claims, Counts 8-10, to establish statutory standing under ERISA and the Bankruptcy Code by pleading that Vantage was a fiduciary at the commencement of the bankruptcy case.

## F. Conclusion

 Based upon the facts alleged in the SAC and the arguments presented to the court, the court rules as follows on the Motion to Dismiss:  (a) it is denied as to Counts 1-3 and 6-7; (b) Count 4 is dismissed by consent of the Trustee and the Matrix Defendants, but the Trustee is granted 14-days' leave to amend Count 1 to incorporate the UCC-related arguments into Count 1 as part of the breach of contract claim;[109] (c) the court will recommend that the District Court dismiss Counts 8-10—the ERISA claims—unless, within 14 days of this Order, the Trustee further

---

[107] *Kirschbaum*, 526 F.3d at 251.

[108] SAC, DE #43 in the AP, at ¶ 51-52.

[109] This is consistent with what was announced at the hearing on the Motion to Dismiss, held on March 10, 2021. As mentioned earlier, the court is skeptical as to the UCC's application to the Services Agreement and Custodial Account Agreements.

amends the SAC, to establish *statutory standing*, as articulated in this Order, under ERISA and the Bankruptcy Code. To be clear, the court is granting the Trustee leave to amend Counts 1, 8, 9, and 10. But if Counts 8, 9, and 10 are not timely amended, this court will make a Report and Recommendation to the District Court that Counts 8-10 be finally dismissed.

Accordingly, it is

**ORDERED** that the Motion to Dismiss is **DENIED** as to Counts 1-3 and Counts 6-7 of the SAC; it is further

**ORDERED** that the Motion to Dismiss is **GRANTED** by consent as to Count 4 (however, the Trustee is granted 14 days' leave to amend the complaint to incorporate his UCC arguments into Count 1, if he so chooses); it is further

**ORDERED** the Motion to Dismiss is **DENIED** as to Counts 8-10, solely conditional on the Trustee further amending the SAC, within 14 days, to establish *statutory standing*, as articulated in this Order, under ERISA and the Bankruptcy Code. If the complaint is not amended to establish statutory standing as to Counts 8-10, the court will submit a report and recommendation to the District Court suggesting dismissal of Counts 8-10.

### ###END OF MEMORANDUM OPINION AND ORDER###