

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 13, 2024**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **VANTAGE BENEFITS** | § | **Case No. 18-31351-SGJ-7** |
| **ADMINISTRATORS, INC.** | § | |
|    Debtor. | § | **(Chapter 7)** |

| | | |
|---|---|---|
| **JEFFREY MIMS, as Chapter 7 Trustee** | § | |
|   for Vantage Benefits Administrators, Inc. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 20-03055-sgj** |
| | § | |
| **MATRIX TRUST COMPANY, MATRIX** | § | |
| **SETTLEMENT & CLEARANCE** | § | **Civ. Act. No. 3:21-1346-G** |
| **SERVICES, LLC, JEFFREY RICHIE and** | § | |
| **WENDY RICHIE** | § | |
|     Defendants. | § | |

## REPORT AND RECOMMENDATION ON MATRIX DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. Introduction

Pending before the court is a Motion for Summary Judgment ("MSJ") filed in the above-referenced adversary proceeding ("Adversary Proceeding"). The MSJ was filed by two of the four defendants—the so called "Matrix Defendants."[1] The Plaintiff in the Adversary Proceeding is Jeffrey Mims, a chapter 7 trustee ("Plaintiff" or "Trustee") appointed in the bankruptcy case of a company called Vantage Benefits Administrators, Inc. ("Vantage"). The Vantage bankruptcy case was commenced as an involuntary case by certain creditors on April 19, 2018.

Vantage was founded in or about 1997, and its primary business activity was providing services as a "third-party administrator" ("TPA") for numerous employee retirement benefit plans. These retirement benefit plans had been established by several third-party companies for their own employees.[2] Vantage contracted with these third-party client-companies to provide services such as record-keeping, processing of plan participants' requests for distributions, and providing information to participants about their accounts. Vantage charged fees for its TPA services and had 50 employees. Significant to this Adversary Proceeding, Vantage did not actually handle the retirement funds—rather it contracted out the custodial services for the retirement accounts to the Matrix Defendants. The relationship among Vantage and the Matrix Defendants was memorialized in: (a) a "Services Agreement"[3] dated September 27, 2012, to which Vantage and both Matrix Defendants were parties; and (b) various "Custodial Account Agreements" to which Vantage, Vantage's clients, and only one of the Matrix Defendants, MTC, was a party.

---

[1] The Matrix Defendants are Matrix Trust Company ("MTC") and Matrix Settlement & Clearance Services, LLC ("MSCS").

[2] Vantage also had a more recently established "fiduciary services" line of business with 10-15 clients and developed related software.

[3] This Services Agreement should not be confused with separate services agreements that Vantage had with its clients to whom it provided TPA services.

The involuntary bankruptcy case was commenced against Vantage approximately six months after Vantage's headquarters were raided by the Federal Bureau of Investigation ("FBI") on October 25, 2017, and its co-owners, Jeff and Wendy Richie (the "Richies"), husband and wife, were arrested for their roles in a massive embezzlement scheme, to which they later pleaded guilty (in June 2020). The Richies are now serving time in a federal prison (and not surprisingly, they have defaulted as defendants in this Adversary Proceeding). The Vantage embezzlement scheme involved unauthorized distribution requests sent by the Richies to the Matrix Defendants, requesting transfers of funds from 13 different pension plans and seven retirement plan accounts that Vantage administered, which occurred over several years and resulted in the theft of millions of dollars. Some of these retirement plans were those of large and impressive clients such as Texas A&M University Optional Retirement Plan, Dallas County Community College, and Collin County Community College. Certain employees of Vantage were whistleblowers—having reported irregularities and concerns to federal officials. At bottom, this Adversary Proceeding involves allegations that the Richies created and transmitted false and illegal "distribution requests" to the Matrix Defendants, requesting disbursements of funds allegedly on behalf of plan participants, but the funds were requested to go (and went) to *a Vantage operating account*, not the account of a retirement plan on behalf of which Vantage was acting as TPA.

The Plaintiff is bringing claims against the Matrix Defendants on behalf of the Vantage bankruptcy estate. Such claims became property of the bankruptcy estate "as of the commencement of the case" pursuant to Bankruptcy Code section 541 ("§ 541"). The theory of Plaintiff's case is that the Matrix Defendants "enabled" the Richies' embezzlement of funds by failing to provide statements or online access to plans (which presumably would have

3

contradicted the falsified account statements and information on the Vantage website that were being created by the Richies); creating and providing software which allowed "under the table" payment requests by the Richies; and failing to send mandatory IRS Form 1099s for the illegal payments. The Trustee further alleges that the Matrix Defendants' utilization of a highly automated business model (*e.g.,* use of certain software called "BridgeNet")—allegedly involving little if any human review and aimed at reducing costs—likely prevented the Matrix Defendants from seeing and identifying "red flags" that might have revealed the embezzlement. For example, as alleged by the Trustee, "all or substantially all of the transfers (there were hundreds) by Matrix were made to the same account—the Vantage operating account—despite the fact that the transfers were purportedly 'disbursements' or 'distributions' to individual plan participants."[4]

In summary, the Trustee argues that the Matrix Defendants' overall way of doing business "made it easy" for the Richies to embezzle in the manner they did—the Matrix Defendants had exclusive control over plan assets, and they did not implement appropriate measures and controls. The Matrix Defendants earned transaction-based fees for making the various illegal payments. The Matrix Defendants allegedly also did not report the various payments to the plan beneficiaries or to the IRS as legally required.  All of the collective actions of the Matrix Defendants and the Richies are alleged to have destroyed the business of Vantage—which, prior to these activities of the Richies—had been a legitimate TPA.

---

[4] *See Trustee's Third Amended Complaint* ¶ 49. Dkt. No. 70.

A.  *Procedural History*

As noted, Vantage's bankruptcy case was commenced on April 19, 2018, by the filing of

an involuntary petition for relief by some of Vantage's creditors.  Prior to the bankruptcy, one of

the retirement plan victims, MBA Engineering Inc. ("MBA"), sued Vantage and the Richies in

federal district court in Dallas,[5] and, in an amended complaint filed in March 2018, added one of

the Matrix Defendants, MTC, as a defendant in that suit. MBA asserted essentially the same fact

allegations against MTC as are made by the Trustee in this Adversary Proceeding and pursued

various causes of action against MTC, including for "Common Law Professional Negligence"

and "Common Law Negligence."[6] After the close of discovery, District Judge Brantley Starr

granted MTC's motion for summary judgment that MTC had no liability under the applicable

Custodial Account Agreement or under the various state law tort claims asserted against it by

MBA.  It is important to note that Judge Starr's judgment did not address MTC's liability *to*

*Vantage,* under its Services Agreement with Vantage. Rather, Judge Starr addressed MTC's

liability (or lack of liability) *to MBA*, the plan that was a victim of the Richies' illegal scheme,

under the Custodial Account Agreement between MBA, MTC (but not MSCS), and Vantage.

In yet another pre-bankruptcy lawsuit brought in 2018, in the federal district court in

Colorado by still another retirement plan that was a victim of the Richies' fraudulent scheme, the

plaintiff-plan alleged that MTC, acting under the same form of Custodial Account Agreement at

issue in this Adversary Proceeding, was negligent in failing to discover and prevent the thefts by

Vantage.  The retirement plan did not prevail in that Colorado suit against MTC.  In granting

---

[5] *MBA Eng'g Inc. v. Vantage Benefits Adm'rs Inc.*, Civ. Act. No. 3:17-cv-003300-X.

[6] The Matrix Defendants acknowledge in their MSJ that at least "one difference in the *MBA* case was that MBA did
not bring a breach of contract claim because it asserted there was no applicable [Custodial Account Agreement at
issue]," but noted that Judge Starr nevertheless found "that MBA was subject to the terms of the [Custodial Account
Agreement]." MSJ 10.

MTC's motion to dismiss, the district court found, among other things, that the retirement plan's tort claims against MTC were barred by the economic loss doctrine: "As the Custodial Agreement, a contract, appears to regulate the relationship between defendant and [a plan], a straightforward application of the economic loss bars plaintiff's claim unless she identifies an independent duty of care owed by the defendant under tort law."[7]

The Trustee filed his original complaint in this Adversary Proceeding on April 6, 2020, and the Second Amended Complaint[8] on November 16, 2020, which asserted 10 causes of action (nine of which were against the Matrix Defendants):

- **Count 1** – **Breach of Contract** against the Matrix Defendants (with respect to the Services Agreement);

- **Count 2** – **Negligence** against the Matrix Defendants (breach of duty to Vantage to act as a reasonable, prudent custodian);

- **Count 3** – **Willful Misconduct and Gross Negligence** against the Matrix Defendants (conduct in performing under the Services Agreement was allegedly reckless and involved extreme risk);

- **Count 4** – **UCC[9] Duty of Good Faith and Commercial Reasonableness** against the Matrix Defendants (Services Agreement is alleged to have been governed by the UCC and there was an unwaivable obligation of good faith and commercial reasonableness in the performance thereof);

- **Count 5** – **State Law Breach of Fiduciary Duties by the Richies** (asserted against Richies only);

- **Count 6** – **State Law Participation in Breach of Fiduciary Duties and Aiding and Abetting** the Richies' Breach of Fiduciary Duties, against the Matrix Defendants;

- **Count 7** – **State Law Breach of Fiduciary Duties as Agent** against the Matrix Defendants (as alleged agents of Vantage);

---

[7] *Bryant v. Matrix Tr. Co.*, Civil Action No. 18-cv-00749-PAB-NYW, 2019 WL 1331954 at *7 (D. Colo. Mar. 25, 2019). The court notes that neither the *MBA* case nor the *Bryant* case addressed a Services Agreement between Vantage and the Matrix Defendants like the one at issue here; rather, both only involved the same form of Custodial Account Agreement to which MTC, Vantage, as TPA, and Vantage's retirement plan clients were parties. MSCS, not being a party to the Custodial Account Agreements, was not a party defendant in these cases.

[8] Dkt. No. 43.

[9] "UCC" refers to the Uniform Commercial Code.

- **Count 8 – ERISA[10] Breach of Fiduciary Duties** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only—i.e., the 401(k) plan for Vantage's own employees);

- **Count 9 – ERISA Prohibited Transactions** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only); and

- **Count 10 – ERISA Co-Fiduciary Liability** against the Matrix Defendants (brought on behalf of the Vantage 401(k) plan only).

On December 16, 2020, the Matrix Defendants filed a Motion to Dismiss and Memorandum in Support Thereof ("Rule 12(b) Motion") in which the Matrix Defendants sought dismissal of all claims brought against them in the Second Amended Complaint (Counts 1-4 and 6-10) under theories of lack of standing, the doctrine of *in pari delicto*, and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable in this Adversary Proceeding pursuant to Bankruptcy Rule 7012. Further, as to Counts 2, 3, 6, and 7 (*i.e.,* the various state law tort claims), the Matrix Defendants argued such claims are barred by contract and economic-loss doctrines under New York law, in that they are based on the same conduct and duties as the breach of contract claim. Additionally, the Matrix Defendants sought dismissal of Count 4 for breach of the UCC duties of good faith and commercial reasonableness, contending that it does not assert an independent cause of action.[11]

Notably, the Matrix Defendants contended that New York law should apply in this Adversary Proceeding, due to a choice of law provision in the Services Agreement. Meanwhile, the Trustee argued that: (a) Texas choice of law rules should apply, since the bankruptcy court sits in Texas, and (b) under Texas choice of law rules, Texas law should apply to all claims in the

---

[10] "ERISA" refers to the Employee Retirement Income Security Act of 1974 (Pub. L. 93-406, 88 Stat. 829, enacted Sept. 2, 1974, codified in part at 29 U.S.C. § 1001 et seq.).

[11] For clarity, Count 5 in the Second Amended Complaint was not being asserted against the Matrix Defendants—only against the Richies—and was not addressed by the Rule 12(b) Motion.

Adversary Proceeding since New York had no substantial relationship to the Services Agreement,[12] and the parties, including Vantage, were engaged in business in Texas.

On May 5, 2021, the court issued a 43-page Memorandum Opinion and Order on the Rule 12(b) Motion ("Order on Rule 12(b) Motion")[13] in which it (a) denied the Rule 12(b) Motion as to Counts 1-3 and 6-7; (b) dismissed Count 4 by consent of the Trustee and the Matrix Defendants, with the Trustee having been granted leave to amend Count 1 to incorporate the UCC-related arguments into Count 1 as part of the breach of contract claim; and (c) indicated that the court would recommend that the District Court dismiss Counts 8-10—the ERISA claims—for lack of standing unless, within 14 days, the Trustee further amended the Second Amended Complaint, to establish statutory standing under ERISA and the Bankruptcy Code.  As part of its ruling, the court addressed the choice-of-law issue, noting that a bankruptcy court must apply the choice of law rules of the forum in which it sits,[14] and concluding that, under Texas choice of law rules, the determination of whether the law of New York should be applied in the Adversary Proceeding (which was the choice of law selected by the terms of the Services Agreement) versus the law of Texas (place where acts allegedly took place) would entail "an intensely factual inquiry" that would not be appropriate at the Rule 12(b)(6) stage of the litigation.[15]  Because the court found that Texas law "could plausibly apply" to all of the claims against the Matrix Defendants (as argued by the Plaintiff), the court proceeded to "analyze the Matrix Defendants' *in pari delicto* argument

---

[12] The court noted that the exemplar Custodial Account Agreement has a Colorado choice of law provision. *See* Order on Rule 12(b) Motion 6 n.7.

[13] Dkt. No. 67.

[14] *See* Order on Rule 12(b) Motion 22-23 (citing *In re MC Asset Recovery, LLC v. Commerzbank A.G, et al. (In re Mirant Corp).,* 675 F.3d 530, 536 (5th Cir. 2012), for the proposition that the rule in the Fifth Circuit that a federal court sitting in diversity must apply the choice of law rules of the forum state applies equally in the context of a bankruptcy court exercising bankruptcy subject matter jurisdiction).

[15] *See id.* at 25 ("This court cannot possibly ascertain at this stage of the litigation whether the choice of law provision in the Services Agreement should be enforced without going beyond the four corners of the SAC and Services Agreement.").

and their other Rule 12(b)(6) arguments through the lens of Texas law, to assess whether the Trustee had pleaded plausible claims" that should live another day.  The court noted that it was not clear whether the Fifth Circuit would apply the equitable defense of *in pari delicto* to bankruptcy trustees in the first instance but that, if Texas' *in pari delicto* doctrine were to be applied, any analysis would require a weighing of the facts and equities in the case, which, again, was not permissible at the Rule 12(b)(6) stage of the litigation, such that the Matrix Defendants could not meet their burden of showing that the Trustee's claims were not at least plausible.[16]

The Matrix Defendants promptly filed a notice of appeal of the Order on Rule 12(b) Motion ("Notice of Appeal"), along with a motion for leave to pursue an interlocutory appeal of the same ("Motion for Leave to Appeal"), which were was assigned to District Judge Ada Brown.[17]  Judge Brown issued a Memorandum Opinion and Order on June 20, 2024, denying the Matrix Defendants' Motion for Leave to Appeal ("Order Denying Motion for Leave to Appeal").

While that attempted interlocutory appeal was pending, on May 21, 2021, the Trustee filed his Third Amended Complaint ("Live Complaint"), in which he: (1) amended the breach of contract cause of action (in Count 1) to incorporate his UCC-related arguments that the contracts between Vantage and the Matrix Defendants were imbued with an inherent duty of good faith and commercial reasonableness obligation; (2) eliminated Count 4 (which had theretofore been a separate cause of action labeled "UCC Duty of Good Faith and Commercial Reasonableness"; and,

---

[16] The court mentions here the choice of law and *in pari delicto* issues because these same issues are raised in the context of the instant MSJ.  The court will discuss in greater detail, below, its reasoning in the Order on Rule 12(b) Motion, as it overlaps significantly with its reasoning regarding the pending MSJ.

[17] The Motion for Leave to Appeal and Notice of Appeal were assigned to Judge Brown at Civ. Act. No. 3:21-cv-01223-E, notwithstanding the assignment of the Matrix Defendants' Motion to Withdraw the Reference in this Adversary to Senior District Judge Joe Fish, and notwithstanding that Judge Fish adopted this court's report & recommendation that all pre-trial matters, including dispositive motions, be conducted in the bankruptcy court and that the reference be withdrawn to the district court upon certification by this court that the matter is ready for trial.

(3) eliminated Counts 8-10 (the ERISA causes of action).[18]  The Live Complaint in this Adversary

Proceeding is narrowed to the following causes of action against the Matrix Defendants:

- **Count 1 (Breach of Contract);**
- **Count 2 (Negligence);**
- **Count 3 (Willful Misconduct and Gross Negligence);**
- **Count 6 (State Law Participation in Breach of Fiduciary Duty and Aiding and Abetting the Richies' Breach of Fiduciary Duty); and,**
- **Count 7 (State Law Breach of Fiduciary Duties as Agent).**

The Matrix Defendants filed their answer ("Answer") to the Live Complaint on June 16, 2021,

denying that they have any liability to the Debtor's estate.  In addition, the Matrix Defendants

asserted 23 affirmative defenses, including the equitable defense of *in pari delicto*, which was

addressed at length in the Order on Rule 12(b) Motion.

### B.  *The Matrix Defendants' MSJ*

Over the next three years (approximately), the parties engaged in extensive discovery and

participated in an ultimately unsuccessful mediation.  Thereafter, the Matrix Defendants filed the

instant MSJ on April 11, 2024, seeking summary judgment as to all remaining claims asserted

against them, along with a brief ("MSJ Brief") and appendix ("MSJ Appendix").[19]  The Matrix

Defendants argue that they are entitled to a summary judgment pursuant to Federal Rule of Civil

Procedure 56 because "[t]he Trustee has no evidence of at least one essential element of each of

his claims, and each of those claims also suffers from dispositive legal defects" and, thus, "no

genuine issue of material fact exists as to any of the Trustee's claims."[20]  The MSJ is based on the

---

[18] The Trustee's voluntary withdrawal and effective dismissal of his ERISA claims in the Live Complaint has, thus, mooted the court's indication in the Order on Rule 12(b) Motion that it would recommend to the District Court that it dismiss Counts 8-10 unless the Trustee further amended his complaint to establish statutory standing under ERISA and the Bankruptcy Code.

[19] The MSJ, MSJ Brief, and MSJ Appendix were filed at Dkt. Nos. 208-210.

[20] MSJ Brief 16.

same arguments raised in the Rule 12(b) Motion.  The Matrix Defendants argue that, at this stage
of the litigation: (a) both the choice of law issue and the *in pari delicto* issue can be decided based
on the undisputed facts established by the summary judgment record, (b) the court must apply New
York law to all claims (both contract and tort), and (c) they are entitled to summary judgment of
no liability under New York law.

The Matrix Defendants elaborate in their MSJ as follows.  First, they argue that all of the
Trustee's contract and tort claims are barred by the affirmative defense of *in pari delicto*.  Second,
if the *in pari delicto* defense does not bar all claims, they argue that they are entitled to a summary
judgment on the breach of contract claim (Count 1) because the undisputed evidence shows that
the Matrix Defendants did not breach the terms of the Services Agreement and, in fact, Vantage's
"numerous breaches of the [Services Agreement] bar"—and its failure to fully perform under the
Services Agreement and the Custodial Account Agreements also bar—the Trustee's pursuit of the
breach of contract claim. Third, the Matrix Defendants argue that they are entitled to a summary
judgment on all tort claims (Counts 2, 3, 6, and 7) because certain limitations of liability provisions
in the Services Agreement bar any claim for liability, because "they mimic the breach of contract
claim" and New York law bars tort claims alleging breaches of the same duty as a contract
obligation allegedly breached, and because they are all barred by the "economic loss" doctrine.
Relatedly, the Matrix Defendants assert that, if Texas law applies to the torts, Texas does not
recognize an independent cause of action for willful misconduct and gross negligence (Count 3)
or of knowing participation in breach of fiduciary duty/aiding and abetting breach of fiduciary duty
(Count 6).  The Matrix Defendants add that the Count 7 tort fails because the Trustee fails to point
to any summary judgment evidence that supports his allegation that the Matrix Defendants acted
as agent of Vantage (therefore, they cannot be found liable for breach of fiduciary duty as an

agent).  Fourth, as to all of the Trustee's claims,  the Matrix Defendants argue that they are entitled to summary judgment because he cannot prove damages, an essential element of each of the Trustee's claims, for two reasons:  the damages claimed by the Trustee (1) "are not valid damages as to Vantage" but are damages suffered by the *victim plans* (essentially an Article III standing argument), and (2) are barred under the terms of the limitations of liability provisions in the Services Agreement and the Custodial Account Agreements.

In addition to all of this, the Matrix Defendants argue that the ruling of District Judge Starr in the *MBA* case, that MTC was not liable to the plaintiff retirement plan therein, from whom Vantage stole money, for the same conduct on which the Live Complaint is based, should be dispositive as to (or dictate the result on) the issue of the Matrix Defendants' liability to the Trustee.

### C.  *Trustee's Response to MSJ*

The Trustee filed his response and brief in opposition to the MSJ ("Response") on May 2, 2024.[21]  The Trustee has not filed a cross-motion for summary judgment.  In his Response, the Trustee argues that the court's ruling in its Order on Rule 12(b) Motion, that the choice of law issue is "an intensely factual inquiry" that is not appropriate to address at the Rule 12(b)(6) stage of litigation, applies with equal force at the summary judgment stage, where "[t]here are abundant issues of material fact concerning:

a.  What law should apply;

b.  Whether *in pari delicto* applies;

c.  The intent of the parties in entering the contract with respect to illegal acts;

d.  Instructions to perform illegal acts;

e.  Whether the Matrix Defendants acted in good faith;

f.  Whether the Matrix Defendants were grossly negligent; and

g.  Whether the Matrix Defendants committed willful misconduct,

---

[21] Dkt. No. 212.  The Trustee filed an appendix in support of his Response on May 2, 2024 as well. Dkt. No. 213.

to name a few[,]" that "[t]hese facts and issues deserve a trial[,]" and the MSJ should be denied.[22]

Although the Trustee argues that there are genuine issues of material fact relating to the choice of law analysis that would defeat summary judgment, the Trustee acknowledged at the hearing on the MSJ that there are really no fact issues in dispute as to this issue and that the court could make a ruling at the summary judgment stage regarding which state's law applies to the various claims (where the court had not been able to do so at the Rule 12(b)(6) stage of the litigation).[23] The Trustee argues that the undisputed facts require the application of Texas law to all of the claims. And the Trustee argues that application of Texas' *in pari delicto* doctrine requires a fact intensive inquiry and analysis of the facts and equities of the case in weighing the policy considerations of applying the equitable defense—and that there are genuine issues of material fact that have not been sufficiently developed so as to preclude entry of summary judgment on this possible affirmative defense. The Trustee also responds to the MSJ that there are genuine issues of material fact that exist with respect to the breach of contract claim and whether the Debtor breached the contract and whether, if so, a prior breach of the contract by the Debtor would excuse performance by the Matrix Defendants and, as well, whether the Matrix Defendants committed tortious acts in their performance under the contract. As to the Matrix Defendants' argument that the tort claims are barred because they mimic the breach of contract claim and because they would be barred under the "economic loss" rule, the Trustee responds that the economic loss rule does not apply to the Trustee's allegations and tort claims. The Trustee also argues that Texas law ***does*** recognize a claim for knowing participation in a breach of fiduciary duty, so the Matrix Defendants are not entitled to summary judgment on that basis. The Trustee objects to the Matrix Defendants'

---

[22] Response 25-26.

[23] Both of the parties extensively briefed the choice of law issue as a gating issue that must be determined before the court can conduct its summary judgment analysis.

argument that he does not have constitutional standing to pursue his claims, arguing that he does have standing to pursue the claims and that "[t]here is a real controversy between the parties to be resolved by this Court" on the issue of whether the Trustee can show direct injury to the Debtor for which he can recover damages on behalf of the bankruptcy estate.

D. *Matrix Defendants' Reply in Support of MSJ and Motion to Exclude Certain Exhibits from the Trustee's Summary Judgment Evidence*

On May 16, 2024, the Matrix Defendants filed their reply ("Reply") in support of their MSJ[24] and also a motion to exclude certain of the Trustee's summary judgment evidence—Exhibits E and G—which were contained in the Trustee's appendix in support of his Response ("Motion to Exclude Evidence").[25] Exhibit E was an unsworn expert report of Gary M. Schwartz, a certified fraud examiner (the "Schwartz Report"), dated January 14, 2022, and Exhibit G was a 3-page spreadsheet that contained a detailed list of apparent wire transfers made between 2014 and 2017. The Matrix Defendants seek to strike (1) the entirety of the Schwartz Report on the basis that it is inadmissible hearsay and, also on the basis that (2) the opinions in the report (a) seek to impose on MTC extra-contractual duties based on industry custom and practice where the terms of the contract are unambiguous, (b) are unfounded and unsupported. The Matrix Defendants further argue that Mr. Schwartz lacks sufficient knowledge and experience to offer opinions relevant to this dispute, and that his report makes improper legal conclusions on matters easily understandable by a lay person and, thus, are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

A hearing ("Hearing") on the MSJ and the Motion to Exclude Evidence was heard on June 4, 2024. The court granted the Trustee permission to file a post-Hearing written opposition to the

---

[24] Dkt. No. 214.
[25] Dkt. No. 216.

Motion to Exclude Evidence.   On June 6, 2024, the Trustee filed his response and brief in opposition to the Motion to Exclude Evidence ("Response to Motion to Exclude Evidence"),[26] along with a supplemental appendix ("Supplemental Response Appendix.")[27] that contains a new exhibit – Exhibit I – which was essentially the Schwartz Report that the Trustee had submitted as Exhibit E, only this time with a sworn and notarized affidavit (the "Schwartz Affidavit") at the front of it.[28]   The Trustee argues that any deficiencies in the evidence have been cured with the filing of the Schwartz Affidavit and that the Motion to Exclude Evidence should be denied.   The Matrix Defendants filed their reply in support of their Motion to Exclude Evidence[29] on June 18, 2024, in which they argue that the Trustee's Response to Motion to Exclude Evidence "only confirms that Exhibits E and G are inadmissible and should be excluded from the summary judgment record."[30]

Finally, as noted above,[31] on June 20, 2024, District Judge Ada Brown entered her Order Denying Motion for Leave to Appeal, in which she denied the Matrix Defendants' Motion for Leave to appeal the interlocutory Order on Rule 12(b) Motion.[32]   Several of Judge Brown's statements therein have potential relevance to the issues raised in the MSJ.   First, Judge Brown "agree[d] with the [Order on Rule 12(b) Motion] that review of the determinations of (i) whether

---

[26] Dkt. No. 224.

[27] Dkt. No. 225.

[28] *See* Exhibit I, Supp. Response Appx. 064-092.

[29] Dkt. No. 226.

[30] Motion to Exclude Evidence Reply 1.

[31] *See supra* note 17 and accompanying text.

[32] *See* Order Denying Motion for Leave to Appeal 2-3 (Judge Brown notes that 28 U.S.C. § 158(a)(3) "expressly requires leave of the district court to appeal an interlocutory bankruptcy court order" but "does not provide a standard for when to grant leave[,]" so "District courts have generally looked to the standard that applies for circuit court review of interlocutory district court orders, which is found in 28 U.S.C. § 1292." Under that standard "an interlocutory order is appealable when it involves '(i) a controlling question of law (ii) as to which there is substantial ground for difference of opinion and (iii) that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'") (cleaned up).

New York or Texas law applies and (ii) the *in pari delicto* defense would, under these circumstances, entail factual inquiry that lies beyond a § 1292(b) appeal[,]"[33] in rejecting the Matrix Defendants' argument that the Order on Rule 12(b) Motion involved a controlling question of law "as it relates to the Bankruptcy Court's 'conclusions on "*in pari delicto*.'"[34] Judge Brown also rejected the Matrix Defendants' argument that a substantial ground for a difference of opinion exists regarding the *in pari delicto* doctrine, noting that the Matrix Defendants concede that the Order on Rule 12(b) Motion "comports with Fifth Circuit and Texas precedent regarding *in pari delicto*."[35] Judge Brown "decline[d]" the Matrix Defendants' "invit[ation] [to] the Court to determine a 'substantial ground for difference of opinion' by referring the Court to case law that is (i) outside of the Fifth Circuit and (ii) involves states *other than* Texas" because "the *in pari delicto* doctrine 'is controlled by state common law.'"[36]

At the Hearing on the MSJ, there was some discussion regarding the Trustee having pleaded Count 3 "gross negligence and willful misconduct" as a separate cause of action from his Count 2 "negligence" claim. The Trustee acknowledged that gross negligence and willful misconduct were, essentially, a "heightened level of severity of culpability," as opposed to a separate cause of action from negligence. He represented that he had pled it as a separate count "to ensure fair notice" at trial. He also acknowledged that he will need to prove gross negligence or willful misconduct at trial (not mere negligence) and that "the **Defendants have admitted in**

---

[33] Order Denying Motion for Leave to Appeal 5.

[34] Order Denying Motion for Leave to Appeal 4-5.

[35] Order Denying Motion for Leave to Appeal 5-6.

[36] Order Denying Motion for Leave to Appeal 6 (quoting *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 965 (5th Cir. 2012)).

answering Interrogatory Nos. 15 and 16 that if the Trustee proves willful misconduct or gross negligence, Matrix is liable."[37]  At oral argument, Trustee's counsel clarified:[38]

> THE COURT:  By the way, Count 2, negligence, Count 3, willful misconduct and gross negligence, are you acknowledging that there aren't two different possible causes of action there?  Assuming there are causes of action there?
>
> MR. ALEXANDER:  That's the standard.  That's the standard, yes.  Gross negligence or willful misconduct.  It's not two causes of action.  You have to hit one of those standards.

Based on these admissions by the Trustee, the court recommends that the District Court grant summary judgment in favor of the Matrix Defendants of "no liability" as to the Trustee's Count 2 for simple negligence.  This court need not address any of the Matrix Defendants' summary judgment arguments with respect to Count 2, in light of the Trustee's admissions at oral argument.

### II. Jurisdiction

Bankruptcy subject matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) as it is "related to" the bankruptcy case of Vantage. This bankruptcy court generally has authority to exercise bankruptcy subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984.  However, all of the claims in the Adversary Proceeding are "non-core" in nature and jury trial rights apply to them.  28 U.S.C. § 157(b)(2) & (e).  Thus, on May 21, 2020, the Matrix Defendants filed an unopposed motion to withdraw the reference seeking a jury trial in the District Court. The Trustee and the Matrix Defendants stipulated that: (i) all of the claims asserted by the Trustee in the Adversary Proceeding are non-core claims, (ii) the Trustee's claims and the Matrix Defendants' defenses thereto are all

---

[37] Response 20 (citing to Exhibit B of the Response Appendix).
[38] Hearing Transcript 61:1-8.

to be tried by the District Court, and (iii) the Matrix Defendants and the Trustee are entitled to a jury trial. The Trustee and the Matrix Defendants agreed to the bankruptcy court hearing pretrial matters. Accordingly, the bankruptcy court submitted its Report and Recommendation[39] to the District Court, which adopted the bankruptcy court's Report and Recommendation withdrawing the reference but deferring all pretrial matters to the bankruptcy court.

### III. Undisputed Facts

Plaintiff, Jeffrey Mims, is the Chapter 7 trustee for the bankruptcy estate of Vantage, duly appointed after entry of an order of relief by the United States Bankruptcy Court of the Northern District of Texas, Dallas Division on June 5, 2018.

The Debtor, Vantage, was a corporation founded in 1997 and formed under the laws of California. Its principal place of business since the year 2014 was at 1201 Elm Street, Suite 1600, Dallas, TX 75270. Vantage was a TPA for its own employee benefit plan and for 21 other employee benefit plans located primarily in Texas but also throughout the country. The majority of the plans were ERISA-qualified, while some were exempt from ERISA.

Defendant MTC was formed in 2005 as MG Trust Company, LLC and changed its name to Matrix Trust Company in 2016. MTC is not a bank; it is a Colorado corporation regulated as a non-depository trust company by the Colorado Division of Banking. As such, MTC does not hold client deposits, but relies on a third-party bank, JP Morgan, to hold clients' deposits.[40] MTC provides custody and directed trustee services to institutional clients for which its separate sister corporation, MSCS (a New York limited liability company which is physically located in

---

[39] Dkt. No. 35. As noted above, District Judge Fish was assigned the motion to withdraw the reference and entered his order adopting this court's Report and Recommendation in Civ. Act. No. 20:3-cv-01346-G. *See* Dkt. No. 40 and DCT Dkt. No. 6.

[40] Declaration of Will Beutelschies ("Beutelschies Decl."), MSJ Appx. 155-156. Will Beutelschies is a Senior Vice President and Chief Compliance Officer of MTC.

Colorado),[41] provides automated mutual fund trade execution and settlement services. Those institutional clients include TPAs, like Vantage, that service retirement plans. MSCS provides MTC a technology platform to facilitate the file transfer between the National Securities Clearing Corporation, MTC, and their TPA clients.[42] To provide their services to TPA clients, MTC and MSCS enter into a Services Agreement ("SA") in the same format with each of their TPA clients.[43]

Vantage was solely owned by Jeff Richie and his wife Wendy Richie, who were also its primary officers, with Jeff Richie serving as President and CEO and Wendy Richie serving as Vice President of Administration.[44] The Richies also controlled the Vantage cash accounts, and Jeff Richie controlled expenditures.[45] Vantage moved its office from California to Dallas in 2014.[46] Although Vantage had terminated all but a handful of employees in 2014, it had enlarged to about 52 employees at the time of the FBI raid in October 2017, and just before it was forced into Chapter 7 bankruptcy in 2018.[47]

The Matrix Defendants entered into a SA with Vantage (the "Vantage SA") in September 2012.[48] The Vantage SA specifies that MSCS has the duty to clear trades as requested by the TPA[49] and that MTC agrees to "provide [retirement plan] Customers referred by [the TPA] with the trust or custodial services described in the" form Custodial Account Agreement ("CAA")[50]

---

[41] MSJ Appx. 047, 056.

[42] Beutelschies Decl., MSJ Appx. 156.

[43] Beutelschies Decl., MSJ Appx. 156-157.

[44] Trustee's Interrogatory responses to Matrix Defendants' First Set, dated February 7, 2022, 1, 4, MSJ Appx. 107, 108; Live Complaint ¶ 17.

[45] Live Complaint ¶ 18; Charles Leggette deposition July 18, 2023 transcript excerpts ("Leggette Dep. 1") 129, MSJ Appx. 036.

[46] Leggette Dep. 1 43-44, 122, MSJ Appx. 014-015, 036.

[47] Leggette Dep. 1 35, 56, MSJ Appx. 013, 018.

[48] Vantage SA, MSJ Appx. 047-062.

[49] Vantage SA §§ 4-5, MSJ Appx. 049.

[50] CAA, MSJ Appx. 063-082.

that is an exhibit to the Vantage SA.[51]  The CAA is a contract between Matrix Trust, the TPA that entered into the SA – here, Vantage – and the plan sponsor and plan trustee of the TPA's customer retirement plan.[52]  As custodian, MTC maintained possession of all the plan assets, including cash and securities.  MTC used a single bank account to write checks and direct wire transfers for every single disbursement for all of the plans.

Under the Vantage SA, the Matrix Defendants agreed to provide their specific and identified services in exchange for a fee paid by Vantage.[53]  The total amount of fees received by MTC (which it then split with MSCS) for its custodial work for the 19 retirement plans from which the Richies stole money between 2014 and October 2017 was $39,493.56, which works out to less than $10,000 per year on an annual basis and to just over $2,000 per defrauded plan on a pro rata basis.[54]  The Vantage SA specifies that Vantage "represents, warrants, and covenants that it will retain absolute and complete responsibility for the supervision of all of its representatives, employees or other agents" and that MTC and MSCS "will have no supervisory, compliance or other responsibility as to the actions of such representatives, employees or agents of [Vantage]."[55]  The Vantage SA further provides that the Matrix Defendants "shall not be liable for undertaking any act or instructions from [Vantage] or for failing to act in the absence of such instructions"[56] and that MSCS and MTC "shall be entitled to conclusively rely on the authenticity of any notice or other communication received from [Vantage] so long as . . . [Matrix] reasonably believe[s] the notice or other communication to be genuine"[57] and that Vantage is "to indemnify … MSCS,

---

[51] Vantage SA §§ 1.1, 1.3, and 6, MSJ Appx. 047, 048, and 049.

[52] Beutelschies Decl., MSJ Appx. 157.

[53] Vantage SA §§ 8 and 9, MSJ Appx. 034-035.

[54] Beutelschies Decl., MSJ Appx. 160.

[55] Vantage SA § 14(B)(1); MSJ Appx. 053.

[56] Vantage SA § 16, MSJ Appx. 055.

[57] *Id.*

[MTC] from and against any claims . . . arising from or relating to . . . such MSCS Party acting in accordance with any instructions given by or on behalf of [Vantage]."[58]   The Vantage SA contains a limitation of liability clause that purports to exculpate the Matrix Defendants from any liability to Vantage "for any act or omission of MSCS and [MTC] provided that MSCS and [MTC] acted in good faith, unless such conduct was found to constitute gross negligence or willful misconduct."[59]

The Vantage SA also contains a choice of law provision that states, "Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the choice of law principles thereof."[60]   The exemplar CAA that the Matrix Defendants submitted in their appendix as part of the summary judgment record, on the other hand, has a "choice of law" provision that states that the CAA is governed by Colorado law, not New York law:  "This Agreement shall be construed and interpreted according to the laws of the State of Colorado to the extent that such laws are not preempted by the laws of the United States of America."[61] The choice of law provision in the CAA also states that "[a]ll contributions to, and payments from, the Account shall be deemed to take place in the State of Colorado."[62]

Defendants Jeffrey and Wendy Richie were last known to be residents of Dallas County, Texas and last worked at 1201 Elm Street, Suite 1600, Dallas, TX 75270.

On or about October 25, 2017, the FBI raided Vantage's office in Dallas and arrested the Richies on felony allegations they used the Vantage system to obtain over $15 million from the

---

[58] Vantage SA § 15, MSJ Appx. 055.

[59] Vantage SA § 16, MSJ Appx. 055.

[60] Vantage SA § 19, MSJ Appx. 047.

[61] CAA, § 12.2.1, MSJ Appx. 077.

[62] *Id.*

accounts of more than a dozen retirement benefit plans.[63]  On October 23, 2018, the United States

Department of Justice indicted the Richies for their role in the thefts in the United States District

Court for the Northern District of Texas, Dallas Division.[64]  The Richies were charged with various

crimes.[65] Each pled guilty to theft from an employee benefit plan, aggravated identity theft (Wendy

Richie), and aiding and abetting (Jeffrey Richie). District Judge Sam Lindsay sentenced Wendy

Richie to 132 months in federal prison and Jeffrey Richie to 87 months in federal prison on

December 4, 2020.  The embezzlement scheme involved false and illegal "distribution requests"

sent by the Richies to the Matrix Defendants, requesting transfers of funds from 13 different

pension plans and 7 retirement plan accounts that Vantage administered, which occurred over

several years and resulted in the theft of millions of dollars. More specifically, the Richies created

and transmitted false and illegal "distribution requests" to the Matrix Defendants, requesting

disbursements of funds allegedly on behalf of plan participants, but the funds were requested to go

(and went) to *a Vantage operating account* located in Texas.[66] Vantage used at least a portion of

the stolen funds to operate its business and would have shut down for lack of funds if had had

stopped stealing money from its client funds.[67]

The Matrix Defendants submitted, as part of the summary judgment record, sworn

declarations of Will Beutelschies, Chief Compliance Officer and Senior Vice President of MTC,

and Eric Schmitt, a client services specialist with MSCS.  Both state that the FBI raid was the first

time MTC or MSCS became aware of any thefts by Vantage.[68]  The Trustee has submitted an

---

[63] Live Complaint ¶¶ 78-79.

[64] Live Complaint ¶¶ 78-79.

[65] *See* Indictment [Dkt. No. 1], *United States v. Richie*, No. 3:18-CR-540 (N.D. Tex. filed Oct. 23, 2018), MSJ Appx. 124.

[66] Exhibit G, Response Appx. 061-063; Exhibit A, Affidavit of Jeffrey H. Mims, Chapter 7 Trustee ("Mims Aff."), Response Appx. 002.

[67] Leggette Dep. 1, 99, MSJ Appx. 030.

[68] Beutelschies Decl., MSJ Appx. 159-160 and Declaration of Eric Schmitt, MSJ Appx. 201.

expert report of Greg M. Schwartz that disputes the Matrix Defendants' claim to have been unaware of the Richies fraudulent instructions to them. This is based on the fact that the Matrix Defendants knew or should have known that the Richies were giving them instructions to disburse plan funds to a Vantage operating account, rather than to an account of a plan beneficiary, and that the Richies coded the distributions as non-reportable for tax purposes (and, as a result, MTC did not report the transactions to the plan victims or to the IRS on IRS Forms 1099-R, and MTC also did not send account statements reflecting the illegal transactions to the plan victims).[69]    In addition, the Trustee points to an order and final judgment of a federal district court in Colorado, confirming an arbitration award against MTC in favor of certain plan beneficiaries on whose behalf Vantage acted as TPA and for whom MTC provided custodial services, which included findings by the arbitration panel, after a six-day evidentiary hearing, that MTC was grossly negligent, under the terms of the relevant CAA, in disbursing funds that it knew were owned by and intended for plan beneficiaries to the Vantage operating account.[70]  Specifically, in January 2021, a federal district court in Colorado confirmed a December 2019 arbitration award against MTC and in favor of a specific plan victim (Caldwell plan) that found MTC to be grossly negligent in disbursing $985,000 in plan funds to a Vantage bank account its employee subjectively knew did not belong to the purported plan beneficiary.[71]

The vast majority (over 89%) of the plan victims who submitted claims against the bankruptcy estate have Texas addresses, and none of them have New York addresses.[72]

---

[69] *See* Exhibit G, Response Appx. 061-063; Exhibit I, Supp. Response Appx. 070.

[70] *See Matrix Trust Co. v. Midlands Mgt. Corp.*, Case No. 1:20-cv-00559-WJM-SKC, Dkt. No. 36 (D. Colo. Jan. 4, 2021), Response Appx. 037-060.

[71] Exhibit F, Response Appx. 037-060. The court notes that the district court denied MTC's motion to vacate the arbitration award because it had "forfeited its right to seek vacatur" by failing to comply with a procedural requirement relating to service, and therefore "d[id] not reach the merits of its challenge to the [arbitration award]." *See id.* at 044.

[72] Exhibit A, Mims Aff., Response Appx. 002.

Certain employees of Vantage were whistleblowers—having reported irregularities and concerns to federal officials.

### IV. Legal Analysis

As noted above, the Matrix Defendants argue that they are entitled to summary judgment as to all claims. Among other reasons, they argue that the Trustee lacks constitutional standing to bring the claims, which, in essence, is an argument that goes to the court's authority under Article III of the United States Constitution to exercise subject matter jurisdiction over the claims. "When there is no jurisdiction, the . . . court should dismiss the suit without prejudice so that the plaintiffs may pursue a claim in a court that has jurisdiction." *See Gibson v. U.S.*, 809 F.3d 807, 811 (5th Cir. 2016) (cleaned up). The court has a "constitutional duty . . . to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not." *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022) (citation omitted). The court will address the constitutional standing issues that have been raised by the Matrix Defendants in the MSJ first, and then—only to the extent the court finds that the Trustee has standing—the court will address the separate substantive issues in the MSJ.[73]

### A. *Article III Standing*

As noted, the Matrix Defendants have argued that the Trustee lacks standing to pursue the claims asserted in his Live Complaint. There are two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[74] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might

---

[73] *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted) (the court should consider jurisdictional attack before addressing any attack on the merits).

[74] Article III, Section 2 of the United States Constitution gives federal courts jurisdiction over enumerated cases and controversies.

prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law. It appears that the Matrix Defendants are challenging the Trustee's constitutional standing in their MSJ.

It is well-established that a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the tripartite test for Article III standing: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[75] "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[76] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[77] The Matrix Defendants had argued in their Rule 12(b) Motion that the Trustee's causes of action in his then-pending Second Amended Complaint should be dismissed because the Trustee lacked standing. In its Order on Rule 12(b) Motion, the court extensively addressed the constitutional standing issues that are now raised again in the MSJ.[78] Specifically, the court started with the general premise that a Chapter 7 Trustee has capacity to pursue litigation claims owned by the bankruptcy estate[79] and is also charged with (among other things) collecting

---

[75] See Thole v. U.S. Bank, N.A., 140 S.Ct. 1615, 1618 (2020) (citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); see also Abraugh v. Altimus, 26 F.4th 298, 302 (5th Cir. 2022).

[76] Transunion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (cleaned up).

[77] Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

[78] See Order on Rule 12(b) Motion 12-16.

[79] See Order on Rule 12(b) Motion 12 (citing 11 U.S.C. § 323(b)).

and reducing to money the property of the bankruptcy estate;[80] that property of the estate is broadly

defined under § 541(a)(1) to include causes of action owned by the bankruptcy estate; and, finally,

that a cause of action belongs to a bankruptcy estate where it "explicitly or implicitly allege[s]

harm to the debtor" and "the debtor could have raised the claim as of the commencement of the

[bankruptcy] case."[81]

In their Rule 12(b) Motion, the Matrix Defendants had argued that the Trustee is attempting

to recover damages for an amount equal to the funds that the Matrix Defendants allegedly

disbursed improperly from the various third-party retirement plan accounts for which Vantage

served as a TPA, which harms, they argue, were suffered by the *plan beneficiaries*, not Vantage.

According to the Matrix Defendants, the right to bring any claim pertaining to funds that were

misappropriated from third-party retirement plans belongs to the retirement plans whose funds

were misappropriated, and not the Trustee on behalf of Vantage. The bankruptcy court found

instructive the opinion of the district court in *Osherow v. York*,[82] which involved substantially

similar facts to those here. In *Osherow*, two principals of a debtor had used investor funds, that

were meant to be held in escrow by a third-party bank, for illicit purposes (including running a

pyramid scheme) after the bank made allegedly improper distributions under the applicable

contract. There, similar to the Matrix Defendants in this case, the bank made the argument that the

bankruptcy trustee, Mr. Osherow, lacked standing to bring his suit because he was essentially

alleging damages that were suffered by the investors, not damages that were suffered by the debtor

itself. The bank urged that, because the improper distributions were made to the debtor, no harm

---

[80] *See id.* (citing 11 U.S.C. § 704(a)).

[81] *See id.* (citing *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.),* 25 F.3d 1281, 1284 (5th Cir. 1994)).

[82] No. 5:17-CV-483-DAE, 2019 WL 6048017 at *1-2 (W.D. Tex. August 5, 2019).

could have occurred to the debtor.[83]  In response, the trustee argued that he indeed had standing to sue for breach of a contract, in that he was taking the place of a contractual counterparty (*i.e.,* the debtor), and the bank's breach of contract had caused money to be misappropriated that otherwise would have been out of the reach of the debtor's nefarious principals.[84]  This court agreed with the *Osherow* court's conclusions relevant to Article III standing that "parties to a contract have standing to sue for breach of contract," and that ambiguity over the extent of damages does not strip a party of standing to bring a cause of action.[85]  The court concluded that here, the breach of contract cause of action (Count 1) could have been asserted by Vantage as a party to the SA with the Matrix Defendants, and, therefore, it was inherited by the Trustee such that the Trustee has Article III standing to assert the breach of contract claim.[86]  The court further concluded that, because all of the state law torts (Counts 2-3 and 6-7) likewise pertain to the direct dealings and transactions among Vantage and the Matrix Defendants pursuant to the Vantage SA and CAAs, Vantage itself—not just the retirement plan beneficiaries—had rights, obligations, and legally cognizable interests vis-à-vis these agreements.[87]  The court pointed out that, as with any contractual relationship, several duties automatically flowed back and forth among the parties, that the Matrix Defendants had certain duties with regard to Vantage, pursuant to the Vantage SA, and MTC had certain duties with regard to Vantage and the retirement plan participants pursuant to the CAAs, and that "it is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of

---

[83] *Id.* at *4-5.

[84] *Id.* at *5.

[85] *Id.*

[86] Order on Rule 12(b) Motion 14.

[87] *Id.*

conduct."[88]   The Trustee's claims against the Matrix Defendants were (in the Second Amended Complaint) and are (in the Live Complaint) pleaded as wholly independent from duties that the Matrix Defendants owed to third parties and are based primarily on the Debtor's separate contract and relationship with the Matrix Defendants under the Vantage SA, to which the retirement plan participants were not parties.   In the Live Complaint, as he did in the Second Amended Complaint, the Trustee explicitly or implicitly alleges direct harm to Vantage outside of the harm suffered by the retirement plan victims, such that Vantage could have raised the claims as of the commencement of the bankruptcy case.   The Trustee has alleged, for example, that the ultimate destruction of the Vantage enterprise, through a loss of revenue from its three lines of business, and millions in judgments brought against it due to the alleged wrongdoing of the Richies and the Matrix Defendants, resulted in independent damage to Vantage.

The bankruptcy court concluded that "the Trustee—in the shoes of Vantage—has plausibly articulated Article III standing with regard to the breach of contract and state law tort claims (Counts 1-3 and 6-7)" and further noted that the Trustee had statutory or prudential standing as well with respect to these claims.[89]   The court went on to determine that the Trustee did not have statutory standing to pursue the ERISA claims in Counts 8-10, and the Trustee did not reassert Counts 8-10 or any ERISA claims in the Live Complaint.

The Matrix Defendants have not pointed to any summary judgment evidence that would change the bankruptcy court's previous determination, in its Order on Rule 12(b) Motion, that the Trustee has plead a direct injury to Vantage and, therefore, has constitutional standing with regard to Counts 1-3 and 6-7.   Thus, the bankruptcy court recommends to the District Cout that it conclude

---

[88] Order on Rule 12(b) Motion 14-15, 15 n.30 (citing *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 584 (5th Cir. 2008)).
[89] Rule 12(b) Motion 16, n.33.

that the Matrix Defendants are not entitled to a summary judgment (or dismissal, which would be the proper procedure for addressing a lack of federal subject matter jurisdiction) on the basis that the Trustee lacks Article III standing.  Having determined that standing (federal subject matter jurisdiction) exists as to the Trustee's claims, the bankruptcy court will now address the substantive issues raised in the MSJ.

### B. *Summary Judgment*

Rule 56(a) of the Federal Rules of Civil Procedure provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 "*mandates* the entry of summary judgment, after an adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added in original)), because "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.  A fact is material "if the governing substantive law identifies it as having the potential to affect the outcome of the suit." *Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F.Supp.3d 400, 403 (N.D. Tex. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505) (other citation omitted)).

When a defendant moves for summary judgment on a plaintiff's claim, it may satisfy its summary-judgment burden in one of two ways. The defendant may (1) submit summary-judgment evidence that negates the existence of an essential element of the plaintiff's claim; or (2) show that there is no evidence to support an essential element of the plaintiff's claim. *Celotex*, 477 U.S. at 323–25. If the movant-defendant makes the required initial showing, the burden then shifts to the plaintiff to show there is a genuine dispute of fact for trial. *Anderson*, 477 U.S. at 250. Because a defendant bears the ultimate burden of proof at trial regarding the existence of an affirmative defense, when a defendant moves for summary judgment on an affirmative defense, it bears the initial burden of showing the absence of a genuine dispute of material fact, and, with evidence, establish each element of its defense as a matter of law. *Crescent Towing & Salvage Co. v. M/V ANAX*, 40 F.3d 741, 744 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 322–23); *see also Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017) ("When summary judgment is sought on an affirmative defense, . . . the movant 'must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.'") (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986))). If the defendant meets its initial burden, the plaintiff must then produce "significant probative evidence" demonstrating the existence of a triable dispute of fact on at least one element of the defense. *Kansa Reinsurance Co. v. Cong. Mortg. Corp.*, 20 F.3d 1362, 1371 (5th Cir. 1994); *see also Dewan*, 858 F.3d at 334 (quoting *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016)) ("Once the movant [establishes all elements of its affirmative defense], the burden shifts to the nonmovant to establish an issue of fact that warrants trial.").

"[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337,

343 (5th Cir. 2007) (internal quotations omitted); *see also Kennedy v. Allstate Texas Lloyd's*, 2020

WL 8300511, at *1 (N.D. Tex. Dec. 14, 2020) ("Conclusory allegations and denials, speculation,

improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate

substitutes for specific facts showing that there is a genuine issue for trial.") (citing *Douglass v.*

*United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d

1093, 1097 (5th Cir. 1993)). Rather, "[t]he nonmovant must identify specific evidence in the record

and articulate the manner in which that evidence supports that party's claim." *Duffie v. U.S.*, 600

F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task*

*Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted)); *see also Little*, 37 F.3d at 1075

("[T]he nonmovant must go beyond the pleadings and designate specific facts showing there is a

genuine issue for trial.").

When evaluating a motion for summary judgment, the court views the facts "in the light

most favorable to the nonmoving party" but "only if there is a 'genuine' dispute as to those facts."

*Scott v. Harris*, 550 U.S. at 380; *see also Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234

(5th Cir. 2018) ("The court considers the record as a whole, and draws all justifiable inferences in

favor of the non-movant[, b]ut the non-movant bears 'the burden of demonstrating by competent

summary judgment proof that there is [a genuine dispute] of material fact warranting trial.'")

(internal citations omitted).  The court may not, however, "weigh the evidence or make credibility

determinations."   *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018).

Moreover, the Fifth Circuit has admonished that "the drawing of legitimate inferences from the

facts are jury functions, not those of a judge, whether he is ruling on a motion for summary

judgment or for a directed verdict." *Dewan*, 858 F.3d at 335 (quoting *Anderson*, 477 U.S. at 255).

If the nonmoving party fails to meet its burden of submitting competent summary judgment

evidence that there is a genuine dispute as to a material fact, "the motion for summary judgment must be granted." *Little*, 37 F.3d at 1076 ("A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment.").

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that

[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Under Rule 56(c)(2) "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

### 1.  Motion to Exclude Evidence

Here, the Matrix Defendants submitted a 102-page appendix in support of their MSJ and an additional nine-page appendix in connection with their Reply.[90]  The Trustee filed a 63-page appendix in support of his Response.[91]  Two items in the Trustee's appendix are now in controversy.  One is an unsworn and unsigned "January 14, 2022 Expert Report of Gary M. Schwartz"—a certified fraud examiner—as "Exhibit E."[92] The other item, an "Exhibit G," is what the Trustee has described as an "Excerpt of native data produced by Matrix showing illegal payments in the form of purported distributions of benefits."[93]  In the Matrix Defendants' Motion

---

[90] *See* Dkt. Nos. 210 and 215.

[91] *See* Dkt. No. 213.

[92] Response Appx. 012-036.

[93] Response Appx. 061-063.

to Exclude Evidence, they object pursuant to Rule 56(c)(2), and argue that neither exhibit should be considered by the court in connection with the MSJ. Specifically, they argue that Exhibit E (the "Schwartz Report"), should be excluded as inadmissible hearsay under Federal Rule of Evidence 802. In addition to the fact that the Schwartz Report is unsworn and unsigned, the Matrix Defendants argue that[94]

> [t]he opinions in the Report should be excluded because (i) they seek to impose on Matrix Trust duties based on asserted unwritten industry custom and practice that are inconsistent with the provisions in the [SA] and the [CAA], thereby violating well-established law that evidence of custom or practice cannot be used to add terms to an unambiguous contract; (ii) they are unfounded and unsupported in that they do not take into account the SA (or the CAA) on which this lawsuit is based and as to which Mr. Schwartz concedes he is unfamiliar; (iii) Mr. Schwartz lacks sufficient relevant knowledge and experience to proffer opinions relevant to this dispute; and (iii) they amount to improper legal conclusions on matters easily understandable by a lay person, rendering them inadmissible "opinion" testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

As to Exhibit G, the Matrix Defendants argue that it "is an unexplained spreadsheet" that lacks foundation under Federal Rule of Evidence 901, is inadmissible hearsay under Federal Rule of Evidence 802, and is an inadmissible summary that does not comport with Federal Rule of Evidence 1006.[95]

The Trustee responded to the Motion to Exclude Evidence, in part, by filing a new Exhibit I,[96] which is a signed and sworn ***affidavit*** of Gary M. Schwartz ("Schwartz Affidavit"), attaching to it the Schwartz Report that previously stood alone as Exhibit E—which the Trustee argues cures any hearsay deficiency, and should be considered by the court as part of the summary judgment record. The Trustee also responds that Mr. Schwartz is qualified to offer his opinions and that the

---

[94] Motion to Exclude Evidence 1-2.

[95] Motion to Exclude Evidence 2.

[96] Dkt. No. 225, Supp. Response Appx. 064-092.

Matrix Defendants' argument that Mr. Schwartz was "unfamiliar" with the Vantage SA (and CAA) is incorrect and misplaced:  "[I]f Matrix had read the report, it would have realized the scope of the review by Schwartz was not limited to the SA and CAA, but also focused on whether the "actions or inactions [of Matrix] were customary and reasonable in its custodial capacity and failure to potentially detect the fraudulent activities of the Richies."[97]  The Trustee points out that the Schwartz Affidavit "centers on the customary and standard practices of those in the banking industry, such as [the Matrix Defendants]"[98] and that "[w]hile Matrix argues no expert testimony is required to determine what duties a contract requires of its parties or to advise the finder-of-fact as to whether a party met its contractual obligations, . . . an expert is required to speak on the regular and customary banking practices that should have been followed by Matrix[,]"[99] suggesting that where, as here, the Trustee is asserting a breach of contract claim and alleging that the Matrix Defendants breached extra-contractual tort duties, an expert's opinions on regular and customary business practices are decidedly relevant and should be allowed.  As for the Matrix Defendants' argument that Mr. Schwartz lacks the knowledge, training and experience necessary to testify, the Trustee points to, not simply the Schwartz Affidavit and Schwartz Report, but also his CV attached, further stating that, for nearly the last decade, Mr. Schwartz has testified in courts throughout the United States "on damages, banking standards and practices, financial analysis, and lending standards and practices" and, thus, "Schwartz has experience with the practices and standards that should have been implemented by Matrix to prevent the theft of millions of dollars." The Trustee argues that Mr. Schwartz "provides explanations for his opinions and analysis that quashes any notion that his opinions are inappropriate legal conclusions" and offers opinions on

---

[97] Response to Motion to Exclude Evidence 3 (citing to pages 2 and 8 of Exhibit I, the Schwartz Affidavit).

[98] *Id.* (citing, again, to the Schwartz Affidavit).

[99] Response to Motion to Exclude Evidence 3-4.

issues that would not be easily understood by a lay person, and, therefore, it is appropriate for the court to consider his analysis as an expert opinion.[100]

As to Exhibit G, the Trustee argues that it is not an unexplained spreadsheet that lacks foundation; it is not inadmissible hearsay; and it is not an inadmissible summary that does not comport with the Federal Rules of Evidence 1006.[101] The Trustee explains that the data contained in Exhibit G was extracted from certain excel spreadsheets that were produced by the Matrix Defendants themselves, in response to an order of the bankruptcy court, in October 2022, compelling production of documents, "and while some irrelevant data may have been removed from the original documents, the data itself" does not lack foundation.[102]  The Trustee further responds that[103]

> The information in the Matrix Excel Documents presumably was kept in the course of a regularly conducted activity of Matrix as it was produced by Matrix as Matrix was required to produce the data in that format. Matrix's attempt to exclude Exhibit G under the argument that the spreadsheet contains inadmissible hearsay is also misguided. The data in Exhibit G was extracted directly from the Matrix Excel Documents, and while irrelevant/immaterial information/data has been removed from Exhibit G, it does not make the exhibit inadmissible.

Finally, the Trustee argues that Exhibit G is a "summary, chart, or calculation" that is properly admissible under Federal Rule of Evidence 1006, noting that he is ready to produce "the full extent of the data" contained in the excel spreadsheets if asked to do so by the court.

The Matrix Defendants (in their Motion to Exclude Evidence Reply) argued that, notwithstanding the filing by the Trustee of the Schwartz Affidavit, Exhibit E remains inadmissible hearsay and should be excluded under Federal Rules of Evidence 402 and 702 and *Daubert*.[104]  In

---

[100] Response to Motion to Exclude Evidence 5-6.

[101] Response to Motion to Exclude Evidence 1 (quoting MSJ, 11).

[102] Response to Motion to Exclude Evidence 1-2.

[103] Response to Motion to Exclude Evidence 2.

[104] *See* Motion to Exclude Evidence Reply, 1-3.

addition, the Matrix Defendants argue that Exhibit G remains inadmissible because the Trustee has failed to explain its relevance, stating, "To the extent it is intended to support his damages claims set out in his second amended disclosures and supplemental interrogatories, it is irrelevant because – as established in defendants' summary judgment motion – the Trustee cannot claim as damages the amounts stolen by Vantage."[105]  Moreover, they argue that the Trustee's identification of the excel spreadsheets produced by the Matrix Defendants as being the documents from which the Trustee obtained the data included in Exhibit G "does not identify what 'data' was 'pulled' from what document or what purportedly irrelevant/immaterial information/data has been removed from the original documents" and "[a]n unsworn assertion by counsel in a brief that fails to explain how and by whom the Exhibit G spreadsheet was created does not rise to the level of establishing foundation"[106] under Federal Rules of Evidence 901.  In addition, the Matrix Defendants argue that the Trustee's admission that he created Exhibit G "precludes any argument that the spreadsheet is a business record of Matrix" for purposes of the business records hearsay exception found in Federal Rules of Evidence 803 and, therefore, Exhibit G is inadmissible hearsay.[107]  Finally, the Matrix Defendants argue that while summaries that are admissible under Rule 1006, "they still must be authenticated under Federal Rule of Evidence 901[,]"[108] and the Trustee "makes no attempt to authenticate Exhibit G, such as providing a declaration or affidavit from the creator of the spreadsheet explaining their methodology."[109]  The Matrix Defendants state that the Trustee's failure to authenticate Exhibit G is[110]

---

[105] Motion to Exclude Evidence Reply 3-4.

[106] Motion to Exclude Evidence Reply 4.

[107] *Id.*

[108] *Id.* (citing *Strong v. City of Dallas*, 54 F. App'x 79 (5th Cir. 2002).

[109] *Id.* (citing *Encompass Off. Sols., Inc. v. Connecticut Gen. Life Ins. Co.,* No. 3:11-CV-02487-L, 2017 WL 3268034, at *9 n.4 (N.D. Tex. July 31, 2017)).

[110] *Id.*

particularly problematic where, as here, "the person who prepared the chart would not be subject to cross-examination because…it appears that the chart was prepared by [the introducing party]'s counsel." Further, Rule 1006 has not been applied in the summary judgment context where the summary is "otherwise objectionable, for example, because it contains hearsay." Exhibit G is therefore impermissible as a summary under Rule 1006.

The bankruptcy court concludes that the Matrix Defendants' Motion to Exclude Evidence should only be granted as to Exhibit E (the unsigned, unsworn Schwartz Report), but should be **_denied_** as to Exhibit G (the spreadsheet summary of data provided by the Matrix Defendants in discovery), and to Exhibit I (the Schwartz Affidavit with Schwartz Report attached).[111]  It should be noted that, at the summary judgment stage, "evidence need not be authenticated or otherwise presented in an admissible form."  *Maurer v. Indep. Town,* 870 F.3d 380, 384 (5th Cir. 2017). "Materials cited to support or dispute a fact need only be capable of being presented in a form that would be admissible in evidence." *Id.* (internal quotation marks omitted).  As to the spreadsheet, the Trustee has represented that it is a summary of data that was provided in discovery by the Matrix Defendants themselves.  Thus, the bankruptcy court can conjecture that it is capable of being presented in a form that would be admissible at trial.  As to Exhibit I (the Schwartz Affidavit and attached Report), the bankruptcy court can likewise conjecture that the information therein could be presented in a form that would be admissible at trial.  While the Matrix Defendants have argued that Mr. Schwartz lacks sufficient knowledge and experience to offer opinions relevant to this dispute, and that his report makes improper legal conclusions on matters easily understandable by a lay person, this court disagrees.  Mr. Schwartz appears well qualified as a fraud examiner—

---

[111] Although the Matrix Defendants' Motion to Exclude Evidence does not technically appear to request the exclusion of Exhibit I from the summary judgment record, to the extent it can be read to be an objection under Rule 56(c)(2) to the inclusion of Exhibit I in the summary judgment evidence, the court concludes that such a request should be denied for the reasons stated below.

with sufficient knowledge and experience to offer opinions—and the court does not believe the evidence will necessarily be easily understandable by lay people.

In summary, the Motion to Exclude Evidence as to Exhibits G and I should be denied, as the Matrix Defendants have not made convincing arguments that they are inadmissible under the Federal Rules of Evidence or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### 2. Conflict of Laws

The next issue that must be addressed here, before the court can further address the substantive merits of the MSJ, is whether Texas law, New York law, or a combination of the two, should apply with respect to the various claims and affirmative defenses asserted by the parties. The Trustee has argued that Texas law applies to all of the claims, contract and tort, while the Matrix Defendants contend that New York law – the governing law under the choice of law provisions of the Vantage SA – applies to all of the claims, contract and tort. This issue is significant because there could be different results in this Adversary Proceeding, depending on which law applies. For example, New York law has developed quite differently with regard to the *in pari delicto* defense. As noted by the court in its Order on Rule 12(b) Motion, the choice of law issue entails "an intensely factual inquiry" that would not be appropriate at the Rule 12(b)(6) stage of the litigation,[112] and Judge Brown agreed in her Order Denying Motion for Leave to Appeal.[113] The Trustee and the Matrix Defendants agree that sufficient undisputed facts have been developed during discovery, and are included in the summary judgment record, such that the court can make a determination regarding the choice of law issue at this stage of the litigation, with the Trustee

---

[112] *See supra* note 15 and accompanying text.

[113] *See supra* note 33 and accompanying text.

continuing to argue that Texas law applies to all of the claims, and the Matrix Defendants maintaining their position that New York law applies to all of the claims.

As the court concluded in the Order on Rule 12(b) Motion, the court must look to the law of the forum in which it sits in undertaking the choice of law analysis, which means that the court will look to Texas conflict of laws rules.[114]  Texas follows the Restatement (Second) of Conflict of Laws in analyzing which state's laws apply[115] and requires an issue-by-issue analysis even where, as here, there is a contractual choice of law provision at issue.[116]  Here, the Trustee is suing the Matrix Defendants for breach of the Vantage SA, which contains a choice of law provision that identifies New York law as the law to be applied to the agreement.  "Texas applies the framework set forth in Section 187 of the Restatement (Second) of Conflict of Laws in determining the enforceability of a contractual choice-of-law provision,"[117] and, while "Texas law recognizes the 'party autonomy rule' that parties can agree to be governed by the law of another state[,]"[118] "contractual choice-of-law provisions are not 'unassailable' under Texas law,"[119] and, as

---

[114] *See* Order on Rule 12(b) Motion, 23 ("[T]his court should apply the law of the forum state, Texas, in undertaking th[e] choice of law analysis."); *see also Wilmington Sav. Fund Soc'y, FSB v. iHeartCommunications, Inc. (In re iHeartMedia, Inc.)*, 597 B.R. 339, 350 (Bankr. S.D. Tex. 2019) (where the bankruptcy court in Texas applied Texas choice of law rules with respect to causes of action that "arose outside of the Bankruptcy Code and are based on state law causes of action[,]" after noting that the Fifth Circuit has yet to resolve the issue of whether a bankruptcy court, sitting in bankruptcy subject matter jurisdiction and not diversity jurisdiction, should apply federal law or the law of the forum) (cleaned up).

[115] Both the Fifth Circuit and Texas courts have stated that the choice-of-law analysis in the Restatement provides the appropriate analytical framework.  *See Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 532 (5th Cir. 2020); *Fishback Nursery v. PNC Bank*, 920 F.3d 932, 935-936 (5th Cir. 2019); *In re MC Asset Recovery, LLC v. Commerzbank A.G, et al. (In re Mirant Corp.).,* 675 F.3d 530, 536 (5th Cir. 2012); *Exxon Mobil Corp. v. Drennen,* 452 S.W.3d 319, 324 (Tex. 2014), *reh'g denied* (Feb 27, 2015).

[116] *See* Order on Rule 12(b) Motion 24 (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 727 (5th Cir. 2003)).

[117] *See Realogy*, 957 F.3d at 532 (citing the Texas Supreme Court case, *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990)).

[118] *Id.* (citing *Exxon Mobil Corp. v. Drennen,* 452 S.W.3d 319, 324 (Tex. 2014)); *see also* Order on Rule 12(b) Motion, 23 ("Texas law does . . . recognize the 'party autonomy rule,' pursuant to which parties can agree to be governed by the law of another state and, thus, the 'default position' is that choice of law provisions are enforceable.") (citing *Cardoni v. Prosperity Bank,* 805 F.3d 573, 580 (5th Cir. 2015) ("We are accustomed to giving effect to the knowing and voluntary agreement of parties, especially sophisticated ones.")).

[119] *Realogy*, 957 F.3d at 532 (citing *Cardoni*, 805 F.3d at 580).

recognized by the court in its Order on Rule 12(b) Motion, "it is not uncommon for a party to overcome a choice of law provision."[120] Moreover, if the choice of law provision is "narrow" in that it "deals only with the construction and interpretation of the contract[,] . . . . Texas law requires an issue-by-issue choice of law analysis."[121]

> Restatement (Second) of Conflicts of Laws §187[122] states:
>
> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> > a. the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> >
> > b. application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

The Matrix Defendants argue that, under § 187(1), the parties' choice of New York law would apply to all of the Trustee's claims[123] and that "[e]ven if Section 187(2) were applicable, it also is

---

[120] Rule 12(b) Motion 23 (citing *Cardoni*, 805 F.3d at 581).

[121] *See Benchmark Elecs. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003).

[122] Restatement (Second) of Conflict of Laws § 187 (1971).

[123] The Matrix Defendants contend that the Trustee's tort claims "all arise from the [Vantage] SA[,]" and, thus, the claims should be governed by the Vantage SA's choice of law provision. *See* MSJ, 15. The Matrix Defendants cite three cases to support its view that the tort claims could have arisen from the contract. *See id.* (citing *Alvarado v. PNC Bank Nat'l Ass'n*, 660 F Supp. 3d 612 (S.D. Tex. 2023); *Goodsworth Holdings, Inc. v. Suh*, No. CIV. A. 3:00-CV-1871, 2001 WL 910388 (N.D. Tex. Aug. 3, 2001); *RLI Ins. Co. v. Interstate Battery Sys. Int'l, Inc.*, No. 3:20-CV-1888-D, 2021 WL 5164937 (N.D. Tex. Nov. 5, 2021). But, choice of law was not an issue in any of those cases, and so the court does not find these cases applicable. In any event, as discussed below, in Texas, a narrow choice of law provision only encompasses the construction and interpretation of the contract and does not encompass related tort claims.

satisfied and requires that New York law should be applied."[124]  They say that the Trustee ignores

§ 187(1), which the Matrix Defendants argue should be dispositive, and focuses exclusively on

§ 187(2) in arguing that Texas law should apply to both the breach of contract claim and the tort

claims.

With respect to the breach of contract claim, the bankruptcy court agrees with the Matrix

Defendants that § 187(1) is dispositive regarding the enforceability of the parties' choice of New

York law and, thus, the framework in § 187(2) is not applicable and does not have a place in the

court's choice of law analysis under Texas law.   However, the court disagrees with the Matrix

Defendants with respect to the tort claims asserted.  Under the Fifth Circuit's *Benchmark* case,[125]

and under Texas conflict of law rules, § 187 would not be considered at all as part of a conflict of

law analysis regarding the remaining tort claims.  Rather, that analysis would be conducted under

a different section of the Restatement, namely § 145, which deals with torts.

As the bankruptcy court observed in its Order on Rule 12(b) Motion, the Vantage SA choice

of law provision is virtually identical to the choice of law provision involved in the *Benchmark*

case.  Section 19 of the Vantage SA provides, "This agreement shall be governed by and construed

in accordance with the laws of the State of New York, without regard to the choice of law principles

thereof." In *Benchmark*, the choice of law provision stated that the "Agreement shall be governed

by, and construed in accordance with, the internal laws of the State of New York."[126] The Fifth

Circuit observed that the choice of law provision in *Benchmark* was narrow, because it dealt only

with the construction and interpretation of the contract.   Citing comment c of § 187 of the

Restatement, *Benchmark* stated, "Texas law gives effect to choice of law clauses regarding

---

[124] MSJ 13.

[125] *See supra* note 121.

[126] *Benchmark*, 343 F.3d at 726.

construction of a contract[,]"[127] and, because the particular issue was one which the parties could have resolved by an explicit provision in their agreement directed to that issue within the meaning of subsection (1), the court would "respect the parties' determination that their agreement be construed under New York law." The Fifth Circuit saw no need to address the enforceability of the parties' choice of law under § 187(2) with respect to the breach of contract claim.[128]

But as the Fifth Circuit further explained in *Benchmark*, while Texas conflict of laws rules would respect the parties' choice of New York law to be applied to breach of contract claims, "[t]he contractual choice of law clause [did] not . . . address the parties' entire relationship" and the plaintiff's "[tort] claims of fraud and negligent misrepresentation [were] not governed by the parties' narrow choice of law provision" that "deal[t] only with the construction and interpretation of the contract."[129]   The Fifth Circuit conducted an "issue-by-issue" conflict of laws analysis required by Texas law to address which state's laws – New York's or Texas' – should apply with respect to the tort claims and concluded that Texas law, not New York law, would apply to those claims.[130]   In reaching its conclusion, the Fifth Circuit noted that Texas courts use the Restatement's 'most significant relationship' test to decide conflict of laws issues (that are not governed by an enforceable choice of law provision in a contract) and that, with respect to torts, the court looks to § 145 "when applying the general choice of law principles set forth in § 6."[131]

---

[127] *Id.*   Comment c is titled "Issues the parties could have determined by explicit agreement directed to particular issue."

[128] *Id.*

[129] *Id.*; *see also Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 433 (Tex. 1999) (where the Texas Supreme Court determined that the narrow choice of law provision at issue did not "purport to encompass . . . tort claims.").

[130] *Id.* at 727-28.

[131] *Id.* Restatement (Second) of Conflict of Laws § 6 states that the factors relevant to choosing the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

The court will use this framework for its conflicts of law analysis with respect to the Trustee's state law tort claims.

Section 145 of the Restatement relating to tort claims,[132] states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    a.  the place where the injury occurred,

    b.  the place where the conduct causing the injury occurred,

    c.  the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

    d.  the place where the relationship, if any, between the parties is centered.

This test will determine whether Texas or New York has the "most significant relationship" to the claims, and ultimately will determine which law will govern those claims.

Consideration of the relevant Restatement factors demonstrate that Texas law should govern the tort claims. The only contact either party has with the state of New York is that MSCS is a New York limited liability company; however, according to the Vantage SA, MSCS is physically located in Colorado. In addition, the relevant CAAs are with MTC, a Colorado trust company, and they provide "[a]ll contributions to, and payments from, the [custodial account] shall be deemed to take place in the State of Colorado," and MTC was also physically located in Colorado. All other contacts were with the state of Texas. At the time the Richies carried out their illegal scheme to steal from their clients' retirement plans, Vantage was located in Texas, the Richies were located in Texas, and the funds misappropriated were transferred to an account under the control of the Richies located in Texas. The alleged harms to Vantage occurred in Texas. As

---

[132] Restatement (Second) of Conflict of Laws § 145 (1971).

pointed out by the Fifth Circuit in *Benchmark*, Texas "clearly has an interest" in protecting residents and businesses within its borders.[133]  With the only contact with New York being that MSCS is a New York limited liability company and the most substantial contacts being with Texas, Texas clearly has a more compelling interest in governing the tort claims.  The bankruptcy court determines that Texas has the "most significant relationship" with respect to the Trustee's tort claims asserted in Counts 3, 6, and 7, and will apply Texas substantive law to the Trustee's tort claims and to the Matrix Defendants' affirmative defenses to those claims.

To summarize, the parties' choice of New York law in the Vantage SA will be respected such that the court will apply New York substantive law to the breach of contract claim asserted in Count 1 of the Live Complaint.  The court will apply Texas substantive law, as the state with "the most significant relationship," with respect to the Trustee's tort claims asserted in Counts 3, 6, and 7.  With the choice of law issue decided, the court will now turn to the question of whether the Matrix Defendants are entitled to summary judgment that all of the Trustee's claims are barred by the equitable affirmative defense of *in pari delicto*.[134]

### 3.  *In Pari Delicto*

The common law defense of *in pari delicto* is an equitable doctrine that derives from the Latin, *in pari delicto potior est conditio defendentis*, which literally means "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one."[135]  The defense is "grounded on two premises:  first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is

---

[133] *See Benchmark*, 343 F.3d at 729.

[134] As noted by the court in its Order on Rule 12(b) Motion and above, the court's decision on whether New York or Texas substantive law applies may be determinative of the outcome of its *in pari delicto* analysis because New York's common law doctrine of *in pari delicto* has developed quite differently from that of Texas.

[135] *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (citing Black's Law Dictionary 711 (5th ed. 1979)).

an effective means of deterring illegality."[136]   The United States Supreme Court in *Bateman Eichler* stated that "[i]n its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because 'in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.'"[137]   The Supreme Court stated that "the public policy considerations that undergirded the *in pari delicto* defense were frequently construed as precluding the defense even where the plaintiff bore substantial fault for his injury"[138] but pointed out that "[n]otwithstanding these traditional limitations, many courts have given the *in pari delicto* defense a broad application to bar actions where plaintiffs simply have been involved generally in 'the same sort of wrongdoing' as defendants."[139]   The Fifth Circuit has held that *in pari delicto* is "an equitable, affirmative defense, which is controlled by state common law[,]"[140] which accounts for the fact that in some states, the doctrine, as developed under the state's common law, is applied more strictly to bar a plaintiff's claims while, in others, the doctrine has developed to be interpreted flexibly and to take into account the facts and circumstances of each case to fashion an equitable result.

***But, what about a situation when a bankruptcy company engaged in prepetition misconduct, along with another third party potentially, and now there is a bankruptcy trustee standing in the shoes of the bankruptcy company (i.e., the debtor)?***   Are the fraudulent or illegal acts of insiders of a corporate debtor always imputed to the corporate debtor for purposes of determining whether the corporate debtor was *in pari delicto* with the third-party wrongdoer?   If

---

[136] *Id.* (cleaned up); *see also Jones v. Wells Fargo Bank, N.A.*, 666 F.3d at 965 (citing *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008)).

[137] *Bateman Eichler*, 472 U.S. at 306-07 (citing 1 J. Story, Equity Jurisprudence 304-305 (13th ed. 1886)).

[138] *Bateman Eichler*, 472 U.S. at 307 (citing 1 Story at 305).

[139] *Id.* (citing *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138 (1968)).

[140] *Jones v. Wells Fargo*, 666 F.3d at 965 (citations omitted).

so, does the bankruptcy trustee always take on the mantle of a "wrongdoer" since he is now

standing in the shoes of the debtor?   Does the equitable doctrine prevent the bankruptcy trustee

from using the good offices of the court to pursue torts and recover from a third-party wrongdoer

who may have acted in concert with the debtor—even when the application of the doctrine would

seem quite *inequitable*, given that there are unpaid creditors who have been left in the carnage of

it all?

    As noted by this court in its Order on Rule 12(b) Motion, the Fifth Circuit has not squarely

addressed the issue of whether the *in pari delicto* doctrine applies in the context of a bankruptcy

trustee bringing claims on behalf of a bankruptcy estate.[141]   But, a majority of the federal Circuit

courts of appeal (eight in total) have applied the *in pari delicto* defense to bankruptcy trustees

preventing them from pursuing state law claims such as fraud or breach of fiduciary duties against

third parties who have allegedly participated in or facilitated wrongful conduct (for example,

prepetition advisors to the bankrupt debtor).[142]   These Circuit courts basically hold that § 541 is a

winnower of rights[143] and that a bankruptcy trustee only succeeds to claims/rights to the same

---

[141] Order on Rule 12(b) Motion 26.  Based on the court's research, the Fifth Circuit has still not addressed this issue in the three years since the court issued its Order on Rule 12(b) Motion.

[142] *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151 (11th Cir.2006) ("If a claim of ETS would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.") (citing *Grassmueck v. Am. Shorthorn Ass'n.*, 402 F.3d 833, 837 (8th Cir. 2005); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356–57 (3rd Cir. 2001); *Terlecky v. Hurd (In re Dublin Sec. Inc.)*, 133 F.3d 377, 381 (6th Cir.1997); *Sender v. Buchanan (In re Hedged–Inv. Associates)*, 84 F.3d 1281, 1285 (10th Cir.1996); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158–66 (2nd Cir. 2003)).  The court notes that the Second Circuit, in 1991, considered *in pari delicto* in the context of a bankruptcy trustee, but focused on the bankruptcy trustee's standing (or lack of standing) under New York law to bring the claims in the first instance and not on the merits of *in pari delicto* as an affirmative defense. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991).  This has come to be known as the "Wagoner Doctrine" and is often discussed in the same breath as the *in pari delicto* affirmative defense under New York's common law.  *See also Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271 (10th Cir. 2008); *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. and Rsch. Found. v. PriceWaterhouseCoopers, LLP*, 607 F.3d 346 (3d Cir. 2006) (applying the *in pari delicto* doctrine to claims brought by the unsecured creditors committee on behalf of the debtor); *Baena v. KPMG LLP*, 453 F.3d 1 (1st Cir. 2006); *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Cap. LLC*, 716 F.3d 355 (4th Cir. 2013).

[143] Except for the Second Circuit in the *Wagoner* case, which focused on standing.

extent that the debtor had them—meaning claims are subject to the very defenses that could have been asserted against the debtor.

Interestingly, the Fifth Circuit, in *Jones v. Wells Fargo*, has refused to apply the doctrine to bar the claims of an innocent **receiver**, and the Supreme Court (which has yet to address the issue of applicability of the doctrine to bankruptcy trustee) has held, in *Perma Life* and *Bateman Eichler*, that the *in pari delicto* doctrine does not apply in federal antitrust cases or in securities fraud cases. As noted in the bankruptcy court's Order on Rule 12(b) Motion, the *Jones v. Wells Fargo* case would appear to be most analogous case in the Fifth Circuit, but it is not at all clear that the Fifth Circuit would go against the overwhelming weight of authority in the majority of its sister Circuits and conclude that the *in pari delicto* doctrine does not apply to claims brought by bankruptcy trustees as a matter of law or of federal policy related to bankruptcy cases.

In *Jones v. Wells Fargo*, the Fifth Circuit affirmed the district court, which had declined to apply the *in pari delicto* doctrine to a receiver appointed by the federal district court in an SEC enforcement action against W Financial Group, L.L.C. "for the purpose of recovering the company's assets for the benefit of its investors." The receiver had been specifically authorized "to institute all actions or proceedings necessary to recover W Financial's assets, and to file such actions in the United States District Court for the Northern District of Texas."[144]  In that case, Mr. Wahab, a principal of W Financial (the entity that had gone into a receivership), had—pre-receivership—gone to a Wells Fargo bank branch and obtained on behalf of W Financial a large cashier's check payable to the Lateefs.  Mr. Wahab then went to another Wells Fargo bank branch and presented the check—which had never been seen, much less endorsed, by the Lateefs and instructed Wells Fargo to deposit the check into the bank account of another company that Mr.

---

[144] *Jones v. Wells Fargo*, 666 F.3d at 957.

Wahab controlled.   The receiver ultimately sued Wells Fargo for conversion of the check by following Mr. Wahab's instructions.  Wells Fargo argued the defense of *in pari delicto* against the receiver, since Mr. Wahab, as a principal of W Financial, had played a central role in the conversion. The Fifth Circuit, in affirming the district court's rejection of this defense, stated:[145]

> Wells Fargo's *in pari delicto* argument fails to acknowledge the important distinction between W Financial as a corporation and Wahab as an individual. While it is undisputed that Wahab played a central role in the conversion of the cashier's check, W Financial is composed of more than Wahab or the other individuals who operated the company. "The legal concept that a corporation is a distinct entity separate from its stockholders, officers and directors is fundamental to the law of corporation." A corporation is "separate and distinct from the members who comprise it, with attributes, rights, and liabilities of its own," even though it must act through its officers or agents. To conclude that W Financial stands *in pari delicto* simply because Wahab is a wrongdoer ignores the fundamental distinction between a corporation and its officers. W Financial itself does not stand *in pari delicto* to Wells Fargo, even if Wahab does.

The Fifth Circuit went on to add:[146]

> The distinction between a corporation and its officers or agents is reinforced by the appointment of a receiver. A receiver is "the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property of the receivership." Although a receiver generally "has no greater powers than the corporation had as of the date of the receivership," it is well established that "when the receiver acts to protect innocent creditors ... he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." The receiver thus acts on behalf of the corporation as a whole, an entity separate from its individual bad actors.

Notably, while a claim being brought by a receiver on behalf of a receivership entity would seem to be analogous to a claim being brought by a bankruptcy trustee on behalf of a bankrupt debtor, the Fifth Circuit—in rejecting Wells Fargo's argument that the numerous Circuit court cases that apply *in pari delicto* to bar claims of bankruptcy trustees are analogous to a receiver— specifically commented that "such a situation ***might be*** different because of section 541(a) of the

---

[145] *Id.* at 966-67 (cleaned up).

[146] *Id.* at 966 (cleaned up).

Bankruptcy Code, which limits the debtor estate to interests of the debtor 'as of the commencement of the case.'"[147]

Moreover, certain bankruptcy and federal district courts within the state of Texas have expressly stated that they anticipate that the Fifth Circuit would follow the majority of the other Circuits in applying the *in pari delicto* doctrine to a bankruptcy trustee asserting state-law claims on behalf of the estate pursuant to § 541.  The bankruptcy court in the Southern District of Texas, in addressing whether the doctrine of *in pari delicto* barred the bankruptcy trustee's tort claims against a debtor's insiders based on allegations that the debtor engaged in the fraudulent sale and leasing of its equipment, and also against the debtor's pre-petition lenders who financed the equipment sales and leases, noted that "[t]he Fifth Circuit has not ruled on whether *in pari delicto* applies to trustees asserting claims on behalf of a bankruptcy estate" but that a majority of Circuits does apply *in pari delicto* to trustees.[148] The bankruptcy court opined that "[t]his Court has no reason to believe that the Fifth Circuit would depart from the majority of its sister courts" and that "Texas law governs whether *in pari delicto* bars the Trustee's claims."[149] The court then proceeded to analyze whether the trustee's claims in that case would be barred under Texas's doctrine of *in pari delicto*.[150]   The following year, the district court in the Southern District of Texas, pointing out that the Fifth Circuit had not applied the *in pari delicto* defense to claims made by a bankruptcy trustee and noting that the majority of circuits have done so, stated that "the Court anticipates the

---

[147] *Id.* at 967 (emphasis added).

[148] *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 747-48 (Bankr. S.D. Tex. 2008).

[149] *Id.* at 748.

[150] In the case of in *In re TOCFHBI, Inc.*, this bankruptcy court recognized the unsettled question in the Fifth Circuit regarding the *in pari delicto* doctrine's applicability to bankruptcy trustees when addressing whether a defendant was entitled to summary judgment on a trustee's claims against it based on Texas state-law *in pari delicto* doctrine. 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009) ("The court determines that, even if the *in pari doctrine* is available to use against a bankruptcy trustee, it is not a basis to grant summary judgment in favor of Settle Pou in the case at bar, because such defense is intensely factual and there are genuine issues of disputed fact relevant to this defense.).

Fifth Circuit would join this majority." The court then proceeded to "consider[ ] the parties' arguments on the *in pari delicto* defense."[151]  And, more recently, the district court for the Western District of Texas found that New York's *in pari delicto* defense applied to bar claims by a litigation trustee under the debtor's (CryptoMetrics') confirmed chapter 11 plan against third-party wrongdoers, including the attorneys who represented the debtor pre-petition, where the "[debtor's] own intentional wrongdoing (through its officers) contributed to its injuries,"[152] finding "[t]he doctrine of *in pari delicto* is an issue of substance governed by state law"[153] and applying New York's *in pari delicto* doctrine to dismiss, pursuant to Rule 12(b)(6), certain of the litigation trustee's breach of fiduciary duty claims.

The Trustee argues that the Fifth Circuit's opinion in a case called *Kane*[154] may prove predictive of the Fifth Circuit taking the road less travelled at the Circuit level, as to the doctrine of *in pari delicto*.  *Kane* dealt with a different equitable defense—the equitable defense of judicial estoppel—and whether that equitable defense, which would have barred the claims if they had been brought by the debtor himself, would be applied to prevent the bankruptcy trustee from bringing those claims on behalf of the bankruptcy estate.  The Fifth Circuit declined to apply the equitable defense to the bankruptcy trustee because doing so would result in harm to the creditors of the estate.  In *Kane*, the chapter 7 husband and wife debtors had failed to list a pre-petition personal injury claim they had on their bankruptcy schedules, and had otherwise failed to inform the chapter 7 trustee of the claim, before the Kanes received a no-asset discharge and their case was closed.  This was in spite of the fact that the debtors had already filed their personal injury

---

[151] *Floyd v. CIBC World Mkts., Inc.*, 426 B.R. 622, 642 (S.D. Tex. 2009)
[152] *Brickley v. Scantech Identification Beams Sys., LLC*, 566 B.R. 815 (W.D. Tex. 2017).
[153] *Id.* at 839.
[154] *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380 (5th Cir. 2008).

lawsuit against the defendants in state court three years prior to their bankruptcy filing.[155]  The

bankruptcy case was subsequently reopened, the state-court litigation was removed to federal

district court based on "related to" bankruptcy jurisdiction, and the defendants moved for summary

judgment, arguing that the Kanes should be judicially estopped from pursuing their claims.[156]  The

bankruptcy trustee thereafter moved to substitute himself for the Kanes as the real party-in-interest,

and the district court subsequently granted the defendants' motion for summary judgment,

applying judicial estoppel to bar the Kanes from pursuing the claim and dismissing, as moot, the

trustee's motion to be substituted as the real party-in-interest.[157]  On appeal, the Fifth Circuit stated

that, while "we have applied judicial estoppel to bar an unscheduled claim when others, the debtors

or other insiders, would benefit to the detriment of creditors if the claim were permitted to

proceed[,]"[158] "[w]e disagree" with the district court's conclusion that, "as a matter of law . . . our

decision in *In re Superior Crewboats, Inc.*, 374 F.3d 330, controls the outcome of the case before

us."[159]  The Fifth Circuit held that the equitable defense of judicial estoppel, while it may bar the

debtors from bringing the claim, would not apply to the bankruptcy trustee who was attempting to

substitute in as the real party-in-interest to bring the claim on behalf of the bankruptcy estate,

distinguishing *Superior Crewboats* and *Coastal Plains* on the basis that, in each of those cases, the

debtors (in *Superior Crewboats*) and the former CEO and insider of the debtor corporation (in

---

[155] *Id.* at 383.

[156] *Id.*

[157] *Id.*

[158] *Id.* at 386 (citing *Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330 (5th Cir. 2004), which the district court relied upon in granting the defendants' motion for summary judgment, and *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197 (5th Cir. 1999)).

[159] *Id.*

*Coastal Plains*) stood to benefit from pursuing their claims at the expense of the creditors.[160]  The

court focused on the equitable nature of the defense, stating,[161]

> In this case, no such equitable concerns inhere.  Rather, the only way the Kanes'
> creditors would be harmed is if judicial estoppel were applied to bar the Trustee
> from pursuing the claim against Defendants on behalf of the estate.  In this case,
> equity favors the Trustee.  For as Judge Easterbrook noted in a Seventh Circuit case
> suggesting that a bankruptcy trustee should be able to pursue a claim on behalf of
> the creditors that the debtor himself would be judicially estopped from pursuing:
>
>> [The debtor's nondisclosure in bankruptcy harmed his creditors by
>> hiding assets from them. Using this same nondisclosure to wipe out
>> [the debtor's claim against the defendant] would complete the job
>> by denying creditors even the right to seek some share of the
>> recovery. Yet the creditors have not contradicted themselves in
>> court. They were not aware of what [the debtor] has been doing
>> behind their backs. Creditors gypped by [the debtor's] maneuver are
>> hurt a second time by the district judge's decision. Judicial estoppel
>> is an equitable doctrine, and using it to land another blow on the
>> victims of bankruptcy fraud is not an equitable application.

The *Kane* decision may suggest that the Fifth Circuit, similarly, would be loath to apply the

equitable doctrine of *in pari delicto* if it has the result of harming innocent creditors.  But, perhaps,

not.  The *Kane* opinion was issued in 2008, and the Fifth Circuit did not take the opportunity in

2012 in *Jones v. Wells Fargo* to shut down the defendants' argument that the equitable doctrine of

*in pari delicto* should apply to the receiver just as it has been held by the overwhelming majority

of its sister Circuits to apply to a bankruptcy trustee; rather, the Fifth Circuit simply stated that the

bankruptcy trustee situation "***might be*** different because of section 541(a) of the Bankruptcy Code,

which limits the debtor estate to interests of the debtor 'as of the commencement of the case.'"[162]

Nor has the United States Supreme Court considered *in pari delicto*'s application to

bankruptcy trustees.  But, as noted above, it has twice declined to apply the doctrine in other federal

---

[160] *Id.* at 387.

[161] *Id.* at 387-88 (quoting *Bisek v. Soo Line R.R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006)).

[162] *Jones v. Wells Fargo*, 666 F.3d at 967 (emphasis added).

law contexts without first considering its effect on the federal statute giving rise to the cause of action.[163] Alas, while the Trustee's claims here are brought in this court in the context of a federal bankruptcy proceeding and, thus, based on federal bankruptcy subject matter jurisdiction, all of the causes of action asserted by the Trustee are state-law claims that the Trustee has standing to pursue because they are "property of the estate" under Bankruptcy Code § 541 as causes of action owned by the debtor as of the commencement of the case,[164] and it is well established that property rights in bankruptcy are determined by state law.[165] These are not causes of action that arise from the provisions of the Bankruptcy Code and only exist in the context of a federal bankruptcy case; rather, all of the causes of action here arose before the bankruptcy case was filed and are solely governed by state law. And, courts have held that the equitable "doctrine of *in pari delicto* is an issue of substance governed by state law. So, perhaps, *Perma Life* and *Bateman Eichler* are distinguishable on that basis: causes of action that arise under state law are governed by state substantive law, notwithstanding that they may be brought in federal bankruptcy court – the causes of action in *Perma Life* and *Bateman Eichler* arose under federal regulatory laws designed to provide greater protections than what might be available under state laws.

---

[163] *See Bateman Eichler*, 472 U.S. at 306 (involving federal securities laws) and *Perma Life*, 392 U.S. at 138 (involving federal antitrust laws).

[164] *See* Order on Rule 12(b) Motion, 12 (citing *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.),* 25 F.3d 1281, 1284 (5th Cir. 1994)), where the court stated:

> A chapter 7 trustee is also charged with (among other things) collecting and reducing to money the property of the bankruptcy estate. 11 U.S.C. § 704(a). Property of the estate is broadly defined to include "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Property of the estate includes causes of action. A cause of action belongs to a bankruptcy estate where it "explicitly or implicitly allege[s] harm to the debtor" and "the debtor could have raised the claim as of the commencement of the [bankruptcy] case.

[165] *See Rodriguez v. FDIC*, 589 U.S. 132, 137 (2020) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quoting *Butner v. U.S.*, 440 U.S. 48, 54 (1979)). The Supreme Court in this case faced the issue of how to decide a dispute over a federal tax refund: "Should federal courts rely on state law together with any applicable federal rules, or should they devise their own federal common law test?" *Id.* at 133. The Court noted that "state law is well equipped to handle disputes involving corporate property rights" and "[t]hat cases like the one now before us happen to involve corporate property rights in the context of a federal bankruptcy and a tax dispute doesn't change much." *Id.* at 137.

Moreover, the Supreme Court has held that state-law tort claims brought by the Federal Deposit Insurance Corporation ("FDIC"), as receiver for a failed savings and loan ("S&L"), against the former counsel for the S&L for legal malpractice and breach of fiduciary duty are governed by state law, and there does not exist a general common law that would supplant or override state common law with respect to those claims.[166]  In the *O'Melveny* case, the Supreme Court first noted that "[i]t is common ground that the FDIC was asserting in this case causes of action created by California law," and rejected the law firm's argument that, in the adjudication of those claims,[167]

> (1) a federal common-law rule and not California law determines whether the knowledge of corporate officers acting against the corporation's interest will be imputed to the corporation; and (2) even if California law determines the former question, federal common law determines the more narrow question whether knowledge by officers so acting will be imputed to the FDIC when it sues as receiver of the corporation.

The FDIC, a federal receiver, bringing state-law tort claims against a pre-receivership law firm to an S&L seems closely analogous to a bankruptcy trustee bringing state-law claims against a third-party alleged to have participated in a fraudulent and illegal scheme of corporate insiders.  While the Supreme Court did not address the doctrine of *in pari delicto* specifically in *O'Melveny*, it did discuss the imputation issue – whether corporate insiders' knowledge and acts are imputed to the corporation in the first instance, and, if so, whether such acts or knowledge would be imputed to the FDIC when it sues as receiver of the corporation – which is an issue that underpins whether the acts of the Richies, here, are imputed to Vantage, such that Vantage could be found to be *in pari delicto* with the Matrix Defendants as of the commencement of the bankruptcy case.  And, the Supreme Court answered the first question by starting with the general proposition that "[t]here

---

[166] *O'Melveny & Meyers v. F.D.I.C.*, 512 U.S. 79, 83-85 (1994).
[167] *Id.* at 83.

is no federal general common law,"[168] and "the remote possibility that corporations may go into federal receivership is no conceivable basis for adopting a special federal common-law rule divesting States of authority over the entire law of imputation[,]"[169] and concluding that "the short of the matter is that California law, not federal law, governs the imputation of knowledge to corporate victims of alleged negligence . . . ."[170]

In answering the second question – whether federal law somehow displaces state law on the imputation issue as it may be applied to the FDIC, as receiver – the Supreme Court noted in *O'Melveny* that "we of course would not contradict an explicit federal statutory provision[; n]or would we adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law."[171]  The Supreme Court noted that under FIRREA, the FDIC "by operation of law, succeed[s] to – all rights, titles, powers, and privileges of the insured depository institution[ ]"[172] and that "[t]his language appears to indicate that the FDIC as receiver 'steps into the shoes' of the failed S&L that existed prior to receivership[,] obtaining the rights '*of the insured depository institution*' that existed prior to receivership[,]" and that "[t]hereafter, in litigation by the FDIC asserting claims *of* the S&L—in this case California tort claims potentially defeasible by a showing that the S&L's officers had knowledge—'any defense good against the original party is good against the receiver.'"[173]  This description of the FDIC, under the comprehensive and detailed federal statutory scheme set forth in FIRREA, as "stepping into the

---

[168] *Id.* (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[169] *Id.* (citation omitted).

[170] *Id.* at 84-85.

[171] *Id.* at 85-56 (referring to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183, which established the FDIC and defines the rights, powers, and duties of the FDIC as receiver) (citations omitted).

[172] *Id.* at 86 (citing 12 U.S.C. § 1821(d)(2)(A)(i) (1988 ed., Supp. IV)).

[173] *Id.* (citations omitted).

shoes" of the S&L that existed prior to the receivership, sounds an awful lot like the much-used description of a bankruptcy trustee, under the comprehensive and detailed federal statutory scheme set forth in the Bankruptcy Code, "stepping into the shoes" of the debtor, as of the commencement of the bankruptcy case.  The Supreme Court in *O'Melveny* rejected the law firm's argument that the statutory grant in FIRREA of rights and powers to the FDIC as receiver "should be read as a *nonexclusive* grant of rights to the FDIC receiver, which can be supplemented or modified by federal common law; and that FIRREA as a whole, by demonstrating the high federal interest in this area, confirms the courts' authority to promulgate such common law[,]" stating, "This argument is demolished by those provisions of FIRREA which specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver." [174]   The Supreme Court referred to the rule of statutory construction – *inclusio unius, exclusio alterius*, before going on to opine that "[i]t is hard to avoid the conclusion that § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S&L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise.  To create additional 'federal common-law' exceptions is not to 'supplement' this scheme, but to alter it."[175]  It seems to this court that the same could be said with respect to Bankruptcy Code § 541 and the bankruptcy trustee standing in the shoes of the debtor to work out state-law claims under state law and causes of action that arise exclusively under the Bankruptcy Code to be worked out according to federal bankruptcy law.  And, the Supreme Court reasoned that "this is not one of those cases in which judicial creation of a federal rule would be justified[,]" where the Court has said, in the past, are "few and restricted, limited to situations where there is a 'significant conflict between some federal

---

[174] *Id.*
[175] *Id.* at 86-87.

policy or interest and the use of state law,'"[176] noting that respondent's position is fatal because it had not identified any "significant conflict with an identifiable federal policy or interest[,] . . . not even that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity."[177]  The Supreme Court went on to point out that "[t]he rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred[ ]"[178] and that "[u]niformity of law might facilitate the FDIC's nationwide litigation of these suits, eliminating state-by-state research and reducing uncertainty—but if the avoidance of those ordinary consequences qualified as an identifiable federal interest, we would be awash in 'federal common-law' rules."[179]  The Supreme Court stated further,[180]

> The closest respondent comes to identifying a specific, concrete federal policy or interest that is compromised by California law is its contention that state rules regarding the imputation of knowledge might "deplet[e] the deposit insurance fund," [b]ut neither FIRREA nor the prior law sets forth any anticipated level for the fund, so what respondent must mean by "depletion" is simply the forgoing of *any* money which, under any *conceivable* legal rules, might accrue to the fund.  That is a broad principle indeed, which would support not just elimination of the defense at issue here, but judicial creation of new, "federal-common-law" causes of action to enrich the fund.  Of course we have no authority to do that, because there is no federal policy that the fund should always win.

The Trustee here has not identified "significant conflict between some federal policy or interest and the use of state law" that would require the displacement of state-common-law defenses, such as *in pari delicto*, and any argument that federal bankruptcy policy demands that

---

[176] *Id.* at 87 (citations omitted).

[177] *Id.* at 88.

[178] *Id.*  Again, this seems closely analogous to the situation here where the Trustee's suit does not involve the primary conduct of a federal entity or the United States, but "conduct on the part of private actors that has already occurred."

[179] *Id.* (citation omitted).

[180] *Id.* ("Our cases have previously rejected 'more money' arguments remarkably similar to the one made here.") (citations omitted).

the Trustee maximize the assets of the bankruptcy estate for the benefit of its creditors would seem

to this court to be another "more money" argument that the Supreme Court rejected in *O'Melveny*.

The bankruptcy court must assume, based on the precedent discussed above, that the Fifth

Circuit will follow its sister Circuits in applying the doctrine to bankruptcy trustees and will

analyze whether the Matrix Defendants would be entitled to summary judgment (1) on the

Trustee's breach of contract claim in Count I, based on application of New York's *in pari delicto*

doctrine to the undisputed facts, and (2) on the Trustee's state law tort claims asserted in Counts

3, 6, and 7, based on application of Texas' version of the *in pari delicto* doctrine to the undisputed

facts.

   *a.  Are the Matrix Defendants Entitled to Summary Judgment That the Trustee's Breach of
        Contract Claim (Count 1) Is Barred by the Matrix Defendants' Affirmative Defense of*
        In Pari Delicto*?*

As noted above, New York law applies to the Trustee's breach of contract claim.  Thus,

New York's law must be applied in analyzing whether the Matrix Defendants have met their burden

of showing, based on the undisputed facts, that they are entitled to summary judgment that the

Trustee's breach of contract claim is barred under their affirmative defense of *in pari delicto*.  New

York has adopted a "strong" version of *in pari delicto* under what is called the "*Wagoner* rule,"

that treats the doctrine as a jurisdictional precondition about "'who has a claim for relief.'"[181]  The

doctrine applies "to claims of breach of contract, unjust enrichment, conversion, rescission, or

damages in tort[,]"[182] and, thus, should be applied to the Trustee's breach of contract claim (but

not to the Trustee's tort claims, which would be governed by Texas law—as discussed above).

---

[181] *See, e.g.*, *Kirschner v. KPMG LLP*, 626 F.3d 673, 675–76 (2d Cir. 2010); *Kirschner v. KPMG LLP*, 938 N.E.2d
941, 950–59 (N.Y. 2010).

[182] *Globaltex Grp. Ltd. v. Trends Sportswear Ltd.*, No. 09-CV-0235, 2010 WL 1633438, at *4 (E.D.N.Y. Apr. 21,
2010).

New York's doctrine of *in pari delicto* "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss."[183]  Moreover, in the context of a corporation suing a third-party wrongdoer who is alleged to have contributed to the corporation's injuries incurred as a result of intentional fraudulent conduct of corporate insiders, "All corporate acts—including fraudulent ones—are subject to the presumption of imputation."[184] New York law does recognize a "most narrow of exceptions" to the rule that the knowledge and illegal acts of a corporation's principals will be imputed to the corporation.  Such exception is called the "adverse interest" rule.  But, this exception "is reserved for cases of 'outright theft or looting or embezzlement … where the fraud is committed against a corporation rather than on its behalf[ ]'"[185] and does not apply when the misappropriated funds are used to further the corporate entity's operations, even if the individual wrongdoers convert some of the funds to their personal benefit.[186]

Here, the undisputed facts show that the Richies (Vantage's sole owners and chief officers) used Vantage to steal millions of dollars from 19 of Vantage's more than 100 retirement plan clients, between 2014 and October 2017.  The undisputed facts also establish that Vantage benefitted from the thefts, in that the money stolen from the plans by the Richies was disbursed to Vantage bank accounts and was used, to some extent, to support Vantage operations, and that Vantage would have collapsed without the use of the stolen funds.  Under New York law, the knowledge and illegal acts of the Richies would be imputed to Vantage for purposes of the *in pari delicto* defense, and would, in turn, bar the Trustee's breach of contract claims that are being

---

[183] *In re Lehr Constr. Corp.*, 551 B.R 732, 738 (S.D.N.Y.), aff'd, 666 F. App'x 66 (2d Cir. 2016).

[184] *In re Lehr Constr.*, 666 F. App'x at 68.

[185] *Picard v. JPMorgan Chase Bank & Co.* (*In re Bernard L. Madoff Inv. Sec.*), 721 F.3d 54, 64 (2d Cir. 2013).

[186] *See, e.g.*, *Kirschner*, 938 N.E.2d at 952–53 ("Thus, [s]hould the 'agent act[] both for himself and for the principal,' . . . application of the exception would be precluded.'") (citation omitted).

brought on behalf of the Vantage bankruptcy estate. The "adverse interest" exception does not apply when stolen funds are used to further an entity's operations, even if individual wrongdoers convert some funds to their personal benefit.[187] The Trustee's own allegations do not suggest that the fault of the Matrix Defendants here—in allegedly being grossly negligent in assisting the Richies (and Vantage) in stealing funds, or at least in failing to stop the Richies, when they allegedly knew or should have known that the disbursement instructions were, on their face, improper and illegal—is equal to the fault of Vantage. Thus, this situation is a classic case for the imposition of New York's *in pari delicto* doctrine, to bar the Trustee's breach of contract claims as a matter of law. The court finds that the Trustee has not pointed to any genuine disputes over any material fact in the summary judgment record that would defeat the Matrix Defendants' MSJ on the basis of *in pari delicto* under New York law as to the Trustee's breach of contract claim. Thus, the bankruptcy court recommends that the district court determine that the Matrix Defendants are entitled to summary judgment of no liability on the Trustee's breach of contract claim asserted in Count 1. As such, the bankruptcy court need not address the other bases for summary judgment as to Count 1 raised by the Matrix Defendants.

The court will next address whether the Matrix Defendants can meet their summary judgment burden with respect to their affirmative defense of *in pari delicto* as to the Trustee's state-law tort claims.

>    b.   *Are the Matrix Defendants Entitled to Summary Judgment that the Trustee's Tort Claims (Counts 3, 6, and 7) Are Barred by the Matrix Defendants' Affirmative Defense of* In Pari Delicto*?*

As discussed above, Texas substantive law applies to the Trustee's tort claims asserted in Counts 3, 6, and 7. Thus, Texas law must be applied to determine whether the *in pari delicto*

---

[187] *See id.*

defense entitles the Matrix Defendants to summary judgment on the tort claims.  As discussed extensively in the Order on Rule 12(b) Motion, under Texas law, even when parties are *in pari delicto*, an exception to the doctrine will sometimes be applied if public policy or the equities demand it.  In fact, the Texas Supreme Court stated in *Lewis v. Davis* that

> [t]he rule is adopted not for the benefit of either party and not to punish either of them, but for the benefit of the public . . . .  There is often involved, in reaching a decision as to granting or withholding relief, the question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other. The solution of the question depends upon the peculiar facts and equities of the case, and the answer usually given is that which it is thought will better serve public policy.[188]

In other words, a policy analysis must occur on a case-by-case basis, which is one of the reasons why the bankruptcy court denied the Matrix Defendants' Rule 12(b) Motion: the bankruptcy court determined that "the applicability of the [*in pari delicto*] defense [under Texas law] necessitates an intensely factual inquiry and, thus, is not a proper subject for a Rule 12(b)(6) motion,"[189] which determination was affirmed by the district court in its order denying the Matrix Defendants' Motion for Leave to Appeal: "This Court agrees with the [Order on Rule 12(b) Motion] that review of the determination[ ] of . . . the *in pari delicto* defense would, under these circumstances, entail factual inquiry that lies beyond a § 1292(b) appeal."  In reaching its conclusion, this bankruptcy court cited to the 2008 bankruptcy court decision out of the Southern District of Texas, *Today's Destiny,* where the court ruled on an *in pari delicto* defense (applying Texas law and citing the *Lewis* admonishment that the policy analysis to be conducted under Texas' *in pari delicto* doctrine involves a consideration of "the peculiar facts and equities of the case").  *Today's Destiny* was  in the context of a motion to dismiss a chapter 7 trustee's claims against lenders to a corporate debtor (among others) and found, "[p]rior to an evidentiary hearing in which the Court can consider how

---

[188] *Lewis v. Davis*, 199 S.W.2d 146, 151 (1947).
[189] Order on Rule 12(b) Motion 29-30.

the particular facts and equities of this case influence *in pari delicto*, the Court cannot dismiss the

Trustee's claim under Rule 12(b)(6)."[190] The bankruptcy court in *Today's Destiny,* in ruling that,

in Texas, *in pari delicto* did not, as a matter of law, bar the bankruptcy trustee's contribution claim

against the lenders, stated:[191]

> The Court can, as a matter of law, rule that *in pari delicto* does not bar the Trustee's
> contribution claim. The Lenders have not cited and the Court has not found case-
> law applying *in pari delicto* to contribution claims.  The Texas legislature
> affirmatively enacted a public policy of contribution among joint tort-feasors by
> enacting the contribution statute of the Texas Civil Practice and Remedies Code.
> The legislature did not exempt from the statute joint tort-feasors who participated
> in criminal acts with other joint tort-feasors. The Trustee is not asserting a *tort claim*
> against *innocent* parties injured by the estate. The Trustee is asserting *contribution
> claims* against an alleged *joint tort-feasor.* The differences in application of a
> contribution claim versus a direct claim have significant consequences with respect
> to the policy *in pari delicto* serves.

The Matrix Defendants have not argued that this court's determination in the Order on Rule

12(b) Motion, that application of Texas *in pari delicto* doctrine involves an intensely factual

inquiry in considering the "peculiar facts and equities of the case," does not apply at the summary

judgment stage of litigation.   In fact, this bankruptcy court in 2009 heard an *in pari delicto*

argument in the context of a summary judgment motion and determined it was too factually

intensive of an inquiry to conduct even at the summary judgment stage:  "The court determines

that, even if the *in pari doctrine* is available to use against a bankruptcy trustee, it is not a basis to

grant summary judgment in favor of Settle Pou in the case at bar, because such defense is intensely

factual and there are genuine issues of disputed fact relevant to this defense."[192]

To be clear, the court, in analyzing whether the Matrix Defendants' are entitled to summary

judgment that the Trustee's tort claims are barred by Texas' *in pari delicto* doctrine, must consider

---

[190] *See Today's Destiny*, 388 B.R. at 748-49.

[191] *Id.* at 750.

[192] *In re TOCFHBI, Inc.*, 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009).

the facts and equities of the overall case and how they interact with the policy that *in pari delicto* was designed to serve—especially where the Trustee is seeking recovery for the benefit of the innocent creditors of Vantage's bankruptcy estate.[193]  In this case, the bankruptcy court determines, after conducting a *Lewis* policy analysis based on the undisputed facts in the summary judgment record, that the Trustee's tort claims in Counts 2, 5, and 6 would not be barred, as a matter of law, and, thus, the Matrix Defendants are not entitled to summary judgment as to their affirmative defense of *in pari delicto* on these claims.

But this is not the end of the court's analysis. For the undisputed facts here show that, even if the fraud and illegal acts of the Richies would be imputed to Vantage, the Trustee is an innocent party seeking recovery from the Matrix Defendants that will benefit innocent creditors of the Vantage bankruptcy estate.  In fact, there is no summary evidence that allowing the Trustee to pursue his tort claims against the Matrix Defendants would benefit the wrongdoers here, such as evidence that Vantage's equity holders – the Richies – would receive any of the recoveries the Trustee may realize on his tort claims.  Under *Lewis*, a court must answer the "question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other." In this Adversary Proceeding, the bankruptcy court can easily conclude, based on the summary judgment evidence, that barring the Trustee's tort claims against the Matrix Defendants based on their *in pari delicto* defense would ***not*** outweigh the overall policy of not inflicting additional harm on the innocent victims of the Richies' fraudulent scheme (here, the creditors of the Vantage bankruptcy estate).  Thus, there is no disputed fact issue here that would need to be determined at trial, as part of a *Lewis* policy analysis.  The bankruptcy

---

[193] *See Today's Destiny,* 388 B.R. at 749 ("The need to consider the 'peculiar facts and equities' is particularly acute when a defendant is asserting the defense against a Trustee who seeks recovery for the benefit of creditors of a wrongdoer rather than the wrongdoer himself.").

court not only recommends denial of the Matrix Defendants' summary judgment on their affirmative defense of *in pari delicto* with respect to the Trustee's tort claims, but also recommends granting summary judgment on this issue in favor of the Trustee.  Although the Trustee did not file a cross-motion for summary judgment, the court may enter summary judgment against the movant even if the nonmovant did not file a cross-motion. *See U.S. Cellular Corp. v. City of Wichita Falls, Texas*, 364 F.3d 250, 255 n.6 (5th Cir. 2004) ("[A] district court may grant summary judgment against a movant even if the non-movant has not filed a cross-motion.") (citing *Benchmark*, 343 F.3d at 730; *Landry v. G.B.A.*, 762 F.2d 462, 464 (5th Cir. 1985)).

In summary, the Matrix Defendants' affirmative defense of *in pari delicto* does not, based on the undisputed facts and as a matter of law, bar the Trustee's tort claims asserted in Counts 3, 6, and 7 of the Live Complaint.

### 4. "Economic Loss" Doctrine

The Matrix Defendants argue that, even if the Trustee's claims are not barred pursuant to Texas' *in pari delicto* doctrine, his tort claims asserted in Counts 3, 6, and 7 fail as a matter of law because (a) they are based on ***the same conduct and duties*** that allegedly support the Trustee's ***breach of contract claim***; and (b) the ***"economic-loss doctrine"*** prevents the Trustee from receiving any damages for at least the negligence cause of action (the Matrix Defendants assert that the economic-loss doctrine, under New York law, "prevents a plaintiff from recovering purely economic losses in a negligence action").[194] The Matrix Defendants contend that the Trustee is seeking purely monetary relief on the same allegations as his breach-of-contract claim and in the same amount.  This bankruptcy court has already concluded in the Order on Rule 12(b) Motion, and after extensive analysis, that if Texas law applies to the tort claims at issue (and the choice of

---

[194] *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012).

law issue was not decided at the 12(b)(6) stage of litigation because, as noted above, the Texas'

choice of law rules require an intensely factual inquiry that would not have been appropriate at

that stage), Texas's version of the "economic loss" rule would not bar, as a matter of law, the

Trustee's tort claims, other than, perhaps, the negligence claim, and there were too many factual

issues that could not be determined at the 12(b)(6) stage:

> First, torts can co-exist with breach of contract claims.  Thus, the torts asserted by
> the Trustee are not automatically barred as a matter of law.  Second, the economic
> loss doctrine does not appear to apply with regard to intentional torts.  Therefore,
> the only potential bar the economic loss doctrine would present here would be with
> regard to the negligence claim (Count 2).  The court does not believe that the
> economic loss rule bars the negligence claim for the following reason.  The Trustee
> has pleaded that the Matrix Defendant served in a fiduciary capacity *vis-à-vis* their
> contractual arrangements with Vantage and under ERISA. This would be a special
> relationship obviously. While this court cannot determine at this juncture whether
> the Matrix Defendants absolutely rose to the level of fiduciaries, the Trustee has
> pleaded a plausible set of facts that might lead to such a conclusion.  Here, the
> Trustee has plausibly asserted that the Matrix Defendants acted negligently, grossly
> negligent, or willfully in breaching duties beyond the duties explicitly set out under
> the Services Agreement. Such allegations include, but are not limited to, the Matrix
> Defendants' duty of care in failing to implement reasonable policies and procedures
> to safeguard assets in the Matrix's Defendants' control.[195] The Trustee asserts that
> the Matrix Defendants knew or should have known based on numerous red flags,
> such as depletion of accounts by more than 90% in a just a few months, that the
> disbursements being requested were improper.[196] Further, the Trustee has alleged
> damages that go beyond "benefit of the bargain" or "any anticipated benefit" of the
> Services Agreement.[197] Damages that would be included in the "benefit of the
> bargain" and arise solely as a breach of contract would be lost profits, fees paid to
> the Matrix Defendants, or costs associated with finding a replacement for the
> Matrix Defendants, to name a few examples. But a siege of judgments resulting in
> the destruction of the Debtor's business due to the alleged misconduct of the Matrix
> Defendants cannot be considered a loss of an anticipated benefit of the Services
> Agreement.
>      As pleaded by the Trustee in the SAC, the allegations of tort claims can
> exist despite the existence of the Services Agreement and contractual duties
> between the two parties under Texas law.

---

[195] Second Amended Complaint ¶ 51-77.

[196] *Id.* ¶ 76.

[197] *See DeLanney*, 809 S.W.2d at 495; *See also Chapman*, 445 S.W.3d at 718-19.

The bankruptcy court has now determined, in the context of this MSJ, that Texas law applies to the Matrix Defendants' tort claims. Thus, the court's finding in the Order on Rule 12(b) Motion that, under Texas's "economic loss" rule, the Trustee's tort claims asserted in Count 3, 6, and 7 would not be barred as a matter of law, is affirmed here at the summary judgment stage. That would leave open only the Trustee's simple negligence claim in Count 2 with respect to whether the Matrix Defendants have shown, based on the undisputed summary judgment evidence, that they are entitled to a summary judgment on the basis that the "economic loss" rule bars the Trustee's negligence claim under Texas law, but, as noted above, by admission of the Trustee, Count 2 is being dismissed and therefore not a viable separate cause of action. Thus, the bankruptcy court determines that none of the Trustee's remaining tort claims are barred by the "economic loss" doctrine, and, as it did with respect to the Matrix Defendants' *in pari delicto* defense, recommends entry of summary judgment in favor of the Trustee on this issue, even though the Trustee has not filed a cross-motion for summary judgment.

5. **Remaining Bases for Summary Judgment relating to Count 6 (Knowing Participation in Breach of Fiduciary Duty/Aiding and Abetting) and Count 7 (Breach of Fiduciary Duty of an Agent)**

   *a. Is Count 6 a Cause of Action Recognized under Texas Law?*

The Matrix Defendants have moved for summary judgment as to the Trustee's knowing participation in breach of fiduciary duty/aiding and abetting breach of fiduciary duty claim asserted in Count 6 of the Live Complaint, on the basis that Texas does not recognize such a cause of action. The Matrix Defendants correctly point out that the Texas Supreme Court has yet to decide whether aiding and abetting is a recognized cause of action under Texas law,[198] but they fail to mention

---

[198] MSJ 30. The Matrix Defendants cite *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017) and acknowledge that *First United* is the same case this court cited in denying the Matrix Defendants' Rule 12(b) Motion for the very reason that the Texas Supreme Court had not decided the issue of whether Texas recognizes an independent cause of action for aiding and abetting.

that, as the court pointed out in its Order on Rule 12(b) Motion, the Texas Supreme Court in *First United* assumed for purposes of its opinion that an aiding and abetting claim existed under Texas law because the issue had not been briefed.  The Matrix Defendants argue that "[t]his lawsuit should not be the first to recognize this new cause of action and, for that reason, summary judgment should be granted."  The Trustee points out that the district court in this district has stated, while citing to the Fifth Circuit, that Texas ***does*** recognize a cause of action for knowing participation in breach of fiduciary duty:[199]

> Although the Supreme Court of Texas has not explicitly recognized a cause of action for aiding and abetting, it does recognize a cause of action for knowing participation in a breach of a fiduciary duty. "[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."

The Fifth Circuit has also cited to the Texas Supreme Court case of *Kinzbach* in recognizing a cause of action under Texas law for "***knowingly aiding or participating*** in a breach of fiduciary duty," suggesting that aiding and abetting breach of fiduciary duty is not necessarily a separate cause of action from knowing participation in a breach of fiduciary duty at least where, as here, the plaintiff is alleging ***as*** its aiding and abetting claim ***that*** the Matrix Defendants knowingly participated in the Richies' breach of fiduciary duty.[200]  The Trustee has not pleaded his aiding and abetting claim as a separate cause of action from his knowing participation in breach of fiduciary duty claim but has asserted them as one cause of action.[201]  And, the Matrix Defendants

---

[199] *Taylor v. Rothstein Kass & Co., PLLC*, Civ. Act. No. 3:19-cv-1594-D, 2020 WL 554583 *6 n.4 (N.D. Tex. Feb. 4, 2020) (quoting *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)) and citing *Milligan v. Salamone*, 2019 WL 4003093, at *1 (W.D. Tex. Aug. 23, 2019) (collecting cases that explain that "Texas appellate courts have routinely recognized the existence of a cause of action for knowing participation in the breach of fiduciary duty.").  The court notes that the first part of the quote from *Kinzbach* actually states, "It is settled as the law of this State . . ." before continuing on to recognize that a cause of action for knowing breach of fiduciary duty exists under Texas law.

[200] *In re Ala. & Dunlavy, Ltd.*, 983 F.3d 766, 778 (5th Cir. 2020) (citing *Kinzbach*, 160 S.W.2d at 514).

[201] Count 6 of the Live Complaint asserts a single cause of action titled, "State Law Participation in Breach of Fiduciary Duty and Aiding and Abetting the Richies [sic] Breach of Fiduciary Duty."

have not cited to, nor has this court's own research unearthed, a Texas Supreme Court case that has explicitly stated that a cause of action for aiding and abetting ***does not*** exist under Texas law. Thus, the court does not find support in Texas Supreme Court or Fifth Circuit caselaw for the proposition that, as a matter of law, Texas does not recognize a claim for aiding and abetting, and, therefore, the Matrix Defendants are not entitled to summary judgment as to Count 6 on this issue.

With respect to Count 7 of the Live Complaint, the Trustee's claim for breach of fiduciary duty as an agent, the Matrix Defendants argue that they are entitled to summary judgment because the Trustee has failed to point to any summary judgment evidence that the Matrix Defendants acted as an agent of Vantage. Under Texas law, an agency relationship imposes certain fiduciary duties on the parties.[202]  But, even in an agency relationship such as employer-employee, courts take all aspects of the relationship into consideration when determining the nature of fiduciary duties flowing between the parties.[203]  Further, "factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal."[204]  The Matrix Defendants argue that "both the [Vantage] SA and CAA establish that [the Matrix Defendants] did not act as an agent of Vantage but, at most, Matrix Trust acted as an agent for the retirement plans for which it provided custodial services [under the CAA]."[205]  They point to three provisions in the Vantage SA that would conclusively preclude a finding that either of the Matrix Defendants was acting as an agent for Vantage when they were performing their obligations to Vantage under that agreement:

---

[202] *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex. 2002).
[203] *Id.* at 200.
[204] *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex.2007).
[205] MSJ 31.

- Vantage SA, § 13 – "Nor shall any party represent in any manner that they are an agent or representative of the other parties except as specifically set forth herein.";
- Vantage SA, § 14(A)(5) – "[Vantage] and MSCS are not affiliated with each other in any way. Nor is [Vantage] affiliated in any manner with [MTC]. Neither will represent nor imply in any way that either party has any relationship with the other party except as described in this Agreement."; and,
- Vantage SA, § 14(B)(1) – "[Vantage] will retain absolute and complete responsibility for the supervision of all of its representatives, employees or other agents."

And, the Vantage SA limits, on its face, the Matrix Defendants' duty to investigate and their liability for certain actions.

However, the relationship between the Matrix Defendants and Vantage certainly included a level of trust that the Matrix Defendants would safeguard employee benefit assets that were being serviced, so much so that the bankruptcy court, in making favorable inferences for the Trustee in analyzing his complaint and the Vantage SA in connection with considering the Matrix Defendants' Rule 12(b) Motion, determined that the Trustee had presented a plausible claim that the Matrix Defendants could be deemed to be Vantage's agent and owe fiduciary duties that covered transfers made by the Matrix Defendants that they knew or should have known were illegal and not in the best interest of Vantage or the plan participants, as alleged by the Trustee.[206] The Trustee points to disputed facts that defeat the Matrix Defendants' summary judgment such as the Matrix Defendants' knowledge that they were handling people's hard-earned retirement funds that were not legally allowed to be sent to anybody but the plan participants (which they did not do), and, thus, they knowingly participated in illegal movement of funds and breached their fiduciary duty to Vantage in doing so.  In viewing the facts in the summary judgment evidence

---

[206] Second Amended Complaint ¶¶ 115 – 16.

and in drawing all justifiable inferences in favor of the Trustee, as the court must,[207] the court determines that there remain genuine issues of material fact regarding this issue that require a trial. Thus, the court recommends to the district court that it conclude that the Matrix Defendants are not entitled to summary judgment on the issue of whether the Matrix Defendants owed and breached a fiduciary duty to Vantage as an agent of Vantage.

> b.  *Are the Trustee's Tort Claims Precluded by the Limitations of Liability Provisions of the Vantage SA?*

The court has already addressed the Matrix Defendants' argument that the Trustee does not have standing to pursue damages against them (determining that the Trustee does have constitutional standing to assert his claims for damages),[208] but the Matrix Defendants also argue that they are entitled to summary judgment as to all of the Trustee's claims on the ground that any claim for damages is precluded by the limitation of liability provisions of the Vantage SA and the CAA.[209]  The court has already concluded that the Trustee's breach of contract claim in Count 1 is barred by New York's *in pari delicto* doctrine and that the simple negligence claim in Count 2 will be dismissed based on the admissions of the Trustee.  Thus, the court will only address whether the limitations of liability clause entitles the Matrix Defendants to summary judgment as to Counts 3, 6, and 7 in which the Trustee asserts gross negligence or intentional torts.

The Matrix Defendants fail to acknowledge that, under the terms of the Vantage SA, liability is only limited if they "acted in good faith" and even then, the provision explicitly does not preclude claims based on gross negligence or willful misconduct.[210]  The Matrix Defendants, for the sake of their motion, assume that they acted in good faith at all times; however, the summary

---

[207] *See Scott v. Harris*, 550 U.S. at 380; *Hacienda Recs.*, 718 F. App'x at 234.

[208] *See supra* pp. 24-29.

[209] MSJ 36 (citing Vantage SA §§ 15-16; CAA § 10 as "prohibiting recovery of 'any indirect, incidental, special, consequential or punitive damages.'").

[210] Vantage SA § 16, MSJ Appx. 055.

judgment evidence raises a genuine issue of material fact.  For example, the Trustee has pointed
to summary judgment evidence suggesting that:  (a) the Matrix Defendants failed to implement
reasonable safeguards in their technology which would have potentially prevented the theft of
millions of dollars by the Richies, (b) the Matrix Defendants distributed funds into Vantage's
operating account, which they knew did not belong to the purported beneficiary and thus would
have been illegal distributions, and (c) MTC did not report the transactions to the plan victims or
to the IRS on IRS Forms 1099-R or otherwise send account statements reflecting the illegal
transactions to the plan victims.  One federal district court in Colorado has already entered a final
judgment, confirming an arbitration award in which the arbitration panel found, after six days of
evidentiary hearings, that these same actions by MTC were at least grossly negligent under the
CAA at issue and thus liable to the plaintiff plans.[211]  Disputes here about what and when MTC
knew or should have known about the illegal and fraudulent distributions initiated by Wendy
Richie's instructions certainly go to the issues of whether MTC acted in good faith under the
Vantage SA, and, even if it did, whether its actions were grossly negligent or willful misconduct
under Count 3, or constituted knowing participation in the breach of fiduciary duties by the
Richies, under Count 6, or breach of their own fiduciary duties as agents of Vantage, under Count
7.  Thus, the court recommends to the district court that it determine that the Matrix Defendants
are not entitled to summary judgment that the limitation of liability provisions of the Vantage SA
preclude the Trustee's recovery of damages pursuant to Counts 3, 6, and 7 of the Live Complaint.

---

[211] *See supra* notes 71-72 and accompanying text.

### V. Summary and Conclusion

In summary, for the reasons set forth above, the court concludes that the Trustee has Article III standing to bring the claims asserted in the Live Complaint and, thus, the district court has subject matter jurisdiction over the Live Complaint.

The court further concludes that the Trustee's negligence cause of action asserted in Count 2 should be dismissed since the Trustee acknowledged at oral argument on the MSJ that Count 2 does not state a separate cause of action from the Count 3 "gross negligence and willful misconduct claim," and that he must prove willful misconduct or gross negligence on the part of the Matrix Defendants to prevail on a theory of negligence. Accordingly, the court does not reach the substantive merits of the MSJ as to Count 2.

Addressing the substantive merits of the MSJ, the court has determined that New York law should apply to the Trustee's breach of contract claim in Count 1 and that Texas law should apply to the Trustee's tort claims asserted in Counts 2-3 and 6-7 of the Live Complaint.

Addressing the *in pari delicto* defense, the court has determined that the Fifth Circuit would follow its eight sister circuits and hold that such defense can technically be asserted against a bankruptcy trustee, as § 541 of the Bankruptcy Code imbues property of the estate (including claims and causes of actions) with state law attributes that they had prepetition, and there is nothing in federal common law that would override state law. Accordingly, applying New York *in pari delicto* law to the Count 1 breach of contract claim, the court has determined that the Matrix Defendants are entitled to summary judgment that the Trustee's breach of contract claim under Count 1 is barred by New York's *in pari delicto* doctrine. Therefore, the court does not reach the substantive merits of the MSJ as to Count 1. Additionally, applying Texas *in pari delicto* law to the remaining tort claims of the Live Complaint, the court has determined, based on the undisputed

facts, that the Matrix Defendants are not entitled to summary judgment on their affirmative defense of *in pari delicto* and, in fact, the Trustee is entitled to summary judgment that the *in pari delicto* defense does not apply to bar these claims under Texas state law.  Under the Texas Supreme Court *Lewis* case, a court must answer the "question whether the policy against assisting a wrongdoer outweighs the policy against permitting unjust enrichment of one party at the expense of the other." In this Adversary Proceeding, the bankruptcy court can easily conclude, based on the summary judgment evidence, that barring the Trustee's tort claims against the Matrix Defendants based on their *in pari delicto* defense would ***not*** outweigh the overall policy of not inflicting additional harm on the innocent creditors of the Vantage bankruptcy estate.  Thus, there is no disputed fact issue here that would need to be determined at trial, as part of a *Lewis* policy analysis.

Additionally, the court determines, based on the undisputed facts, that the Matrix Defendants are not entitled to summary judgment on their affirmative defense of the "economic loss" rule as to the remaining tort claims asserted in Counts 3, 6, and 7 because the court has determined that the Trustee, instead, is entitled to judgment as a matter of law that the "economic loss" rule would not bar, under Texas law, the Trustee's claims asserted in Count 3 (gross negligence or willful misconduct), Count 6 (knowing participation/aiding or abetting breach of fiduciary duty), or Count 7 (breach of fiduciary duty as agent).

The court further determines that the Trustee has pointed to genuine disputes of material facts in the summary judgment record that would defeat summary judgment in favor of the Matrix Defendants as to Counts 3, 6, and 7.

## VI. Recommendation to the District Court

Based on the foregoing reasons, the court recommends to the District Court that it:

(1) **GRANT** the Motion to Exclude Evidence as to Trustee's Exhibit E, so as to exclude it from the summary judgment record, but **DENY** the Motion to Exclude Evidence as to Trustee's Exhibits G and I, such that they should be included in the summary judgment record;

(2) as to **Count 1, GRANT** summary judgment in favor of the Matrix Defendants on their affirmative defense that Count 1 of the Live Complaint (breach of contract) is barred under New York's *in pari delicto* doctrine;

(3) as to **Count 2**, **GRANT** summary judgment that such claim should be dismissed, based on the Trustee's acknowledgement that Count 2 does not assert a separate and independent cause of action from the gross negligent and willful misconduct claim asserted in Count 3 of the Live Complaint; and,

(4) as to **Counts 3, 6, and 7**, **DENY** the Matrix Defendants' summary judgment and **GRANT** partial summary judgment in favor of the non-movant Trustee that Counts 3, 6, and 7 are ***not*** barred, as a matter of law, by the doctrine of *in pari delicto* or the "economic loss" rule.

The Bankruptcy Court recommends that Counts 3, 6, and 7 should promptly be set for a jury trial.

**# # # # END OF REPORT & RECOMMENDATION # # # #**